IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JOHN ROBERT SMITH, SHIRLEY HALL
and GENE WALKER                                                                              PLAINTIFFS

V.                                                       CIVIL ACTION NO. 3:01-CV-855WS

ERIC CLARK, Secretary of State of Mississippi;
MIKE MOORE, Attorney General for the State
of Mississippi; RONNIE MUSGROVE, Governor
of Mississippi; MISSISSIPPI REPUBLICAN
EXECUTIVE COMMITTEE; and MISSISSIPPI
DEMOCRATIC EXECUTIVE COMMITTEE                                                DEFENDANTS

V.

BEATRICE BRANCH; RIMS BARBER;
L. C. DORSEY; DAVID RULE; JAMES
WOODARD; JOSEPH P. HUDSON; and
ROBERT NORVEL                                                                                INTERVENORS

---

**SUBMISSION OF MISSISSIPPI REPUBLICAN PARTY
REGARDING AMENDMENT OF JUDGMENT**

---

Because the Mississippi Legislature has not adopted a new plan for congressional redistricting since the receipt of 2010 census data, and because its Joint Committee on Congressional Redistricting has not met its statutory deadline for proposing such a plan, defendants in this case are still bound by the plan imposed by this Court's final judgment of February 26, 2002.  The Republican Party has asked this Court to modify its final judgment in light of the 2010 census.  The Republican Party submits certain considerations which it believes should guide this Court in devising an amended judgment.

# ARGUMENT

## I.  THIS COURT SHOULD ADHERE TO THE PRINCIPLES ANNOUNCED AFTER THE PREVIOUS TRIAL.

After a two-day trial and receipt of submissions from all parties, this Court announced its congressional redistricting plan on February 4, 2002.  *Smith v. Clark*, 189 F.Supp.2d 512 (S.D. Miss. 2002).  On February 19, it issued an opinion explaining in more detail the considerations supporting its plan. *Smith v. Clark*, 189 F.Supp.2d 529 (S.D. Miss. 2002).  No party to this case has so far raised any objections to following those principles in devising a new plan.  In a separate action, *Buck v. Barbour*, No. 3:11-cv-00717 HTW-LRA, plaintiffs have proposed a plan attached as Exhibit D to their complaint, which they describe as "a least change plan from the court ordered plan adopted by this Court on February 4, 2002."  Complaint ¶48.  They claim that the plan adheres to principles embodied in the existing plan.  Complaint ¶49.

With one exception, all of the principles applied by this Court ten years ago should apply with equal force to the plan to be imposed by the amended judgment.

First, the four districts must contain substantially equal population. *Smith*, 189 F.Supp.2d at 538-39.  As Exhibit A to the Republican Party's motion reveals, District 2 is underpopulated by 73,561.  District 1 is overpopulated by 46,271, District 3 by 15,100, and District 4 12,191.  This Court's "task in drafting the map [is] to place" 741,824 persons in three districts and 741,825 in the other.  See *id*., at 539.  However, the Court should not split precincts in an attempt to achieve perfect equality, because it "would cause administrative problems for election officials and confusion and frustration for voters." *Id*., at 539 n.5.

Second, this Court must consider the Voting Rights Act of 1965, 42 U.S.C. §1973 *et seq.*  This Court complied with §2 of the Act, 42 U.S.C. §1973, by "creat[ing] a majority-minority

District 2." *Id.*, at 540.  To comply with §5 of the Act, 42 U.S.C. §1973c this Court must "insure that our plan does not result in significant retrogression in the position of minorities with respect to their opportunity to elect their representative of choice." *Id.*  Exhibit A shows that the black voting age population in District 2 is 63.3 %, up from 59.2 % ten years ago. *Id.*  Ten years ago, this Court found that a diminution in the black voting age population of 1.8 % did "not constitute retrogression." *Id.*  A similar small decline this year in the process of equalizing population would be acceptable.

Third, the four districts must be compact and contiguous.  Ten years ago this Court found compactness difficult to achieve, in light of the statutory concern "to prevent retrogression in District 2," *id.*, at 541, a concern which continues today.  This Court also found compactness to be "a barrier to including as much as possible of the former districts 3 and 4 in the new District 3." *Id.*  The Republican Party suggests that considerations of the boundaries of former Districts 3 and 4 should no longer be a concern.

Fourth, this Court's plan respected county and municipal boundaries.  The only municipality split by the plan was the City of Jackson. As this Court explained:

> … Mayor Johnson testified in Chancery Court that he preferred that the City be represented by two congresspersons.  In addition, as we have earlier noted with respect to why Hinds County was split, it was also necessary to split the City of Jackson to prevent retrogression in District 2.

*Id.*, at 543.

Fifth, the existing plan considered historical and regional interests.  This Court explained that, to avoid retrogression, it was necessary to draw District 2 "in the Delta and along the Mississippi River." *Id.*  The Court continued:

> Once we had drawn that district, the compactness principle argued that the remainder of the State be divided into a northern district, a central district and a

>southern district – at least to the extent possible and practicable. Based on the distribution of the population within the State, it became further apparent that it would be necessary to include both southwest Mississippi (located in former district 4) and east central Mississippi (located in former district 3) in the same district.

*Id.*

Sixth, the Court distributed military bases and major universities among the four districts. *Id.*, at 544. The *Buck* plaintiffs endorsed the maintenance of that separation, Complaint ¶49, as does the Republican Party.

Seventh, this Court "found persuasive the testimony at trial regarding the undesirability of placing several high-growth areas in the same district, because of the competition for federal funding for infrastructure." *Id.* No party so far has suggested that the 2010 census data reveals different high-growth areas from those considered ten years ago.

Eighth, this Court faced the problem of combining the former Districts 3 and 4 when Mississippi lost a district after the 2000 census. The Court noted that "[t]he new District 3 contains all or part of fourteen counties from each of the former districts 3 and 4, respectively," as well as the residences of the incumbent Members of Congress from those two districts. *Id.*, at 545. Because neither of those former incumbents remains a Member of Congress, no obvious reason appears for attempting to keep as much as possible of each of the former two districts in current District 3.

Ninth, this Court's plan sought "to assure that no incumbent would be required to move in order to run in the district in which he resides." *Id.*

Finally, this Court "took into consideration the existing roads and highways in the State, and how that would affect the ability of a candidate, and ultimately the elected representative, to travel throughout his or her district." *Id.*. Obviously, because District 2 must increase in

geographical area in order to increase in population, candidates in that district will necessarily find their travel distances increased.

Accordingly, except for the concern to combine significant portions of former Districts 3 and 4, the same factors which this Court considered ten years ago should be considered in the plan to be imposed by the amended judgment.

## II.   THE *BUCK* PLAN DEVIATES FROM THIS COURT'S PRINCIPLES IN CERTAIN RESPECTS.

The only plan presently on file with this Court is the one attached as Exhibit D to the complaint in the *Buck* case.

The plan appears to satisfy the constitutional and statutory requirements previously identified by this Court. The total deviation from absolute equality is only 563 persons. However, District 2 remains 353 persons under the ideal size, even though it has been shrinking in population for many years; given the likelihood of future population declines, District 2 ideally should begin with a somewhat larger population. The chart attached at the end of Exhibit D to the *Buck* complaint shows a black voting age population in District 2 of 61.5 %. Because the Court's new plan must account for population shifts, "examining the benchmark plan with the census numbers in effect at the time [of adoption] comports with the one-person, one-vote principle of *Reynolds v. Sims*, 377 U.S. 533 (1964), and its progeny." *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). The *Buck* plan exceeds the 59.2 % benchmark established ten years ago. *Smith*, 189 F.Supp.2d at 540.

The first significant problem with the *Buck* plan appears in some of the divided counties. Although Exhibit D does not contain a list of precincts, the map makes it appear that some Madison County precincts presently in District 2 would be assigned to District 3. Because

District 2 must gain territory in order to gain population, there is no immediately obvious reason why any precincts presently in District 2 should be assigned to any other district. It is especially odd that the *Buck* plan would exclude high-growth areas from an already underpopulated district. The *Buck* complaint offers no explanation.

A more detailed map of the City of Jackson appears to show that precincts 8, 9, 17, 36, 37. 44, 45, and 79 are being moved from District 3 to District 2. Certainly, some new areas must be added to District 2, but the *Buck* complaint assigns no reason supporting the acquisition of these particular precincts.

A review of the history of the division of the City of Jackson may be in order. Before the 1984 election, the United States District Court for the Northern District of Mississippi entered an order imposing a plan which divided Hinds County for the first time. *Jordan v. Winter*, 604 F.Supp. 807 (N.D. Miss.), *aff'd*, 469 U.S. 1002 (1984). However, the Court did not divide the City of Jackson; the entire City remained in District 4. 604 F.Supp. at 815. The City of Jackson was divided for the first time in 1991 by an act of the Legislature, still codified at Miss. Code Ann. §23-15-1037 (Rev. 2007). Although that statute moved much of the City into the Second District, all of the precincts which would be moved by the *Buck* plan remained in the Fourth District. When this Court devised the current plan ten years ago, it assigned those precincts to the new Third District. *Smith*, 189 F.Supp.2d at 520-21.[1]

The voting age population at all of those precincts was overwhelmingly white ten years ago, *id.*, and most of the area remains predominantly white today. The relevant 2010 census data follows:

---

[1] For the Court's convenience, attached hereto as Exhibits 1 through 4 are maps of the plans from 1982, 1984, 1991 and 2002.

| Precinct | VAP | WHITE VAP | WHITE VAP % |
|---|---|---|---|
| Hinds 8 | 1,181 | 996 | 84.3 % |
| Hinds 9 | 1,696 | 1,562 | 92.1 % |
| Hinds 17 | 662 | 610 | 92.1 % |
| Hinds 36 | 1,269 | 530 | 41.8 % |
| Hinds 37 | 1,253 | 612 | 48.8 % |
| Hinds 44 | 2,907 | 1,158 | 39.8 % |
| Hinds 45 | 2,060 | 1,817 | 88.2 % |
| Hinds 79 | 2,572 | 629 | 24.5 % |

In light of this Court's statutory concern of avoiding retrogression, it is impossible to imagine why these overwhelmingly white precincts should be moved into the Second District. It simply makes it more complicated to find additional black population in other areas.

The *Buck* plan finds additional population by pushing eastward into Madison, Leake, Grenada, and Panola Counties. The plan has the virtue of unifying Leake County, but it divides Grenada County for the first time. The *Buck* complaint does not explain how these eastern counties share historical or regional interests with the area "in the Delta and along the Mississippi River," which this Court recognized as the proper focus of the Second District. *Smith*, 189 F.Supp.2d at 543.

By contrast, the late Senator Henry Kirksey, accepted by all parties as an expert, explained at trial why all counties along the Mississippi River from Tennessee to Louisiana share historical and regional interests. He said that "the Mississippi River is known worldwide," and "the population from Tunica all the way to Louisiana, Wilkinson County, is black majority." Tr.29. He continued:

> [T]his district is one that incorporates a population that is pretty much the same from Tunica all the way down to Wilkinson County. And my view was that if you could really cause the state leadership to focus on that fact, something can be done, because it needs to be done.

Tr.29. In addition to these common cultural characteristics, Senator Kirksey relied on historical

7

factors:

> [T]here have been districts drawn years ago, one called the Shoe String District, that included every county on the river from all the way from Tennessee to Louisiana. So that was the Shoe String District. So that is an historically common area for congressional districts.

Tr. 30.

As this Court recognized ten years ago, travel problems raise a concern as districts increase in size. It is a long way from Tunica to Wilkinson County, but it is also a long way from Tunica to the Neshoba County border. The *Buck* complaint does not suggest any historical or regional interests which would support expanding the Second District eastward instead of southward.

Indeed, the evolution of the Second District over the last thirty years displays a southward trend. When the Court reconstituted the Second District in 1982, it extended from Tunica County through Warren County. *Jordan v. Winter*, 541 F.Supp. 1135 (N.D. Miss. 1982), vacated, 461 U.S. 921 (1983). On remand, the Court extended the district southward through Claiborne and Jefferson Counties. *Jordan*, 604 F.Supp. at 818-20.[2] The Legislature concurred in that extension in its 1991 statute, and this Court maintained that length ten years ago.

By pushing District 2 all the way to the Neshoba County line, the *Buck* plan recreates the eastward bulge of the 1982 plan that the Supreme Court of the United States vacated in 1983. The Court responded in 1984 by reducing that eastward bulge and pushing District 2 southward down the River, and the Supreme Court affirmed. Almost thirty years later, the Buck complaint offers no good reason for pushing District 2 away from its base along the Mississippi River.

---

[2] In so doing, the Court noted that Mississippi had historically maintained a Delta district from 1882 to 1966. *Id.*, at 809 n.3. The Court explained that the extension joined "rural Delta and river counties with similarities of interest." *Id.*, at 815.

### III. THIS COURT SHOULD DEVISE ITS OWN PLAN BASED ON THE EXISTING RECORD.

The federal courts of this State have acquired a wealth of experience with Mississippi congressional redistricting over the decades. The historical evolution of those districts has been set out in a series of judicial opinions. Those opinions describe a host of historical, cultural, and economic factors which have guided those decisions. This Court itself heard two days of testimony on the subject ten years ago.

At no point in that process has any court ever adopted a plan submitted by any litigant. The Court for the Northern District devised its own plans for the 1982 and 1984 elections. This Court did the same thing ten years ago. It should do so now.

With that history in mind, the Republican Party will not file a proposed plan of its own, unless this Court should so request. The Party does have an opinion, however, on what seems to be the principal issue: whether District 2 should push eastward or southward.

The historical record, extending back to the Shoe String District described by Senator Kirksey, suggests that District 2 should push southward. The community of interest among the rural counties along the Mississippi River has been repeatedly recognized by court decisions extending back over three decades. Moreover the trial record suggests that the two southern counties belong together. Expert witness Joseph A. Lusteck responded to a question from the bench:

> JUDGE BRAMLETTE: Well, let's look at Adams. If you have a choice with Wilkinson, would it be better served putting it in the district with Adams or putting it in a district with Harrison, which has the highest, I believe – second highest population increase? District 5.
>
> THE WITNESS: I think geographically it would be better to be put with Adams, because the economic relationship with Harrison is a long drive. The jobs are available in Natchez.

Tr.82.

In light of all of the factors revealed by this record, the Republican Party believes the best solution is to extend District 2 from Tunica to the Louisiana line, as Mississippi has done before. This Court has previously demonstrated its ability to make the additional changes required by the Constitution and laws of the United States.

## CONCLUSION

The Mississippi Republican Party submits this discussion of the record for the Court's consideration.

Respectfully submitted, this the 12th day of December, 2011.

**MISSISSIPPI REPUBLICAN PARTY EXECUTIVE COMMITTEE**

By: s/Michael B. Wallace
MICHAEL B. WALLACE (MSB No. 6904)
C. STEVENS SEALE (MSB No. 6688)
JAMES D. FINDLEY (MSB No. 103649)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson MS  39201-0651
(601) 968-5534

**CERTIFICATE OF SERVICE**

  I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent such notification of such filing to the following:

 Hon. Jim Hood
 Attorney General
 Post Office Box 220
 Jackson, MS  39205-0246

 Robert Bruce McDuff
 Robert McDuff Law Office
 767 N. Congress Street
 Jackson, MS  39202-3009

 John Griffin Jones
 Jones Funderburg Sessums
 Post Office Box 13960
 Jackson, MS  39286-3960

 Herbert Lee, Jr.
 Lee & Assoc.
 2311 W. Capitol Street
 Jackson, MS  39209-4220

 Arthur F. Jernigan, Jr.
 Harris Jernigan & Geno
 Post Office Box 3380
 Ridgeland, MS  39158-3380

 Carroll Rhodes
 Law Offices of Carroll Rhodes
 Post Office Box 588
 Hazlehurst, MS  39083-0588

 Stephen L. Thomas
 Bradley Arant Boult Cummings LLP
 Post Office Box 1789
 Jackson, MS  39215-1789

>Samuel L. Begley
>Begley Law Firm
>Post Office Box 287
>Jackson, MS  39205
>
>William Trey Jones, III
>Joseph Anthony Sclafani
>Matthew W. Allen
>Brunini, Grantham, Grower & Hewes, PLLC
>Post Office Drawer 119
>Jackson, MS  39205

This, the 12th day of December, 2011.

>s/Michael B. Wallace
>MICHAEL B. WALLACE