E-Filed Document        May 28 2021 15:48:13        2020-IA-01199-SCT        Pages: 18

IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

NO. 2020-IA-01199-SCT

IN RE INITIATIVE MEASURE NO. 65:

MAYOR MARY HAWKINS BUTLER, IN HER INDIVIDUAL

AND OFFICIAL CAPACITIES AND THE CITY OF MADISON;

THE CITY OF MADISON

              PETITIONERS

V.

MICHAEL WATSON, IN HIS OFFICIAL CAPACITY

AS SECRETARY OF STATE FOR THE

STATE OF MISSISSIPPI

              RESPONDENT

## MOTION FOR A REHEARING BY WOULD BE INTERVENORS
## MISSISSIPPI EARLY VOTING INITIATIVE 78 AND DAVID ALLEN

PURSUANT TO Rules 27(g), 32, and 40 of the Mississippi Rules of Appellate Procedure, Mississippi Early Voting Initiative 78 and Dr. David B. Allen, Sponsor of

**EXHIBIT 2**

Ballot Initiative 77, respectfully move to request a rehearing in this action. The Court's granting of a rehearing is warranted and urgently necessary in light of the impact on fundamental constitutional rights of Movants and of Mississippi voters by this Court's decision in this case. This decision not only struck down Initiative 65 and potentially voided Movants lawfully filed Initiatives, it has potentially succeeded in rendering void for the second time in one hundred (100) years the rights of the voters to propose ballot initiatives when their legislature and its leadership have failed or refused to act.

Mississippi Early Voting Initiative 78, hereinafter MEVI78, and Dr. David B. Allen, Sponsor of Ballot Initiative 77, or Movants, request this rehearing because the Respondent State of Mississippi has indicated it has no intention of requesting a rehearing and Movants believe there are urgent errors of law and fact in the record that led to this Court's decision. It is these substantial deficiencies that are being respectfully submitted by Movants in the instant motion for this Court's due consideration.

**ARGUMENT**

A constitution cannot be changed by a court ruling, nor may it be changed by any law. A constitution can only be changed by its own constitutionally mandated amendment process. In its May 14, 2021 ruling, this Court violated this basic foundational principle of constitutional law and voided a key section of the Constitution of the State of Mississippi.

It is said that history does not repeat itself, but that it rhymes. However, in the case of Mississippi and what happens when the will of the majority is opposed by the powerful few, one could make the argument that history does in fact repeat itself. When

Mississippi adopted Section 273 (3) and its citizen-sponsored ballot initiative process in 1992, that accomplishment had been no easy feat. In fact, when it did so, it had been a full seventy (70) years since the last similar initiative process had been struck down by this Court, then, as now, on an administrative technicality. In that case, this Court felt that in response to procedural rather than substantiv objections raised by petitioner, it could not act; the court then, as now did act, by striking down the alleged offending constitutional provision, thus depriving the voters of a fundamental right. Then, as now, this Court suggested the legislature needed to "fix" the process and that the matter was otherwise out of its hands.

Mississippians began demanding a citizen sponsored ballot initiative process in order to hold their leaders accountable as far back as 1912. This spirit on the part of the people has never faltered, but because achieving this right requires the consent of two parties, i.e., the voters and the legislature, it has not been an easy task. Then, as now, some in the legislative leadership over the years have been strongly opposed to the people having this power and been opposed to accountability, hiding behind the lack of a process. However, after great efforts on the part of certain legislators and voters, the Constitution was finally amended to provide the voters this right in 1916. On March 26, 1917 this Court upheld the process when a particular ballot initiative referendum was challenged. *State v. Brantley*, 113 Miss. 786 (Miss. 1917). The Assistant Attorney General Lamar F. Easterling, who defended the process, wrote the following day that the decision "settles the matter finally in this state."

Unfortunately, Attorney General Easterling spoke too soon. Five (5) years later, a citizen group backing an initiative to change the allegedly outrageous salary of

3

Mississippi's revenue agent (alleged to be $40,000 which would have been over half a million in today's dollars) turned in enough petition signatures to qualify the measure for the November 1922 ballot. The measure was challenged by the agent. This Court reversed its own 1917 judgment, using a technicality to find the entire provision unconstitutional, just as this Court has done in this case. *See State of Mississippi, ex rel. Michael C. Moore, Attorney General of the State of Mississippi; Raymond Vecchio, Oliver E. Diaz, Jr., and Others Similarly Situated v. Dick Molpus, Secretary of the State of Mississippi,* 578 So.2d 624 (Miss. 1991). Importantly, however, this Court also stated it supported the ballot initiative process and opined that "[t]he Constitution is the product of the people in their sovereign capacity. It was intended primarily to secure the rights of the people against the encroachments of the legislative branch of the government" *Power v. Robertson*, 130 Miss. 188, 93 So. 769 (Miss. 1922).

For reasons unbeknownst to us, the Mississippi legislature declined to remedy the technicality cited by this Court over the next seventy (70) years, in spite of this Court's holding, and Mississippians had no means to correct the process and restore their rights. It was only in 1992 when Section 273(3), the subject citizen sponsored initiative, was finally readopted following multiple efforts going back at least to the 1970s, including a failed attempt to revive the long dormant 1914 Initiative and Referendum Amendment by asking this Court to overrule *Power v. Roberson*. The request to revive the 1914 IR amendment was dismissed not on the merits, but on the grounds of being time-barred by this Court; this Court also suggested that case was wrongly decided, finding that "[w]eight considerations of finality and repose counsel restraint in the face of sixty-eight year old precedent, even if we be convinced it was wrongly decided. In most settings, the

4

mere fact that a prior ruling may have been wrong – even badly wrong – is not enough to move the judicial hand. *State ex rel, Moore v. Molpus*, 578 So.2d 633.

When the Section 273(3) initiative was approved in the 1992 election, it was approved by an astounding seventy percent (70%) of the popular vote, indicating continuing broad support for the provision. Now, sadly, history appears to be repeating itself: pursuant to a complaint filed by Petitioner, a small town mayor who is opposed to the substance of the initiative allegedly because she personally opposes medical marijuana, the subject of Ballot Initiative 65, this Court has invalidated a substantially similar process that it invalidated ninety-nine (99) years ago, and then, as now, is placing the blame and the onus for corrective action on the legislature. Movants believe the instant case was erroneously decided and also that it will be eventually found to have been so, if not now by this Court, then by some future court. Movants also fear this Court's suggested remedy of calling on the legislature may very well meet the same fate as that of the ballot initiative process struck down by this Court in 1922. In short, history has shown us that a few in the legislature are able to stop necessary changes without accountability and then avoid accountability to the citizens almost entirely. Indeed, in this case, it is a few members of the legislature in alliance with an aggrieved mayor who are using a technicality to convince this Court to wrongly rewrite the Mississippi Constitution without the consent of those who, according to the Constitution and the principles this country was founded upon, retain the ultimate authority to amend it: the voters.

The legislature and the voters are co-equal partners in this ballot initiative process; however, it is solely the voters who are being penalized by this decision. We,

generations of Mississippians, are being penalized for the weaknesses and deficiencies of the legislature as a whole, whether it be the legislature's alleged error in the drafting of Section 273(3); and/or its inaction due to what appears now in hindsight to be a naïve reliance on the opinions of other branches of government; and/or even a concerted effort by a few, who, in bad faith have prevented the so-called needed "fix" that has been proposed numerous times, all along intending to use it as a weapon only when the voters finally succeeded in passing an initiative of which certain leadership in the legislature did not approve. In any case, regardless of the legislature's motivations, the Court's instant decision to void the current ballot initiative process because the legislature failed to correct an alleged technical deficiency, only to see members of the legislature provide this very technical deficiency argument to this Court, is in direct conflict with the Court's statement in *Power* that the ballot initiative process "was intended primarily to secure the rights of the people against the encroachments of the legislative branch of the government." *Ibid*. Movants submit these listed points of law and fact that, in the opinion of the Movants, this Court has overlooked or misapprehended, and respectfully requests this Court grant a rehearing.

## ERRORS OF LAW

1. **The Court should defer to the Secretary of State as per this Court's own recent precedent.**

   In a relatively recent decision, this Court ruled that great deference must be shown by the Court to other branches of government due to its status as a separately elected

office. In that case, Attorney General Jim Hood asked the judicial branch of government to void several pardons granted by Governor Haley Barbour, alleging the applicants failed to publish notice as required by Section 124 of the Mississippi Constitution. Attorney General Hood was asking this court to interpret and apply another branch's application of a constitutional issue, just as in this case. This Court declined to do so then, holding that the separation of powers doctrine applied and that the Court had no authority to review the actions of the Governor with regard to the process of the pardons for compliance with Mississippi Constitution Section 124, stating:

> This case is about whether this Supreme Court has the right, authority, and power to declare itself superior to, and above, both the other two branches of government in all matters of constitutional compliance. While this Court clearly has the constitutional duty to interpret the content of laws passed by the Legislature and executive orders issued by the governor, we decline - as have so many other courts before us - to assume for ourselves the absolute power to police the other branches of government in fulfilling their constitutional duties to produce laws and executive orders, unless there is alleged a justiciable violation of a personal right.
>
> *In re: Charles Hooker, David Gatlin, Nathan Kern, Anthony McCray, Kirby Tate, Katherine Robertson, and Aaron* B, NO. 2012-IA-00166-SCT.

The Court acknowledged it had been asked by the attorney general to review a host of cases and issues for compliance with the constitution and then stated:

> [w]e need not discuss these issues because, even assuming the attorney general's views are correct, the controlling issue is not whether Section 124 requires applicants for pardons to publish notice - it clearly does. The controlling issue is whether the judicial branch of government has constitutional authority to void a facially-valid pardon issued by the coequal executive branch, where the only challenge is compliance with Section 124's publication requirement. *Ibid*.

As in the *Barbour* decision, the instant case does not raise a justiciable violation of a personal right. Under Section 270, the Secretary of State serves as the office that makes the determination as to whether the initiative signature gathering was sufficient to comply with the relevant constitutional and statutory law. Based on its review of the signatures, it was the decision by the Office of the Secretary of State to place Initiative 65 on the ballot to be presented to the people for a vote on November 3, 2020. Sufficiency of deferential review is the appropriate standard, not de novo. Due to its status as a separately elected office tasked with compliance with the Mississippi Constitution, this Court must defer to this other separately elected office and find that the sponsors of Ballot Initiative #65 complied with the Mississippi Constitution.

2.  **The Court is legislating from the bench absent any authority to do so**.

As noted by the dissenting Justices Maxwell and Chamberlin, the Mississippi Supreme Court majority has effectively ended the ballot initiative process in the foundational governing document of our state. Overruling a constitutional provision is not the province of this Court. This Court of course can and should interpret and apply the Constitution to the facts before it; however, here it is voiding an entire constitutional provision, right, and power owned by the people of the state of Mississippi. Indeed, much is made in the opinion of the requirement to strictly construe the language of Section 273(3) and of the Court's inability to interpret the provision to fit the current situation. Petitioner argued and this Court apparently agreed that literalism and a reading of the "plain meaning of the words and terms" is required in a reading of the constitution. Textualism mandates that a reading of the constitution binds the reader not only to the

text of the Constitution **but also to the intentions revealed by that language**. In finding the use of five (5) congressional districts at the time to be fatal to a time when there are four (4) congressional districts, this Court is legislating that the legislature and the people wanted the provision to be limited only to a magical period in time when there were five (5) congressional districts, no more, no less. There is no such intent evident in either the constitution nor in the application of basic common sense as applied to this situation. Had the legislature and the voters wished to sunset the provision it would have said so. By injecting this supposition into the analysis of the document in order to claim to be addressing the intent of the drafters, the Court has committed an additional grievous error.

The people of this state in their wisdom created the courts for the purpose of the court's pursuit of impartial application of the law and the constitution, justice and protection of their rights and interests from special interests who are opposed or who act in a manner contrary to the founding principles of this country, that is, government by the people, for the people, and of the people. It created the courts to apply the law and the constitution to the ever evolving and changing facts and realities of the day. It did not create the courts as a legislative body that would use changes in society to fabricate a reason to strike down fundamental provisions simply because the authors of the provision did not foresee some change. Indeed, If the U.S. Supreme Court were to so strictly construe the 1st Amendment's protections for free speech as Petitioner argues the Court must do in this case, then that court would never have applied those same freedom of speech protections to money, in the form of campaign finance donations, which it has done for a long time. The United States Supreme Court does not strike down provisions

of the United States Constitution: it invalidates legislation and executive actions that conflict with the constitution. Such is the limited role of this court as well. Section 273(3) clearly states "The people reserve unto themselves the power to propose and enact constitutional amendments by initiative." *See* Miss. Const. Art. 15, Section 273(3). In light of the 1922 decision by this Court striking down the prior ballot initiative, this reads like a clear warning by the drafters to the Court not to overstep its authority again. And yet, here we are again.

Interpreting a provision within the context of the entire document, and then applying that provision to the facts at hand is absolutely not "legislating from the bench" as claimed by Petitioner. However, voiding a constitutional provision clearly does constitute legislating from the bench.

If the Supreme Court can strike down sections of the constitution, what is to keep future Supreme Courts from striking down additional provisions that it deems imperfect? As discussed above, it has done so twice now; once in 1922, after upholding the same provision before, and now in this case, and both times to the severe detriment of the authors of the very constitution it seeks to uphold. And just as before, it has done so when individual members of the legislature or other elected officials complained because they did not like the specific results of the citizen sponsored initiative process. Elected officials, whether they be the Revenue agent in 1922 or Petitioner, who fears medical marijuana, or the legislature, who has known of the voters' desire and efforts to pass medical marijuana for many years through numerous attempted ballot initiatives, but refused or failed to act, have glibly tossed the rights of the people under the bus as so

much collateral damage all in the service of their own personal interests. The role of the Supreme Court must be one of great deference to the Constitution, flawed or not, and in the interests of all the citizens of the State of Mississippi, not just a few. This unfortunate decision has now allowed elected officials to rob the voters of a fundamental right owned by them, and for the second time it has done so not because a provision became unconstitutional due to later provisions adopted in that constitution but based on a technicality. All decisions must be read with the fullest intent to understand and apply the law to the facts, as opposed to a narrow intent to invalidate.

3. **The Court cannot make a law that is retroactive from the date of the court ruling thereby invalidating votes by electors that have already been certified in an election.**

This decision by the Court come overs six (6) months after the November 2020 elections ballots by the voters had already been certified by the Secretary of State, and citizens and corporations have already taken action in reliance on the State's certification. If the Court can invalidate certified votes by the electorate several months after an election and after certification, where will this end? Can this Court invalidate Initiative 27, or others? There must be finality in the electoral process and the voters must be able to rely upon the results. If the Court begins voiding votes months or even years after votes have been certified, we are potentially on troublesome path where history and legalities may be potentially rewritten to change the current circumstances in a manner to reflect the will of those currently, and temporarily, in authority. Over six (6) months after

an election is simply far too late to nullify the voters' decision on initiative 65 made in the November 3, 2020 election.

4. **The Court lacks the authority to strike down any provision of the Constitution, the founding document from whence it derives its sole authority and power.**

Just as the enactment of an amendment to our state constitution requires the will of both the legislature and the voters, so too does its potential erasure. The people and the legislature, in concert, set up this provision of the constitution. The judiciary is a creature of the constitution and as such creature, it is tasked with interpreting and applying the constitution. It cannot void the constitution. The judiciary, in its very important role interpreting the law in statutory and constitutional provisions, can and indeed should strike down legislation and administrative rule-making that is unconstitutional. However, as to the constitution, it can only interpret, and where it cannot determine the meaning or application because of competing arguments from different parties to the constitution, it must decline to issue a ruling for fear of causing harm to the constitution and the will of the voter. In short, it cannot both nullify or erase the authority and will of the voters and still be in compliance with the authority granted to it under the constitution.

## ERRORS OF FACT

1. **The intention of the 1992 legislature can only be understood by the actual language of the amendment and the legislative history surrounding the legislative amendment**.

The Court suggests the vague possibility of some possible legislative "intent" for this provision to sunset at some future, unknown date. This speculative, unknown

triggering date would supposedly, possibly, occur IF and when our Congressional District numbers changed. There is simply no evidence of such an intent by the legislature or, for that matter, by the people, the only other party who has the authority to revise, overrule, or void portions of the Constitution in concert with the legislature. In fact, history shows that Mississippians, by a wide margin, have fought for a citizen sponsored ballot initiative process since 1912 when the state had eight (8) seats in the U.S. Congress. This is evidence of an ongoing, indeed, perennial, widespread desire to hold our state representatives and leaders accountable through the ballot initiative process.

In the instant opinion, this Court stated that "[t]he only evidence of the intent of the drafters that passed the amendment process is the intent found in the text itself, and …..hat text clearly evidences an intent to cap the signatures at twenty percent of qualified electors of a single congressional district." This is wholly incorrect. Because the drafters were using the congressional districts in place at the time, the only intent one can surmise from this provision is the intent of the legislature and the voters that the ballot initiative demonstrate broad, geographic diversity in its support. Five (5) districts happened to be an easy selection to make because it was a defined, contiguous, geographic area that happens to be also one of the most well-known defined geographic areas beyond the county division, by the voters. But if geographical diversity in support is the intent, which is the most logical explanation, then Petitioner's argument clearly fails because requiring signatures from five (5) congressional districts shows greater geographic diversity in support than from four (4) congressional districts.

Moreover, had the legislature and the voters of 1992 wished to sunset the subject ballot initiative provision, it would have said so. Indeed, there is no certainty that the number of congressional districts would ever change in the history of this state. We could have retained five (5) seats forever and had the ballot initiative process into perpetuity. There is simply no rational basis for an argument that the authors of the amendment believed that somehow the number five (5) was a magical triggering number and any others, 3, 4, 6, 7, or even 8, the latter which it had during the time of the prior amendment were incompatible with a constitutional right.

Indeed, the Secretary of State can follow the will and the intent of the 1992 voters and legislature by choosing to either continue to use the five (5) congressional districts as set forth in the amendment; or alternatively, by using whatever the current redrawn lines would be, whether it was for (4) four new districts like today, or five (5) differently drawn ones, as suggested in the Court's opinion hypothetical. The purpose of the congressional districts for the US Congress is to ensure that the principle of one person, one vote is adhered to, so district lines may change. But in this matter of a ballot initiative, the purpose of using the congressional districts is only for showing broad enough support throughout the state. The one person, one vote principle, does not come into play until the extremely lengthy, onerous, and complicated ballot initiative process is completed.

2. **The Court and Petitioner incorrectly stated that not enough signatures were collected to support the Initiative based on a an allocation across four (4) instead of five (5) districts**.

Petitioner made the argument, accepted by this Court, that an insufficient number of votes from each of the current four (4) congressional districts were had simply because there were fewer required per district under the five (5) congressional district formula which was used. There was no attempt whatsoever to find evidence to establish whether this argument was true or false. Indeed, Petitioner claimed to attempt to do so would be too much trouble for the clerks. Not only is that statement false and shows the Petitioner has little understanding of how Circuit Clerks function, for an elected official to claim that protecting and guarding the rights of the voters is "too much trouble" is truly appalling.  It is our understanding that many County Clerks cease certifying/counting signatures in Congressional districts after the 20% threshold is reached. Many, many more signatures were collected than were necessary and the Court could have requested the Office of the Secretary of State to provide all of the filed petitions for an audit. However, this was an assumption made with no efforts to find evidence to establish whether it was true or false. Given that Initiative 65 received overwhelming support by the voters in the November 2020 election (74% approval), it is arguable that there was a sufficient number from each of the current four (4) districts had an effort been made to count them. There is simply no proof that the number of signatures required under a four (4) congressional district formula were not gathered. There is only this unproven accusation based on an erroneous assumption and perhaps ignorance of the process that the percentage was not sufficient.

3. **A misleading and faulty comparison was made by Petitioners between the passage of bills and amendments to the Constitution thus leading this Court to believe the processes were comparable and that the comparison had significance.**

Amending a state constitution is not a short-term event nor an easy, simple, nor frequent proposition; indeed, this is by design, precisely because of its import and significance. There are numerous restrictions and requirements in place that, by their very nature, serve to limit the number of Initiatives attempted and placed. Then even once passed, they are subject to approval by the voters. But several legislators opposed to the right of the citizens to hold them accountable glibly in their Amicus Brief cited bill after bill that had been passed by them over the years as though this were evidence of the legislature's intent not to enact the technical fix in the Constitution, and thereby, according to them, allow the measure to fail. There is simply no comparison between a bill that requires a simple majority and an amendment to the constitution.

It was also correctly noted that "[f]rom 2003 to 2015 at least six attempts were made by individual legislators to amend section 273 to reflect the new reality of four Congressional District[s]. None of them made it out of committee." Justice J. Chamberlain, p. 13, footnote 2 quoting *Butler vs Watson,* 2020-IA-01199-SCT. In fact, if there even were such an intent not to act, the evidence shows that intent was at least in part based on the legislature's reliance on the opinions by the Attorney General and the Secretary of State that there was no fix needed by the legislature rather than a desire to allow the provision to sunset.

## CONCLUSION

In truth, as discussed above, the Ballot Initiative requires an immense investment of time, money, and grueling work by Mississippi citizens. This is in part by design to ensure the voters and the initiators consider the gravity and import of the procedure; it is

also, in part due to the many very precise requirements placed upon the initiative sponsor, without corresponding requirements for cooperation placed upon other officials whose assistance is necessary, whether it be the local or state officials who do not care about the initiative at hand or even actively oppose it.

We do not know whether Petitioner sees the death of this Ballot Initiative Process as mere collateral damage of her zeal to stop the legalization of medical marijuana; nor do we know if she and her allies in this lawsuit are truly frightened by the democratic process and have used Initiative 65 to finally strike it down because the people have realized how they can use it to hold the legislature accountable, as foreseen and applauded by this Court. The process has been working as intended by the voters and the legislators who passed it in 1992; the process has been satisfying the purpose recognized by this court in 1922 and again in 1991. Democracy dies, not at all once, but cut by cut and blow by blow. This court must not now again be responsible for a serious blow to democracy and the death of this right granted to the people.

The people of the great state of Mississippi must not be deprived of a fundamental constitutional right through a legally and factually erroneous reading of the matter, and an unconstitutionally sound reading of the constitution. For the foregoing reasons, this request for a rehearing should be granted.

Respectfully submitted, this the 28th Day of May 2021.
MEVI 78

By: S/Aphrodite Kavyas McCarthy

        Aphrodite Kavyas McCarthy

        MSB #100353

        22332 Freddie Frank Road

        Long Beach, MS 39560

        Tel: 228-452-9943

        dita.mccarthy@gmail.com

Dr. David B. Allen, M.D.

        <u>S/Dr. David Allen</u>

        Dr. David B. Allen, M.D.

        13013 Highway 613

        Moss Point, MS 39562

        916-826-7489

        Cali215doc@gmail.com