IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JOHN ROBERT SMITH, ET AL.                           PLAINTIFFS

VERSUS                          CAUSE NO. 3:01-CV-00855-HTW-EGJ-DCB

ERIC CLARK, ET AL.                                  DEFENDANTS



STATUS HEARING

BEFORE

THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT
THE HONORABLE DAVID C. BRAMLETTE
SENIOR UNITED STATES DISTRICT JUDGE
AND THE HONORABLE E. GRADY JOLLY
UNITED STATES CIRCUIT JUDGE
FEBRUARY 2, 2022
JACKSON, MISSISSIPPI



REPORTED BY:  TAMIKA T. BARTEE, B.C.R., RPR, CCR #1782
_____

501 E. Court Street, Suite 2.500
Jackson, Mississippi  39201
Telephone:  (601)608-4188
E-mail:  Tamika_Bartee@mssd.uscourts.gov

**APPEARANCES:**

```
FOR THE PLAINTIFFS:              ARTHUR JERNIGAN, ESQUIRE

FOR THE KELVIN BUCK PLAINTIFFS:  CARROLL RHODES, ESQUIRE
                                 JOHN WALKER, ESQUIRE
                                 CARLOS TANNER, ESQUIRE

FOR THE MS REPUBLICAN PARTY
EXECUTIVE COMMITTEE:             MICHAEL WALLACE, ESQUIRE
                                 TATE LEWIS, EXECUTIVE DIRECTOR

FOR THE MS DEMOCRATIC PARTY
EXECUTIVE COMMITTEE:             SAMUEL L. BEGLEY, ESQUIRE
                                 JUDGE TYREE IRVING
                                 ANITRA EUBANKS, ESQUIRE

FOR THE MS SECRETARY OF STATE:   TREY JONES, ESQUIRE
                                 MATT ALLEN, ESQUIRE
                                 LEIGH JANOS, ESQUIRE
                                 KYLE KIRKPATRICK, ELECTIONS
                                 DIV.

FOR MS EARLY VOTING INITIATIVE 78: WILBUR O. COLOM, ESQUIRE
                                 APHRODITE McCARTHY, ESQUIRE
                                 DITA McCARTHY, ESQUIRE
                                 KELLY JACOBS, ESQUIRE

FOR THE MS GOVERNOR AND
MS ATTORNEY GENERAL:             JUSTIN MATHENY, ESQUIRE
                                 DOUG MIRACLE, ESQUIRE

FOR THE MS NAACP:                MATTHEW CAMPBELL
                                 JAMIL JOHNSON

FOR CONGRESSMAN BENNIE THOMPSON: FANNIE WARE
```

```
 1          JUDGE JOLLY:  The purpose of our meeting today is

 2   really quite -- is an informal meeting, and to try to find out the

 3   positions of the parties, where everybody is and what the issues

 4   are really before us.

 5          So I'm not going to really resolve any legal issues today,

 6   but we hope to become better informed and narrow the issues.  So

 7   with that understanding, let me have each of the parties identify

 8   themselves -- or each of the lawyers identify themselves and the

 9   party that they represent.  Starting with you, Mr. Jernigan.

10          MR. JERNIGAN:  May it please the Court.  I am

11   Arthur Jernigan, and I represent the original plaintiffs,

12   John Robert Smith and Gene Walker.  Unfortunately, Your Honor, we

13   lost Shirley Hall in the last twenty years since this case was

14   filed; she died last year.  So they do remain the original

15   plaintiffs.

16          JUDGE JOLLY:  This is an old case, isn't it?

17          Okay.  Next, please.

18          MR. RHODES:  May it please the Court.  Carroll Rhodes,

19   along with John Walker and Carlos Tanner, and we represent the

20   Kelvin Buck plaintiffs in the 2011 case.

21          JUDGE JOLLY:  In opposition to the --

22          MR. RHODES:  In opposition to the Republican Party's

23   motion.

24          JUDGE JOLLY:  All right, sir.  Anybody else want to --

25   Mr. Wallace?
```

```
1           MR. WALLACE:  Your Honor, I'm Mike Wallace, I represent

2    the Mississippi Republican Party.  They are the defendants in both

3    of these consolidated cases.

4           JUDGE JOLLY:  Anybody -- yes, indeed.

5           MR. MATHENY:  Your Honor, Justin Matheny with the Attorney

6    General's Office.  I'm here with Doug Miracle, and I represent

7    Governor Reeves and Attorney General Fitch in both cases.

8           JUDGE JOLLY:  All right.

9           MR. JONES:  May it please the Court.  I'm Trey Jones,

10   Your Honor, and this is my partner, Matt Allen, and we represent

11   the Secretary of State's Office.  And here with me is

12   Kyle Kirkpatrick from the Secretary of State's Office.

13          JUDGE JOLLY:  All right.

14          MR. BEGLEY:  May it please the Court, Sam Begley.  I

15   represent the Mississippi Democratic Party Executive Committee.

16   We are the defendants in both cases.

17          JUDGE JOLLY:  All right.  Anybody else will share an

18   appearance?

19          MS. McCARTHY:  May it please the Court.  Aphrodite

20   McCarthy and Wilbur Colom.  We here represent MEVI 78.  We're

21   proposed plaintiff intervenors in this case.

22          JUDGE JOLLY:  Okay.  You're not a party at this point, but

23   you are the --

24          MS. McCARTHY:  No, Your Honor.

25          JUDGE JOLLY:  -- intervenor.  You've moved to intervene in
```

1    the case.

2         JUDGE JOLLY:  Does anybody else wish to enter an

3    appearance at this time?

4         I'm going to read a little statement here from the

5    Southern District of Mississippi, and to clarify the fact -- the

6    reason we're having this hearing when so many hearings are

7    precluded from trial or from in-person arguments.

8         This is the statement:  As many of you are aware, the

9    Southern District of Mississippi is presently operating under

10   Special Order No. 17, promulgated by Chief Judge Dan Jordan for

11   the Southern District of Mississippi, and agreed to by all other

12   district court judges.

13        This order cancels in-court proceedings in various

14   courtrooms in the Southern District of Mississippi because of the

15   perils presented by COVID-19.  This order, however, contains an

16   exception for matters deemed to be extraordinary, and we deem this

17   redistricting matter, as an exception to Special Order No. 17.  We

18   have thus chosen to proceed with all safety precautions in place.

19        Now, we have the two basic parties here, as I understand

20   the proceeding at this point.  We have the Mississippi Republican

21   Party that has moved to vacate an injunction entered in 2011 or

22   '12 -- I forget when it was.  And then, we have the opposition to

23   the vacating of that injunction.

24        Now, what I would like to know is, is there anybody here

25   that does not align themselves with one or -- with either of those

1   parties?  Who does not align themselves with those -- and I'm

2   saying that in order to try to reduce the number of people that

3   we're going to hear from today.

4          I want to hear from the primary parties, that is, the

5   movant and the opposition to the motion, and then, if anybody

6   wants to add to that, we would be happy to hear you.  But if you

7   are aligned with either the movant or the opposition to the

8   movant, then there will be less inclination to hear from you.

9          So now -- so, Mr. Jernigan, who do you represent?

10         MR. JERNIGAN:  Your Honor, I represent John Robert Smith

11  and Gene Walker.  They were the original plaintiffs in the

12  original redistricting case filed in 2001 or '2, after the 2000

13  census.  Your Honor, we -- we initiated this, and asked for the

14  original three-judge court to enter a constitutional redistricting

15  plan or order elections at large.

16         This Court entered a constitutional redistricting plan,

17  which was appealed to the United States Supreme Court and

18  affirmed.  Because I'm a counsel of record for the original

19  plaintiffs, I'm here, Your Honor, but we ask for the same relief

20  from the Court now that we asked for then, and that's for this

21  Court to affirm a constitutional redistricting plan.  We submit,

22  Your Honor, that was done by the Mississippi Legislature a couple

23  or three weeks ago and signed into law by the governor and meets

24  all the constitutional requirements to be confirmed.

25         JUDGE JOLLY:  So you are fully aligned with the Republican

1    Party in this case, or the interests of the Republican Party?

2         MR. JERNIGAN:  We are essentially asking for the same

3    relief, Your Honor, yes.

4         JUDGE JOLLY:  All right.  Good.  So --

5         JUDGE BRAMLETTE:  Well, let me see.  What relief is that?

6    I mean, do you agree with what the legislature has done or not?

7         MR. JERNIGAN:  We do, Your Honor, and we submit that that

8    plan is constitutional and should be confirmed.

9         MR. BEGLEY:  Sam Begley representing the Mississippi

10   Democratic Party Executive Committee.  The party is aligned with

11   the plaintiffs, and the proponents to the motion.

12        JUDGE JOLLY:  All right.  Does anyone else care to make a

13   response to my question?  All right.  Then what we will do is hear

14   first from the movant, who is Mr. Wallace.

15        And I emphasize again, although we may get into some of

16   merits of your argument, the purpose here today, of course, is not

17   to decide any of the issues that have been raised in this

18   proceeding, but is to simply try to narrow the issues and narrow

19   the parties so that it can be more expeditiously and effectively

20   resolved.

21        So, Mr. Wallace, why don't we hear from you and --

22        MR. WALLACE:  Thank you, Your Honor.  May it please the

23   Court.  I'm Mike Wallace for the Republican Party defendants in

24   this case.  We thank the Court for assembling so speedily today.

25   It is always difficult to assemble a three-judge panel.  We know

1   that, especially in the emergency conditions that this Court is

2   facing right now.  That is why we filed our motion the instant the

3   governor signed the bill and it became law and there was something

4   for you to consider.  The good news is that ours is largely a

5   procedural motion about how we ought to proceed, and the good news

6   is that Mr. Rhodes and his clients largely agree with that.

7       We have said in our motion that this Court is the place to

8   determine whether Mississippi has adopted a constitutional

9   congressional redistricting plan.  That's the language you used in

10   the order that is still in effect.  We think this is the Court

11   where that ought to be established, and the Buck plaintiffs agree

12   with that.

13       The Buck plaintiffs say they want to file a motion to

14   enjoin the new statute, and we agree that they have a right to do

15   that, and that this is the place to do it.  So we're -- we're all

16   on the same page there.

17       He also says that they have the burden of proof, and once

18   again, we agree with them a hundred percent.  They do have the

19   burden of filing a motion and proving House Bill 384 to be

20   unconstitutional or illegal.

21       We think the issues you will need to address are the ones

22   that we laid out in our motion.  First, does H.B. 384 constitute a

23   constitutional redistricting plan, and a legal redistricting plan?

24   Does it satisfy all state and federal constitutional and statutory

25   requirements?  Mr. Rhodes says it doesn't, and he ought to have an

1    opportunity to say why.

2         And the other issue is whether it is unconstitutional for

3    being -- the existing plan is unconstitutional for being

4    malapportioned.  We think we all agree on that.

5    JUDGE JOLLY:  I'm going to ask you a question you probably

6    may or may not have thought of, and certainly not hold you to any

7    spontaneous answers that you may make.

8         But there is a motion before us to dissolve the

9    injunction.  And the grounds for the assertion of jurisdiction of

10   this panel is because we said that -- that until -- that we

11   maintain jurisdiction until the state of Mississippi came up with

12   a legitimate plan, in effect, creating our own jurisdiction over

13   the redistricting for 2020, for this next decade.

14        Now, you filed a motion to dissolve, and we are the ones

15   that created the jurisdiction of this panel.  Now, if we said we

16   grant the motion to dissolve without comment on the

17   constitutionality of the present redistricting plan drawn by the

18   legislature, would we be in error or can we do that, or should we

19   do that?

20   MR. WALLACE:  I have thought about that, Your Honor, and

21   to some extent, I think we've addressed that in our brief.  As I

22   recall the language of our motion, we've asked you to vacate the

23   injunction and to determine what injunction, if any, should

24   replace it.

25        So it's a -- it's a vacate or modify, is what we've

1   technically asked for.  You probably have the authority to say, we

2   think grounds for vacation are here and we want to vacate it and

3   not go any further.  That may be within your power.  I don't

4   believe it is best practices for a court of equity, and we've

5   cited some authority on that, including the *Jackson* case from the

6   Fifth Circuit that says a redistricting court generally ought to

7   consider all possible challenges to the redistricting and wrap it

8   up in one case.

9        I've cited the usual equitable principles which apply in

10   federal court, as well as in any other court of equity, which is

11   that equity does justice by a whole and not by halves.  You want

12   to tie up all the loose ends so there will be no further

13   litigation later on.

14        If you disregard those principles of equity, and we know

15   they are all very elastic, but if you were to dismiss this case,

16   you would not foreclose further litigation.

17        Mr. Rhodes has already told you that he has a client that

18   wants to file more litigation.  You could end this case, but you

19   could not end this dispute.  It would keep on going, and it would

20   go to some other judge who doesn't know as much about it as this

21   panel does.

22        Last night, I had the wonderful experience of sitting down

23   and rereading the trial from 20 years ago.  We -- Mr. Johnston got

24   it back from the archives yesterday.  A lot of what you learned

25   20 years ago is about old arguments that are dead.  But you also

1   learned about how the secretary of state runs an election, how the

2   local election commissioners run an election.  How much time they

3   need; how complicated it is.  You three judges are the experts on

4   all of the practical facets of running an election.

5        And if a new Court has to start over, learn all of that

6   and finish all of that by March 1st, they're going to have a very

7   difficult time.

8        So, Your Honor, I have anticipated your question.  I can't

9   sit here and tell you that you can't just bring the hammer down

10  today and tell us we're done, go home.  But, I think, under the

11  usual proceedings in equity, it would be prudent to finish what

12  you've started, and let's find out whether this statute is really

13  constitutional or whether it isn't.

14       JUDGE JOLLY:  Okay.  Let me ask Mr. Rhodes his position

15  with respect to that question.  If you'd just step down a minute.

16  Is this --

17       MR. WALLACE:  And the only thing we disagree on, he

18  wants -- he wants -- he wants -- he wants the -- he wants you to

19  extend the filing deadline to March 1.  That's where we'll have a

20  fight, but I will get out of his way for right now.

21       JUDGE JOLLY:  Okay.  Glad to see you, Mr. Rhodes.  Haven't

22  seen you in a long time.

23       MR. RHODES:  Thank you, Judge.  Glad to see you.  And it's

24  good to be here, too.  And I'd like to thank the three-judge court

25  for convening so quickly.

1          And, Judge Jolly, to answer your question:  The Republican

2     Party has asked this Court to vacate its prior injunction.  The

3     prior injunction that this Court entered in 2011 enjoined the use

4     of the plan that was in existence that had been drawn by the Court

5     before and put in place.  The Court drew or adopted a plan that

6     the parties agreed to, put that plan in place in 2011, for the

7     2012 congressional elections and all succeeding congressional

8     elections.

9          But now, because of the 2020 census, it shows that the

10    plan that the Court put in place in 2011, is now malapportioned.

11    And when the Court put that plan in place in 2011, the Court said

12    the injunction would stay in place until the state of Mississippi

13    produces a constitutional plan that has been precleared.

14    Preclearance no longer is required after the *Shelby County* case.

15    But this Court has to determine whether the state has met its

16    burden of producing a constitutional plan.  So the Court cannot

17    just vacate or dissolve the injunction without making that

18    determination.  And for making that determination --

19          JUDGE JOLLY:  Well, I mean, we could, we could just say,

20    you know, we're not going to reach that question now.  We created

21    the jurisdiction ourselves, and because we created it, we

22    dis-create it.  And --

23          MR. RHODES:  Yes, Judge, but you said, "until -- "

24          JUDGE JOLLY:  Sir?

25          MR. RHODES:  You said it will remain in place until they

1    produce a constitutional plan.  So if you vacate or dissolve, the

2    assumption here is that their plan is already constitutional, and

3    we would like to litigate that issue.

4         JUDGE JOLLY:  No, no, that -- I'm saying, we would

5    pretermit that question.  We would not even address -- we would

6    specifically not decide that question, but we would dissolve

7    the -- which in case would put you in the position of asking for

8    another three-judge court.

9         MR. RHODES:  Yes, Your Honor.  And we would have to try to

10   ask for another three-judge court in short order, and ask that the

11   plan that the State has adopted be enjoined because it is

12   unconstitutional.  So it's better if this Court -- and we ask the

13   Court not to vacate its injunction but to amend it.  And to amend

14   it by putting in place just an interim plan that -- the Court

15   fashioned a plan in 2002.  All the Court did make minor changes to

16   equalize population.  The Court did the same thing 2011.  And

17   we're asking the Court to do the same thing again, while this

18   issue of whether or not what the State did is constitutional is

19   litigated, and let the elections go forward on the schedule.

20        The only reason we said that the Court want to move the

21   qualification deadline back, is because the qualification deadline

22   is already opened, and voters and candidates do not know what the

23   districts really look like yet.  But you can keep the

24   qualification deadline just like it is, and just put in place an

25   interim plan to use while the parties sort out whether or not the

1    state plan is constitutional.

2        JUDGE BRAMLETTE:  Mr. Rhodes, in 2002, we did enter a

3    final judgment as you said.  At that time, the Mississippi

4    legislature had not acted.  We came along in 2011, and we amended

5    the prior judgment.  As you know, again, the Mississippi

6    legislature was silent.

7        But in 2022, the legislature has created a new four

8    district plan, which has been signed into law.  Now, we stated in

9    our 2011 opinion, this:  Primary responsibility for

10   reapportionment lies with the State of Mississippi.  If the State

11   of Mississippi can timely reapportion the districts in a

12   constitutionally and acceptable manner, the federal courts have no

13   duties to draw up the district lines.

14       So I'm concerned about our jurisdiction.  I mean, we're a

15   court.  We're not consultants or advisors.  Do we have

16   jurisdiction?  I guess my question is:  How long does this

17   injunction of 2002 last?

18       MR. RHODES:  Judge --

19       JUDGE BRAMLETTE:  How will its purpose be achieved?  Is it

20   equitable to apply it prospectively *ad infinitum*.  I mean,

21   clearly, Judge Jolly and I are running out of time.

22       MR. RHODES:  Judge, some of the plaintiffs' lawyers are

23   running out of time, too.  But Judge, what y'all said was that

24   that injunction stays in place until the State of Mississippi

25   produces a constitutionally-accepted plan.

1          Now, all we're asking for the Court to do, is to amend its

2     injunction and put a temporary plan in place that the

3     Court fashions, or one the NAACP offered.

4          In the plan that the NAACP offered, the NAACP followed the

5     Court's guidance from its 2002 opinion and 2011 opinion, to make

6     only minor changes to equalize population, maintain a black

7     majority district, keep districts compact, not have districts

8     unusually large, keeping universities and military bases, et

9     cetera.  We followed the Court's neutral criteria and the other

10    criteria that this Court did to make minor changes.

11         So the NAACP is asking to use their plan, and all the Buck

12    plaintiffs are saying, the Court could draw or fashion its own

13    plan, just make minor changes to the existing plan until that

14    issue of whether or not what the State did is constitutional.

15         And that's where the Buck plaintiffs are challenging what

16    the state did as unconstitutional.  And we're saying the Court

17    needs to resolve that issue prior to dissolving itself.

18         JUDGE WINGATE:  Mr. Rhodes, if we just tinker with the

19    plan, make some amendments to it, won't a potential, aspiring

20    office holder still be confused as to where they are running from?

21    What district would actually be the district which would envelop

22    their efforts?

23         MR. RHODES:  Judge, not as much as if this -- if the Court

24    just dissolved the injunction and let the state plan go into

25    place.  Because the state plan does more than tinker with the

1    existing districts.  So election officials will have less to do if

2    the Court just tinkers with the existing plan a little bit.

3          Voters would not be as confused if the Court just tinkers

4    a little bit.  And candidates would not be confused.  So what the

5    Court has done in the past, if the Court does again, will be

6    better for voters and election officials and candidates than what

7    the State does.

8          Because if the State -- if you just dissolve your

9    injunction, and the State put its plan in place, elected officials

10   in four counties in Southwest Mississippi will have to notify

11   people, and there are more split counties, split precincts in the

12   state plan than in the NAACP plan, which the NCAAP plan is asking

13   the Court not to just tinker with this a little bit, and not do

14   any major changes, you know, so the elections can proceed as

15   they're already scheduled.

16         JUDGE WINGATE:  Mr. Rhodes, one additional question:

17   Somewhere in your papers, you said that the legislative plan has

18   some racial problems.  Did you say that?

19         MR. RHODES:  Yes.

20         JUDGE WINGATE:  What are you talking about?

21         MR. RHODES:  Judge, the NAACP has engaged or engaging

22   political scientists to do analysis.  Although that plan put black

23   voters into the Second Congressional District, the question is:

24   How performing are those black voters?

25         JUDGE BRAMLETTE:  How what?

1        MR. RHODES:  Performing.  You know, as far as being able

2   to keep the ability of black voters in the Second District able to

3   elect a candidate of their choice.  And this is one of the

4   concerns that the Buck plaintiffs have.

5        JUDGE WINGATE:  Okay.  I don't quite understand that.

6   Could you put some more meat on that skeleton?

7        MR. RHODES:  Okay.  Yes, Your Honor.

8        JUDGE WINGATE:  Because you are talking about the Second

9   District, right?

10       MR. RHODES:  Second District.  But I'm talking about the

11   additional area from the state plan, Franklin County.

12       JUDGE WINGATE:  The additional area which is far south?

13       MR. RHODES:  Farther south.

14       JUDGE WINGATE:  All right.

15       MR. RHODES:  Bringing them in would further dilute or

16   limit the ability of black voters to elect, not just a current

17   congressman.  It's about being able to elect a candidate of

18   choice.

19       If President Biden, for instance, is re-elected and

20   decides to appoint Congressman Thompson as the Secretary of

21   Homeland Security or any other position, then that becomes --

22   Second District becomes an open seat.

23       The question becomes whether or not any other black

24   candidate would be able to raise funds and campaign that full

25   length of the state, and be able to get black voters to turn out

 1   like they would if you had the voters from central Mississippi,

 2   Hinds County area, or some other area in that district.

 3        New candidate would be able to campaign better, you know,

 4   just in a compact district.  The Second District that the State

 5   drew is not as compact, and there is some investigation going on

 6   as to whether or not legislators had an intent to harm the ability

 7   of black voters to elect.  That's why we're asking for an

 8   evidentiary hearing on that issue of intent.

 9        JUDGE WINGATE:  I want to follow up on that.  You know,

10   when you first started, you provided the factors that were

11   necessary for us to consider on redistricting: compactness,

12   et cetera, et cetera.  Right?

13        MR. RHODES:  Yes.

14        JUDGE WINGATE:  All right.  Now, among those factors,

15   where is the factor that will speak to your concern about someone

16   new coming in, some minority, some new person aspiring for that

17   position to run with a district that the person is not familiar

18   with as to constitute a racial bias?  I mean, how does racial bias

19   generate from that when that district is 60-plus percent

20   African-American?  And right now, I think, it's something like

21   62 percent.  And -- but under the state plan, it's still plus

22   60 percent African-American.

23        MR. RHODES:  Yes, Your Honor, and it depends on where that

24   African-American addition to the Second Congressional District is

25   coming from.  And although --

1          JUDGE WINGATE:  I didn't quite understand.

2          MR. RHODES:  -- although the criteria -- this Court, in

3     2011, recognized that Second Congressional Dist- -- Mississippi

4     needs one black congressional district.  The Court realized that

5     the State should comply with Section 2 of the Voting Rights Act,

6     that criteria.  Section 2 of the Voting Rights Act says that black

7     voters need to be afforded the opportunity to elect a candidate of

8     their choice.

9          Now, it doesn't say whether that candidate of choice was

10    an incumbent or somebody new.  And with all the litigation that

11    has gone on within the Fifth Circuit and the United States Supreme

12    Court over that issue of what constitutes vote dilution since the

13    1980s, have been -- the Courts have been more concerned with black

14    voters generally, whether it's a newcomer, incumbent, or whoever,

15    to be able to be elected, whether black voters can elect someone

16    that they choose.

17         And what we're saying is that it matters where those black

18    voters come from when you add them.  You can add folks who are not

19    as politically active, you can add people who are as politically

20    active, and it makes a difference as to whether or not the black

21    voters are able to elect a candidate of their choice.

22         JUDGE WINGATE:  Thank you.

23         JUDGE JOLLY:  Okay.  Mr. Rhodes, do you have anything

24    further to say?

25         MR. RHODES:  Your Honor, we are just asking the Court to

1   amend its injunction, tinker with it, and let elections proceed

2   while we litigate this issue with the same three-judge court.

3       JUDGE JOLLY:  So we understand, your position is that the

4   discrimination really comes from the size -- from the geographical

5   size of the district?  Is that --

6       MR. RHODES:  Not just geographical size, but where the

7   black voters are added to, to the Second Congressional -- where

8   they're coming from.

9       JUDGE BRAMLETTE:  How does that factor in though?  In

10  other words, Wilkinson County, when you add Wilkinson and Adams

11  and Jefferson -- you mentioned Franklin County a moment ago, that

12  offsets Franklin; Franklin's majority Caucasian.  But these other

13  counties are black.  Are you saying that black voters -- nobody

14  wants to come to Wilkinson County, I understand that.  That's

15  where I'm from.  Are you saying the black voters down there are

16  not as prepared to make the right decision, vis-a-vis, a black

17  candidate?  Is that what you're saying?

18      MR. RHODES:  Your Honor, in the 1980s, I, along with

19  Deborah McDonald and Willie Rose litigated that issue in front of

20  Judge Barbour in *Monroe v. City of Woodville*.  And Judge Barbour

21  said in that case -- and it was affirmed by the Fifth Circuit --

22  that black voters are not losing elections because of

23  statistically significant white/black voting.  Black voters are

24  losing elections because too many black voters are crossing over

25  and voting for the white candidates.

1          Although Wilkinson County is majority black, they have

2     majority white elected.  Now, that might be the candidates of

3     their choice, but, you know.

4          JUDGE BRAMLETTE:  It's not now, I can tell you that.  You

5     can walk through the courthouse down there; most of the officials

6     elected are African-American.

7          MR. RHODES:  And, Your Honor, there have been quite a few

8     losses where African-American officials in Wilkinson County over

9     the last 20, 30 years, have lost to white candidates.  And because

10    the black turnout is not as high, and that's another reason, you

11    know, in the Second Congressional District.

12         Franklin County is not going to have a -- and Amite County

13    is not going to have that high of a black voter turnout, and

14    that's why the concern is, where are the black voters you're

15    adding to the Second District, where are they coming from?

16         JUDGE JOLLY:  So, I mean, you're alleging racial

17    discrimination that would support the change in the district on

18    the basis of the enthusiasm -- the voter enthusiasm of the black

19    population?

20         MR. RHODES:  Judge, what we're saying is that the

21    districts were drawn with certain information in mind.  Where we

22    get the black voters from in drawing this district that the

23    legislature came up with, and which configuration would give a

24    white candidate a better chance to be elected in the Second

25    Congressional District.  That's one of the intentional

1    discrimination issues we need -- we want to have an evidentiary

2    hearing on it.

3           JUDGE JOLLY:  Is that the nub of your claim of

4    discrimination, is that it does not include more black

5    enthusiastic voters?  Is that --

6           MR. RHODES:  Well, Judge, and the additional claim is that

7    neutral redistricting criteria that was adopted by this Court,

8    when the legislature considered what criteria they're going to use

9    to draw a district this time around, the Joint Legislative

10   Congressional Redistricting and Legislative Reapportionment

11   Committee came up with criteria.  And No. 4 in their criteria was

12   to use the neutral criteria that this Court adopted in its 2011

13   order.

14          That neutral criteria included the size of the district,

15   not running the district all the way down the Mississippi River.

16   Compactness; compactness was the first neutral criteria that this

17   Court stated.  And the Court stated why compactness was important.

18          And we're saying that this Second Congressional District

19   has been compact, going all the way back to *Jordan v. Winter*.

20   After the *Jordan v. Winter* case was over in 1984, the legislature

21   in the 1990s, drew congressional districts; they kept the Second

22   Congressional District compact.

23          This time around, they did not.  The Court did after 2001

24   and 2011; the Court kept it compact.  And the additional criteria

25   was the size.  The Court talked about how geographically large

 1    these districts do not need to be.

 2         JUDGE JOLLY:  You're right about that.

 3         MR. RHODES:  So we're talking about they subordinated

 4    racially-neutral criteria to a consideration of race.  That's one

 5    of the issues we're talking about in intent of discrimination.

 6         JUDGE JOLLY:  The district runs from Memphis, Tennessee,

 7    all the way down to the Louisiana line.  It's a long, long

 8    district.  That much is certainly obvious.

 9         MR. RHODES:  Yes.  But the Court in the past has cut it

10    off at Jefferson County.

11         JUDGE JOLLY:  But is that racially discrim- -- are you

12    saying it is racially discriminatory because of its size?

13         MR. RHODES:  No, Judge.  We said that this Court

14    adopted --

15         JUDGE JOLLY:  Does that even figure into your argument,

16    that the Second Congressional District is physically larger,

17    making it much more difficult for whomever was the congressman or

18    the candidate from that area to campaign than it would in any

19    other district; is that your argument?

20         MR. RHODES:  For making it unnecessarily larger.  This

21    Court in 2001 and 2011 said compactness was an issue and refused,

22    refused to run the district all the way down to Wilkinson County,

23    that area.  Instead, the Court picked up population within

24    Hinds County.

25         The Court, in its opinion, also said, you need to put

1    growth areas in different congressional districts.  One of the

2    growth areas in this area of Hinds County, is the Jackson

3    Metropolitan area.  Northeast Jackson growing, Madison County

4    growing.  You can pick up population and put in the Second

5    Congressional District from there, and not subordinate this

6    neutral criteria that this Court adopted in 2011.  Compactness,

7    not having unusually large districts; those are criteria that this

8    Court adopted in 2011, and the legislature, this year -- well, in

9    2021, stated that they wanted to use the Court's neutral criteria

10   in drawing the congressional district.  And all we're saying is

11   that the Court -- is that the legislature did not use, but

12   subordinated that neutral criteria to their criteria of race of

13   drawing the district the way it did.  And that's why we want an

14   evidentiary hearing on that issue, from the same Court.

15          JUDGE JOLLY:  Thank you, Mr. Rhodes.  Oh, hold on just a

16   minute.

17          JUDGE WINGATE:  And if you had a hearing on this point,

18   how would you make your proof?

19          MR. RHODES:  Part of it would come from the floor debate

20   in the senate.

21          JUDGE WINGATE:  From where?

22          MR. RHODES:  The floor debate.  We have captured some

23   testimony from the floor debate as to race being intentional, and

24   we want to be able to engage in discovery, Your Honor.  We would

25   like to take depositions of committee members, staffers, as to

1   what instructions were given on the drawing of the lines, who had

2   input on the drawing of the lines.  Before we have that

3   evidentiary hearing, we would like to have some discovery of those

4   issues.

5       JUDGE BRAMLETTE:  What would happen to the qualifying date

6   of March 1st if we did that, obviously -- that date, March 1st, so

7   what is your response to my question?  What would we do about the

8   qualifying date?

9       MR. RHODES:  Judge, what we're -- leave the qualifying

10  date the same.  What we're asking the Court to do is to draw its

11  own interim plan or to adopt the NAACP plan as an interim plan.

12  Let people run.  The Court schedule an evidentiary hearing some

13  time later on this year, give us time to conduct some discovery.

14  If the state can prove, or if the -- let me say it another way.

15  If the plaintiffs, the Buck plaintiffs, fail to prove that the

16  State plan was drawn unconstitutionally for an intentional racial

17  purpose, then the Court could vacate its injunction, and put in

18  place a state plan.

19       On the other hand, if the Buck plaintiffs prove that the

20  State did use race as a predominant factor in drawing its plan,

21  then the Court could, again, keep its interim plan in place until

22  the State comes back with a constitutional plan that complies with

23  Section 2.

24       JUDGE WINGATE:  Mr. Rhodes, on the NAACP plan, there are

25  some sections that are in red of areas that have been added or

1    moved.

2         MR. RHODES:  Yes.

3         JUDGE WINGATE:  All right.  Where were they moved to?

4         MR. RHODES:  In the Second Congressional District.

5    Primarily, the shifts were between the Third Congressional

6    District and the Second Congressional District.  And between the

7    Third District and the Fourth District, there was a move.

8         And the reason this movement took place, Judge, the Second

9    Congressional District lost 65,000 people.  First, Third, and

10   Fourth gained.  So all of them have to, you know, move some

11   population around.

12        But in the NAACP plan, they only split, I think, four

13   counties -- three counties, excuse me, three counties, in order to

14   achieve zero percent population deviation.

15        You can move people from the Third District to the Second.

16   You can move them from the First District to the Second.  But the

17   way the Court has been drawing the plans in the past, the Court

18   has come into the Jackson metro area to pick up population to put

19   in the Second District when the Second District loses population.

20   And we ask the Court to put an interim plan in place doing that,

21   or use the NAACP plan.

22        JUDGE WINGATE:  And none of these plans violate the

23   protocols that are set up for a minority elected from a

24   majority/minority district?

25        MR. RHODES:  Well, the NAACP is maintaining that the state

1    plan does by where the black voters, or the black population was

2    moved into the Second District.

3            JUDGE WINGATE:  But the Second District would still have

4    greater than 60 percent?

5            MR. RHODES:  Yes.  Yeah.

6            JUDGE WINGATE:  And that was a big concern the last time

7    we did this?

8            MR. RHODES:  Yes, Judge, but since that time, the math and

9    science has become more sophisticated, and the Supreme Court has

10   also indicated, you don't need no target number.  You need enough

11   black voter in each population within a district to give black

12   voters an equal chance to elect a candidate of their choice.

13           In the past, we were covered by Section 5 of the Voting

14   Rights Act.  And Section 5 prohibited retrogression.  People

15   misunderstood retrogression to mean we can't reduce that number

16   below what it is.

17           But the Court -- the Supreme Court has said, no,

18   retrogression -- you can reduce the number, but you have to give

19   black voters the ability to elect.

20           Now, we maintain that given the racial black voting within

21   Mississippi, and within the Second Congressional District, it

22   would still need to be around that 60 percent.  But we just don't

23   want to say that -- that you got to have 60 percent.  You need

24   enough blacks in the Second Congressional District to give them a

25   chance to elect a candidate of their choice.

1          JUDGE WINGATE:  But your percentage in the Second District

2    that you submitted is still more than 60 percent?

3          MR. RHODES:  It's still more than 60 percent.

4          JUDGE WINGATE:  In fact, right now, it's what, 62 percent?

5          MR. RHODES:  It's 62 percent in the plan we submitted.

6    And that's because of Northeast Jackson.  We put all of

7    Hinds County into the Second Congressional District.  White

8    vote -- white population leaving Jackson, blacks moving

9    into Northeast Jackson.

10          Southern Madison County, white populations are leaving,

11    the black folks are moving in.  So what we did was added where

12    there was growth, and it just so happens that that growth happened

13    to be in black areas.

14          JUDGE WINGATE:  Last question:  Since Congressman

15    Bennie Thompson is the incumbent, is he in lockstep with your

16    argument?

17          MR. RHODES:  Yes, Your Honor, I believe some -- I believe

18    Ms. Fannie Ware from his office is here today, too.

19          JUDGE WINGATE:  So he's in lockstep with your argument

20    here about the Second District as constituted by the

21    Mississippi Legislature?

22          MR. RHODES:  In opposition.

23          JUDGE WINGATE:  That it's too sparse, too large --

24          MR. RHODES:  Yes.

25          JUDGE WINGATE:  -- even though the number of

1    African-Americans in that district would still comprise more than

2    60 percent?

3         MR. RHODES:  Yes.  And Judge, in Wilkinson County,

4    Mississippi, in *Monroe v. City of Woodville*, African-Americans

5    were over 50 percent of the town of Woodville, unable to elect

6    alderman.

7         JUDGE WINGATE:  Okay.  Now, why were they unable to elect

8    somebody?

9         MR. RHODES:  As Judge Barbour said, they didn't lose

10   because of white statistical black voting, but because too many

11   black folks were crossing over and voting for white candidates.

12        JUDGE BRAMLETTE:  Judge Barbour didn't know too much about

13   Wilkinson County.

14        JUDGE WINGATE:  You get in trouble on Wilkinson County.

15        JUDGE JOLLY:  Anything further?  Thank you, Mr. Rhodes.

16        MR. RHODES:  Thank you, Your Honor.

17        MR. WALLACE:  Your Honor, may I?

18        JUDGE JOLLY:  Yes, indeed.

19        MR. WALLACE:  May it please the Court.  I want to say

20   something about Judge Bramlette's question about jurisdiction, and

21   then I'll talk as much or as little as you like about Mr. Rhodes'

22   allegations, which I've just heard for the first time here this

23   afternoon, just as you have.

24        The Court has jurisdiction.  The retentive power of equity

25   is pretty strong, and so you have jurisdiction.  The question is

1    the extent to which you want to exercise it.  I'm reminded of what

2    this Court did in the legislative redistricting hearing ten years

3    ago.

4           The Court issued an order in 2011 that says you're going

5    to go ahead and use the old plan for the time being because we

6    don't have time to set up a new one, but this Court's going to

7    retain jurisdiction.  And when the Court adopts a plan next year,

8    come see us, and we won't have to repeat anything that's already

9    been done, and we're going to look at it.  And that's what the

10   Court did, and the Court denied further relief to the plaintiffs.

11   So you can keep jurisdiction until you are satisfied that

12   the problem has been completely addressed.

13          Judge Bramlette, it doesn't mean you have to keep it for

14   ever and ever world without end.  I'm -- I'm like any defendant;

15   my ultimate goal is to have this complaint dismissed.  But I think

16   to get there, you have to make the determination you've said you

17   need to make:  Has the legislature adopted a constitutional plan?

18   We think it has.

19          Once this Court makes that determination, it says so, it

20   allows the statutory plan to go into effect, and at that point,

21   this Court dismisses the case with a job well done and all the

22   loose ends tied up.

23          So we think you have jurisdiction to do that.  We think

24   you ought to do that.  And the fact that we've already been told

25   what the claims are going to be is all the more reason for us to

1   do it here.

2        If the Court does dismiss this case, then it takes weeks,

3   and I don't know how long to assemble a three-judge Court, get all

4   the parties, all these same parties -- we're all indispensable

5   parties; nobody's going to be missing.  We'll all be back in some

6   courtroom, and then I will have my opportunity to respond to what

7   Mr. Rhodes just said.  And we're getting pretty close to March 1st

8   by the time that happens.

9        You were also right, Judge Bramlette; it is not this

10  Court's business to grant any relief until it determines that the

11  legislature has done something wrong.  And there -- to this point,

12  there has been no cognizable allegation that there's anything

13  wrong with House Bill 384.  And without some such well-supported

14  allegation, then you can't go moving deadlines, you can't enjoin

15  House Bill 384; you need to let -- you need to let it go into

16  place.

17        Now, the only -- as I said, I'll say as much or as little

18  as you want about his allegations.  But his principal allegation

19  is that he has an expert who will tell you that the 60 percent

20  black majority in District 2 under House Bill 384 is not

21  performing.  And what "performing" means is that it doesn't

22  perform, or it may not perform the way Mr. Rhodes wants it to.

23  What does the statute say?  The statute says that black voters

24  have to have an equal opportunity to elect candidates of their

25  choice.

1        If he has an expert that is going to tell this Court that

2   a 60 percent black voting-age population majority anywhere in the

3   State of Mississippi lacks an equal opportunity to elect

4   candidates of the choice, I want to see that expert report.

5        As a matter of fact, I want to see it tomorrow.  I think

6   what this Court ought to do, is tell Mr. Rhodes to go home,

7   compose his motion, attach his expert report, and send it in here,

8   and then I will say as much as I would like to say about the

9   allegations we've heard today.

10       Judge, I don't know Wilkinson County; I'm from Biloxi.

11   And I don't know the Delta all that well, either.  But I do not

12   believe there is a distinction between the way black voters

13   perform in Wilkinson County and the way they perform in --

14       JUDGE JOLLY:  Let me ask you:  Has the inability to

15   perform or the performance question ever been recognized as a

16   basis for discrimination in redistricting cases?

17       MR. WALLACE:  I think what he's talking about is a term of

18   art that says, are they cohesive enough to elect candidates of

19   their choice?  We had that discussion last year with Judge Reeves

20   about a state senate district, which was black majority, and he

21   thought it wasn't a performing black majority.  And it was mooted

22   in the middle of en banc oral argument at the Fifth Circuit a few

23   months later.  So we don't know what the law really is on that.

24       But I don't know of any authority.  That's why I -- that's

25   why common sense tells me a 60 percent majority will get you

```
 1    there.  I'm -- I'm old enough to remember Frank Parker.  I wish
 2    Mr. McDuff were here to tell me if I'm getting him wrong.  Mr.
 3    Parker's theory was, you needed a 65 percent black voting -- black
 4    majority because there were all kinds of impediments to blacks
 5    registering and getting to the polls and getting organized and all
 6    of those things.  And you needed a 60 percent voting age
 7    population majority for all of those reasons.
 8         We are here 40 years later, and now for the first time,
 9    I'm hearing a lawyer tell me that a 60 percent voting age
10    population isn't good enough.  And I really want to see that
11    expert report, because I don't believe that's the law.
12         So I know this -- this Court has every reason to want this
13    cup to pass from you.  I understand that.  But you are further
14    down the road than anybody.  Mr. Rhodes is obviously ready to file
15    his motion and his expert report, and we've got a deadline on
16    March 1st.  And I came here to ask you to set a schedule, and
17    that's what I'm going to do, and I'm going to sit down.
18         Please -- please tell Mr. Rhodes to get busy, and we'll
19    see what he has to say.  And if you think his argument is legally
20    sufficient, then we'll see if it's factually sufficient.  But
21    right now, we're just talking.  Let's get it scheduled and do some
22    law.
23         JUDGE BRAMLETTE:  What about the qualifying deadline?
24    Does this Court have authority to delay that?
25         MR. WALLACE:  There's a -- there's a -- there's a lot of
```

1  law on that, Your Honor, and it all says that qualifying deadlines

2  are an important part of the statutory scheme, and they ought to

3  be respected by the Court.

4       As you've said, what the legislature has done can be

5  disrupted if there's good reason to believe the legislature has

6  messed something up.  We went through that in great detail in the

7  2011 legislative litigation ten years ago about when you can and

8  when you should change dates.  And the Court, ten years ago,

9  decided not to do it.

10       Until I see any reason to believe that the legislature has

11  done something wrong, I would tell you it would be error to extend

12  dates.  Let's -- let's see their case, and if you think it's

13  serious, then we can see what kind of authority this Court ought

14  to exercise.  Thank you, Your Honor.

15       JUDGE JOLLY:  Thank you, Mr. Wallace.  We have a motion to

16  intervene, and after we have heard the motion to intervene, if the

17  parties have something to say about it, I think we will then set a

18  briefing date, but I'll have to talk to my colleagues here about

19  that.  So let's hear on the motion to intervene.

20       Mr. Colom?

21       MR. COLOM:  Yes, Your Honor, thank you for the

22  opportunity.  I think our issue is probably not ripe for being

23  addressed now.  We are concerned about the previous order and

24  language in it that we believe affected the right to initiative in

25  Mississippi and that we did not believe that this Court intended

1    for that injunction creating the four districts going back to

2    2001, I believe, to have any impact.

3          However, the Court's decision on Mr. Rhodes' motion on

4    behalf of the NAACP will determine whether or not we want to make

5    suggestions to the Court to what should be put in such an

6    injunction.

7          JUDGE JOLLY:  But why should you have any right to make

8    those suggestions in this proceeding.  This is a reapportionment

9    proceeding, and I'm not fully understanding why you think your

10   claim is relevant, to put it in legal terms.  What kind of

11   standing do you have to raise that issue in this proceeding?

12         MR. COLOM:  Our clients are individuals, citizens of

13   Mississippi, seeking to advance an initiative for early voting.

14   The Supreme Court has made -- or Mississippi, has made the -- the

15   initiative process in Mississippi inoperable because it says that

16   there are only four districts in Mississippi, and the Constitution

17   of Mississippi contemplates getting initiative voters to sign

18   petitions from five districts.

19         It's our belief, they rely upon this Court's opinion,

20   given the injunction, for the -- for the conclusion that the five

21   districts, for initiative purposes, no longer exist, when we

22   believe that this Court's jurisdiction did not extend to the

23   Mississippi Constitution's provision on initiatives and that this

24   Court did not intend to have its injunction of effect in any way

25   the initiative process in Mississippi.

1          So I will request to this Court, and I will -- we actually

2   made our motion to amend the order that this Court had entered --

3   that's before the new redistricting plan -- to state that it in no

4   way extended to in anyway to affect the Mississippi constitutional

5   provision on initiatives.

6          JUDGE JOLLY:  We can't issue a decision and then decide

7   anticipatory issues that might come up with respect to it.

8          MR. COLOM:  Well, the Court maintained jurisdiction to

9   modify or amend its own order.  And we -- we wanted to modify

10  language within the injunction to make it clear that it only

11  affected the election of people to Congress and had no application

12  to anything else operative within the state of Mississippi laws

13  and Constitution.

14         JUDGE JOLLY:  It's like it's self-evident.

15         MR. COLOM:  Well, the Mississippi Supreme Court did not

16  see it that way.  I just wanted this Court to make that clear,

17  because they took the districts the Court had created for

18  elections to Congress, right, as -- as applicable to the

19  Mississippi Constitution for purposes of the initiative process.

20         JUDGE BRAMLETTE:  Counselor, aren't you asking this Court,

21  though, to perform a legislative function by amending Section 273

22  of the State Constitution of 1890, in order to provide for a voter

23  initiative process.  Isn't that what you're doing?

24         MR. COLOM:  No, sir.  I'm asking this Court to make it

25  clear that it is not taking on the legislative purposes -- for

1  legislative purposes, doing that.  That the jurisdiction of this

2  Court, when it entered its orders, were only to enforce the

3  federal Constitution and the Voting Rights Act, and that this --

4  the order entered by this Court did not reach anything else.  It's

5  solely within the Mississippi Constitutional and statutes that has

6  no application to those federal Constitution and statutory

7  provisions.  It is to clarify the limits of the order by this

8  Court.  It is to clarify and modify it to make it clear.

9       JUDGE JOLLY:  Who said we did do that?

10      MR. COLOM:  The Mississippi Supreme Court said you did.

11      JUDGE JOLLY:  How did they say that?

12      MR. COLOM:  In an opinion striking down the initiative

13  proc- -- well, not strike it down.  They said it was inoperative

14  because of the order entered by this Court creating four

15  districts, when the Constitution says the initiative petitions had

16  to be collected from the five congressional districts, the old one

17  that existed in 1990.

18      JUDGE WINGATE:  But even if we were to put in the order

19  that you asked, to say that we didn't intend for our ruling to

20  have that far reaching effect, you'd still be left, realistically,

21  with four districts.

22      MR. COLOM:  Yeah, for purposes of electing the people to

23  Congress, that's -- that's understandable, because that's a

24  federal constitutional requirement.

25      JUDGE WINGATE:  But the statute that concerns you says

1    that you have to have petitions from five districts.

2         MR. COLOM:  Not the statute, the constitutional provision

3    says that.

4         JUDGE WINGATE:  Right.

5         MR. COLOM:  And the Mississippi Supreme Court says this --

6    but it also says, Your Honors, that Mississippi Legislature cannot

7    adopt any legislation that undermines the constitutional right to

8    initiative.

9         So what the Court -- the way the opinion of this Court has

10   been applied, it has done something that the legislature, in fact,

11   could not do.  That the legislature could not adopt a

12   redistricting plan, in our view, that undermined the

13   constitutional right to initiative.

14        And so, we're saying, we wanted this Court to simply

15   clarify in any order or opinion, that it is not extending its

16   jurisdiction to any other provision within the Mississippi

17   Constitution or statutes.

18        JUDGE WINGATE:  Would that be binding on the Mississippi

19   Supreme Court?

20        MR. COLOM:  No, sir.  It would be binding on this Court,

21   and -- to clarify its order.  Again, we would approach the

22   Mississippi Supreme Court to address that issue once this Court

23   makes it clear that its order, its writ, does not go to the

24   initiative process in the Mississippi Constitution.

25        JUDGE JOLLY:  I mean, don't you -- I mean, does it occur

1   to you, though, that if everybody has a question about what our

2   redistricting order does, they file to us for an interpretation of

3   our redistricting order.  I mean, it seems to me that that clearly

4   is not the avenue for the relief you are seeking.  I mean, you can

5   do it by an independent action, but to try to intervene in this

6   particular case, it's just not germane to what we are doing.

7        MR. COLOM:  Well -- well, our argument, Your Honor, is

8   since you maintained jurisdiction and only this Court can

9   interpret its orders, and we've asked to modify it.  The other

10  side said --

11       JUDGE JOLLY:  Any Court can interpret our order.  Any

12  competent court can interpret our order.

13       MR. COLOM:  Well, in some questions -- in this case,

14  Your Honor, we believe the Court was silent.

15       JUDGE JOLLY:  You need an independent action to ask some

16  legitimate court to say that the redistricting order doesn't mean

17  this; let somebody else interpret our order.  I mean, we can't

18  answer every question that every citizen would ask about our

19  order.  I mean, it doesn't make sense, does it?

20       MR. COLOM:  Well, I was -- I think it's appropriate

21  because it goes beyond -- I was arguing that this Court's order

22  had limited scope, and had limited jurisdiction, and to simply

23  clarify that within the order.

24       Now, it says clearly in the order that you can amend or

25  modify or clarify -- I think the word is used "clarify," if I

 1    remember correctly -- and we wanted you to clarify that order.

 2         JUDGE JOLLY:  Thank you very much.

 3         MR. COLOM:  Thank you.

 4         JUDGE JOLLY:  Thank you, sir.  And now --

 5         JUDGE WINGATE:  We just heard from those who wish to be

 6    intervenors.  What about the ones who are already intervenors?

 7         MR. WALLACE:  May it please the Court.  Those are

 8    Mr. McDuff's clients, the Branch intervenors, and he sent an

 9    e-mail to your chambers this morning that says they -- they do not

10    care to participate.

11         JUDGE WINGATE:  And he's speaking for all of his clients?

12         MR. WALLACE:  That's the way I interpreted the e-mail, but

13    I'd encourage the Court to go back and look at it.

14         JUDGE JOLLY:  I understand what you're saying now.  All

15    right.  If anybody else has anything they would like to say, any

16    other represented party here would have any kind of remarks,

17    Mr. Begley from the Democratic point of view, or any of the other

18    parties that would like to make further comment?  Okay.  I believe

19    not.

20         So we will -- now, Mr. Wallace, you have filed the motion

21    to dissolve the injunction.  And ordinarily, I mean, that puts the

22    burden on you to initially file the motion -- I mean, file the

23    first brief.

24         But on the other hand, if, to the extent that it is at

25    issue in this case, Mr. Rhodes has the burden to show that the

1    legislature acted in a discriminatory way --

2          So, I believe the way to handle this, and I'll be glad to

3    hear from either of you on this, but is for you to file the first

4    brief supporting your motion to dissolve the injunction.  And then

5    Mr. Rhodes' response to that, and, of course, you would have any

6    kind of opportunity you wanted to to respond to his initial

7    response to your motion.  Have I got that sufficiently confused

8    for you?

9          JUDGE BRAMLETTE:  And also, Mr. Wallace, when you do that,

10   of course, you have to argue in your brief why it is and how it is

11   that this three-judge panel should move forward and make a

12   decision on the constitutionality of the legislative plan.

13         MR. WALLACE:  Thank you.  And may it please the Court.

14   Yes, we did file the motion.  We filed it in the name of vacating

15   the injunction and for other relief.  Our ultimate objective is to

16   vacate the injunction.  The other relief we asked for was a

17   schedule to permit the Court to decide to -- to -- to make the

18   decision on whether it's constitutional or not.  So we have filed

19   that brief, and they've filed an answer to it.

20         So I understand the Court's concern about jurisdiction.  I

21   think we've addressed that to some extent in our prior briefing,

22   but we will be happy to say more about it.  But ultimately --

23   ultimately, the Buck plaintiffs have agreed they have the burden

24   of proof.  I don't care whether we go first or they go first, but

25   it's hard for us to say any more than we've said now until we see

1     what their actual claim is.

2          JUDGE JOLLY:  That's exactly right.  And that's fine.  We

3     can't cut anybody off and say, You file a motion, you file a

4     response and that's it.

5          So, Mr. Rhodes, do you have anything that you would like

6     to contribute to this conversation?  And the conversation being

7     about whose burden it is to proceed first on the motion to

8     dissolve the injunction.

9          MR. RHODES:  Your Honor, since Mr. Wallace's client filed

10    a motion to vacate, then they should carry the burden on those two

11    issues they raised, to vacate, and whether or not the legislative

12    plan is constitutional.  Because they're saying, "vacate your

13    injunction altogether," and your injunction says, "You are

14    enjoined until the legislature propose a constitutional

15    redistricting plan."  So his motion to vacate, and say vacate all

16    of that order.  And so they -- I think they would have the burden

17    of showing that the legislature plan is constitutional and we

18    could respond.  And we could have the burden of proving it's not.

19         JUDGE JOLLY:  We'll just start it this way.  Mr. Wallace,

20    you filed the first brief on the motion to dissolve, and we'll

21    just take it from there.  Then, I think, at that point, when you

22    file a motion to dissolve, you are asserting that the present

23    motion -- that the present plan is satisfactory, which, of course,

24    is his burden to show that it is unconstitutional.

25         So, I mean, we do have it a bit confused here about who

1   has what burden, but I don't know if that ultimately has any

2   substantial effect on who -- who goes first and who goes second.

3        MR. WALLACE:  We will be happy to go first.  We'll tell

4   you why we think it's constitutional and legal.  And, I guess,

5   we'll be anticipating the argument that he has briefly stated

6   today, and we'll have more to say in rebuttal once we hear him and

7   see him flesh out his arguments in his brief.

8        JUDGE JOLLY:  Okay.  What --

9        MR. RHODES:  Your Honor, for us to meet our burden, that's

10  why, in our response, we asked for an evidentiary hearing.  We

11  want to take depositions, because the burden is on us to prove

12  intent of discrimination.  We want to gather evidence to produce

13  in the record.  We wanted to -- that's why we didn't want to short

14  circuit it.  We wanted to --

15       JUDGE JOLLY:  We'll have briefing first, and if the

16  substantial issues of dispute are raised in the briefing, then you

17  will have your opportunity to engage in such discovery procedures

18  that may be appropriate and available.

19       So we will go with the schedule that I indicated.

20  Mr. Wallace goes first; you respond to that.  Then if anybody

21  feels like they've been shortchanged, or that the procedure has

22  precluded them from making the arguments that they wanted to make,

23  we'll take it up at that time.

24       All right.  Now, let me ask you about the timing of these

25  briefs.  Any kind of suggestions about that?  I mean, we,

```
 1    obviously, need to act fast if we're going to keep the March date.
 2    So...
 3         MR. WALLACE:  Your Honor, this group of defendants are
 4    cooperating.  I think we have a pretty good idea of what our
 5    arguments are.  There are elected officials who need to be
 6    consulted, and I don't know how easy they will be to consult when
 7    the legislature is in town.
 8         I would say I can have a brief to you by this time next
 9    week, but I don't know whether that's going to provide sufficient
10    opportunity for the other defendants to look at that and have
11    input.  Attorney general --
12         JUDGE JOLLY:  Why don't we make it a week from Monday.
13    What date would that be?  The week from this coming Monday.  Is
14    that what you said?
15         MR. WALLACE:  I think that's February 14th, isn't it?
16         JUDGE JOLLY:  Well, not to interfere with anybody's
17    romantic plans.
18         MR. WALLACE:  I'm looking around at the other folks, and
19    they seem to think we can do it by the 14th.  I think we can do it
20    by the 14th.
21         JUDGE JOLLY:  Close of business on the 14th.
22         MR. WALLACE:  Yes, Your Honor.
23         JUDGE JOLLY:  All right.  And then, Mr. Rhodes, you would
24    respond in -- can you respond in seven days thereafter?
25         MR. RHODES:  Judge, we would like to be given about the
```

 1  same length of time.  So theirs was -- they have a little bit

 2  longer, I think about ten days for theirs.

 3          JUDGE JOLLY:  Ten days?

 4          MR. RHODES:  Yes.

 5          JUDGE JOLLY:  All right.  Then, ten days from the 14th --

 6  well, ten days, I guess, from the 15th.  It would be the close of

 7  business on the 14th, theirs would be filed.  You would have from

 8  that point forward, ten days to file your brief.

 9          MR. BEGLEY:  Your Honor, Sam Begley for the Democratic

10  Party.

11          JUDGE JOLLY:  Sure.  Sure.

12          MR. BEGLEY:  The parties would like the opportunity to

13  respond to the Republican Party at the same time that the Buck

14  plaintiffs do, by filing a brief.

15          JUDGE JOLLY:  You're a party to this case.  As of now,

16  you're not an intervenor or anything; you're a party.

17          MR. BEGLEY:  I just wanted to make sure you weren't

18  limiting to these parties right here.

19          JUDGE JOLLY:  No, I certainly am not.

20          MR. BEGLEY:  Okay.

21          JUDGE JOLLY:  Does anybody else want to file a brief who

22  is entitled to file a brief?

23          JUDGE WINGATE:  Does anybody contemplate moving the

24  qualifying date?

25          MR. WALLACE:  I expect we will oppose that.  I can't speak

```
1    for the elected officials, but I think they will oppose it.  I

2    think we will -- since -- since we still haven't seen what their

3    claim really is, we will have to have a rebuttal after the 24th --

4    after the 24th.  We can do it quickly, but we do have to have a

5    chance to rebut these arguments that we have not yet seen.

6           JUDGE JOLLY:  Mr. Rhodes, I would say that I am a bit

7    confused about the basis for -- of your position of the

8    discriminatory intent of the plan itself, and how this is

9    discriminatory in terms of black voting rights.

10          So you need to spell that out in this brief.  This is your

11   opportunity to do it, and to attach all affidavits, maps, or other

12   documents that are necessary to establish your position.

13          MR. RHODES:  Yes, Your Honor.

14          JUDGE JOLLY:  Thank you, Mr. Rhodes.

15          Yes, sir?

16          MR. MATHENY:  I have a question, Your Honor.  Justin

17   Matheny for the Attorney General and the Governor.

18          JUDGE JOLLY:  Right.

19          MR. MATHENY:  We would like the opportunity to either join

20   Mr. Wallace's brief or file our own on the same time schedule,

21   and, of course, we will not be duplicating anything that he does

22   or --

23          JUDGE JOLLY:  Well, you're certainly entitled to do so if

24   there is no duplication.

25          MR. MATHENY:  Yes, Your Honor.
```

1          JUDGE JOLLY:  But, we do not want duplication.

2          MR. MATHENY:  Crystal clear.

3          JUDGE JOLLY:  Don't need it.  Does anybody?  Does anybody

4     else have any matter they'd like to raise at this point?

5          MR. JERNIGAN:  No, Judge Bramlette, just we want

6     constitutional reenforcement.  I think we're going to file with

7     Mr. Wallace and ride that horse as long as we can, Your Honor.

8          JUDGE JOLLY:  Okay.

9          MR. JONES:  Your Honor?

10         JUDGE JOLLY:  Yes, Mr. Jones.

11         MR. JONES:  May it please the Court.  Do we have a small

12    window of time to file a reply, a rebuttal, following the 24th?

13         JUDGE JOLLY:  Well, I mean, at that time, I mean, there

14    would be reply brief -- you would be entitled to file a reply

15    brief.  We're not asking for simultaneous briefs.  So there would

16    be a reply; there would be a time for a reply that we have not

17    thought about or talked about today.  And I would say a reply

18    brief should be five days thereafter.  Would that be --

19         MR. WALLACE:  We will have a busy weekend, Your Honor, but

20    we'll do that.  The --

21         JUDGE JOLLY:  We'll make it convenient to you.

22         MR. WALLACE:  My brother rides in the Irish parade on the

23    26th, but if he files a brief on Thursday the 24th, we'll have a

24    rebuttal for you on the 28th.

25         JUDGE JOLLY:  Well, I wouldn't dare interfere with the

1    parade.  So you can extend that if you wish.

2        JUDGE WINGATE:  So Mr. Wallace, do you see the last brief

3    being filed on the 24th?

4        MR. WALLACE:  Their brief is to be filed on the 24th.  We

5    will get you our rebuttal by Monday the 28th.

6        JUDGE WINGATE:  It's the 28th.

7        MR. WALLACE:  Monday -- their brief is Thursday the 24th,

8    and we will get you the rebuttal by Monday, the 28th.

9        JUDGE WINGATE:  And the qualifying deadline is when?

10       MR. WALLACE:  It's the next day, Judge.

11       JUDGE WINGATE:  I know.  That's why I asked the question a

12   few moments ago:  Did anyone contemplate moving the qualifying

13   deadline?  If so, then I need -- I think we would like to see

14   whatever authority you have for moving it or not moving it, so

15   that we don't have to say, go out and research this matter on that

16   late date to see if we have that authority to do it.  So that we

17   can look at all of that at one time.

18       MR. WALLACE:  Your Honor, I can commit that in this brief

19   I'm going to file a week from Monday, I will cover the cases that

20   control and sort of rebutting an argument that hasn't been made

21   yet, but I will tell you what we think the law is on your

22   authority to move the deadline, and why we think you can't.  And

23   then I suppose you'll hear from him on that on the 24th.

24       JUDGE WINGATE:  All right.  As long as you place it in

25   issue.  Thank you.

1          JUDGE JOLLY:  Does anybody have anything else they wish to

2    raise before we adjourn this meeting, this proceeding?  Okay.  The

3    proceeding is adjourned.

4          (Adjourned.)

1                    COURT REPORTER'S CERTIFICATE

2

3          I, Tamika T. Bartee, Certified Court Reporter, in and for

4     the State of Mississippi, Official Court Reporter for the United

5     States District Court, Southern District of Mississippi, do hereby

6     certify that the above and foregoing pages contain a full, true,

7     and correct transcript of the proceedings had in the aforenamed

8     case at the time and place indicated, which proceedings were

9     recorded by me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11    comply with those prescribed by the Court and Judicial Conference

12    of the United States.

13         THIS the 7th day of February, 2022.

14

15

16                    _s/ Tamika T. Bartee_

17                    Tamika T. Bartee, BCR, RPR, CCR #1782
                      Official Court Reporter
18                    United States District Court
                      Tamika_Bartee@mssd.uscourts.gov
19

20

21

22

23

24

25