## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

**JOHN ROBERT SMITH, SHIRLEY HALL
AND GENE WALKER**                                                   **PLAINTIFFS**


**VS.**                                         **Civil Action No. 3:01-cv-855-HTW-DCB**


**DELBERT HOSEMANN, Secretary of State of
Mississippi; JIM HOOD, Attorney General for the State of
Mississippi; HALEY BARBOUR,
Governor of the State of Mississippi; MISSISSIPPI
REPUBLICAN EXECUTIVE COMMITTEE; and
MISSISSIPPI DEMOCRATIC EXECUTIVE
COMMITTEE**                                                        **DEFENDANTS**


**and**


**BEATRICE BRANCH, RIMS BARBER,
L.C. DORSEY, DAVID RULE,
JAMES WOODWARD, JOSEPH P. HUDSON,
and ROBERT NORVEL
INTERVENORS**

### CONSOLIDATED WITH

**KELVIN BUCK, ET AL.**                                             **PLAINTIFFS**


**VS.**                                         **Civil Action No. 3:11-cv-717-HTW-LRA**


**HALEY BARBOUR, ET AL.**                                          **DEFENDANTS**

**MEMORANDUM OF AUTHORITIES OF MISSISSIPPI
REPUBLICAN EXECUTIVE COMMITTEE IN SUPPORT OF
MOTION TO VACATE INJUNCTION AND FOR OTHER RELIEF**

Although the Legislature and Governor worked quickly to adopt a new four-district congressional redistricting statute, H.B. 384, which was signed into law on January 24, 2022 [Dkt. #146-1], this Court was left an unusually short time to resolve any disputes before the qualifying deadline of March 1, 2022. To minimize disruption and confusion for all concerned, this Court should decide before March 1 that H.B. 384 satisfies all state and federal constitutional and statutory requirements and therefore should vacate its existing injunction. [Dkt. #128]. No party has asked this Court to extend that deadline, and, for the reasons set forth later in this brief, the Court should not do so.

## PROCEDURAL STATUS

The 2022 congressional election process in Mississippi is already under way. So far, ten individuals have qualified to run for Congress as Republicans in the four new districts established by H.B. 384.[1] Records of the Federal Election Commission show that 20 individuals, including Republicans, Democrats, and independents have taken steps to become candidates.[2] The qualifying period closes on March 1, 2022. Absentee ballots must be sent to military personnel and other voters overseas 45 days before the primary on June 7, 2022. 52 U.S.C. § 2302.

---

[1] Those individuals and their residences are identified in the affidavit of Taylor Lewis, Executive Director of the Mississippi Republican Party, attached as Exhibit 1.

[2] Pursuant to Fed. R. Evid. 201(b)(2), judicial notice may be taken of FEC records attached and made a part hereof as Exhibit 2.

1

Right now, however, defendants in this case, who have responsibility for the party primaries and general elections, are still obliged to conduct elections pursuant to the four-district plan established by this Court's injunctive final judgment of December 30, 2011.  [Dkt. #128]. That judgment by its terms remains binding "until such time as the State of Mississippi produces a constitutional congressional redistricting plan that is precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965."  [Dkt. #128 at 2].  The Republican Party believes that the Legislature satisfied the terms of that judgment when it adopted H.B. 384.

Later on the morning that H.B. 384 was signed, the Republican Party, under Fed. R. Civ. P. 60(b)(5), moved to vacate the injunction and for other relief.  [Dkt. #143].  Given the enactment of H.B. 384, the Party asked this Court to "reconsider what injunction, if any, should be in effect." [Dkt. #143  ¶1].  The brief filed by the Party in support of its motion made clear the precise relief sought: "[T]his Court should vacate the current final judgment, declare that the new statutory plan satisfies all state and federal statutes and constitutional requirements, and permit it to go into effect."  [Dkt. #144 at 9].  The motion therefore asked this Court to request all parties, as well as interested non-parties, to address these issues:

A.    Whether the State of Mississippi has produced a constitutional congressional redistricting plan that satisfies all state and federal constitutional requirements, thus satisfying the conditions of the final judgment.

B.    Whether the districts mandated by the final judgment now are unconstitutionally malapportioned, thus rendering it inequitable that the final judgment should remain in effect.

[Dkt. #143 ¶8].

To establish its right to relief on both issues, the Party's motion attached public records of which this Court can take judicial notice.  [Dkt. #143-1, -2, & -3].  The *Buck* plaintiffs, in their response in opposition to the Republican Party's motion, likewise submitted materials for the

Court's consideration. [Dkt. #151-1, -2, -3, & -4]. In addition, at the hearing on the Republican Party's motion, counsel for the *Buck* plaintiffs announced that "the NAACP has engaged or engaging political scientists to do analysis" to support the contention that H.B. 384 violates § 2 of the Voting Rights Act, 52 U.S.C. § 10301. [2/2/22 Tr. 16]. This Court recognized the *Buck* plaintiffs' need for proof in support of their position and let them provide it:

> JUDGE JOLLY: Mr. Rhodes, I would say that I am a bit confused about the basis for – of your position of the discriminatory intent of the plan itself, and how this is discriminatory in terms of black voting rights.
>
> So you need to spell that out in this brief. This is your opportunity to do it, and to attach all affidavits, maps, or other documents that are necessary to establish your position.

[2/2/22 Tr. 46].

This brief will set forth the Party's basis for contending in its motion that the State has satisfied the command of the existing injunction by adopting a constitutional plan. The Party will also address the *Buck* plaintiffs' arguments as best it can, relying on the statements made at the hearing. Should the *Buck* plaintiffs, in their brief due February 24, 2022, present any new arguments and evidence, then the Party will address them in its brief due February 28, 2022. The *Buck* plaintiffs admit that they bear the burden of proving any illegality in H.B. 384. [Dkt. #52 at 8]. It is a burden which they cannot carry.

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION TO RESOLVE ALL ISSUES.

This Court decided ten years ago that it has continuing jurisdiction to entertain challenges to its existing injunction under Rule 60(b)(5) because "our final judgment has prospective application." [Dkt. 127 at 9]. The same is true of the existing final judgment of injunction. [Dkt. #128]. The Republican Party has asserted that all defendants remain bound by that injunction

[Dkt. #143 ¶1], and the *Buck* plaintiffs agree.   [Dkt. 151 ¶¶7-8].  Because this Court retained "jurisdiction to implement, enforce, and amend this judgment" [Dkt. 128 at 2], until the adoption of a constitutional plan, this Court may entertain a motion under Rule 60(b)(5), consistent with *Jackson v. DeSoto Par. Sch. Bd.*, 585 F.2d 726, 728 n.1 (5th Cir. 1978).  [Dkt. 127 at 10-11 & n.6].

It is true that the Republican Party seeks relief that is slightly different from its motion a decade ago.  It is beyond dispute, of course, that a defendant can always seek relief from an injunction entered against it.  Here, all defendants will have to conduct the 2022 elections under the existing injunction unless this Court vacates it, as the Party has asked.  However, the Party does not ask that the injunction simply be vacated, but that it be vacated based on this Court's finding that the State has satisfied the conditions set forth in the judgment by "produc[ing] a constitutional congressional redistricting plan" consistent with the Voting Rights Act.  [Dkt. #128 at 2].

There is good reason that the Party asks this Court to rule on the legality of H.B. 384.  As the Party explained in its original supporting brief [Dkt. #144 at 4-5], the Party's situation is like that of the school district in *Board of Educ. v. Dowell*, 498 U.S. 237 (1991).  There, the district sought relief from a desegregation injunction imposed in a suit going back to 1961.  The Supreme Court explained that the district had a right to seek "a finding by the District Court that the Oklahoma City School District was being operated in compliance with the commands of the Equal Protection Clause."  *Id.*, at 247.  A mere vacation of the injunction would be of little use to the school district if plaintiffs could come right back to file a new action asserting unconstitutional conduct.  It simply makes sense to determine the constitutional question before granting the relief.

The federal courts of this state have repeatedly applied these principles in reviewing and dismissing longstanding injunctions governing desegregation of the local schools.[3]   In *United States v. Mississippi*, 2012 WL 13219551 (S.D. Miss. Jan. 3, 2012), an injunction requiring desegregation of McComb schools had been entered in 1971.  As in this case, "[t]he Court retained jurisdiction over the case 'to insure full compliance with this order and to modify or amend the same as may be deemed necessary or desirable for the operation of a unitary school system.'"  *Id.,* at *1.  Four decades later, the Court found the schools to be operating in a fully constitutional manner and concluded that "all injunctions entered in this case against the District are dissolved, and the case against the District is dismissed with prejudice."  *Id.,* at *4.  In *Carter v. Sunflower Cnty. Sch. Dist.*, 2014 WL 4384248 (N.D. Miss. Sept. 3, 2014), the Court granted similar relief over plaintiff's objection.  The Court found that "the Drew School District proved at the June 2012 hearing that it has achieved unitary status." *Id.*, at *4.  Having found all constitutional requirements to have been satisfied, the Court held "that all prior injunctions are dissolved, jurisdiction of this Court is terminated, and this case is dismissed with prejudice."  *Id.*, at *5.

Just as the courts in *Dowell* and in *Mississippi* had jurisdiction to determine the constitutionality of conditions in local schools, so too this Court has jurisdiction to determine the legality of H.B. 384 while granting the Republican Party's motion to vacate the injunction.  Simply vacating the injunction and dismissing these consolidated cases will not resolve this dispute, because the *Buck* plaintiffs have advised the Court that a new suit will be filed raising the same issues that they have raised here.  [Dkt. #151 ¶19 & n.9].  A simple vacation and dismissal without

---

[3]As in this case, Rule 60(b) applies to a motion to modify a school desegregation injunction. *Cowan v. Bolivar Cnty. Bd. of Educ.*, 2017 WL 988411, at *2 (N.D. Miss. Mar. 13, 2017).

reaching the legality of H.B. 384 would leave that problem for another Court after the qualifying deadline had already passed on March 1.

The jurisdiction to grant equitable relief is flexible, but prudence here suggests that it be used in the manner anticipated by *Jackson*.  This Court should "consider within a single action all issues relating to the . . . apportionment plan."  585 F.2d at 730 n.1.  This Court therefore has jurisdiction to declare that the 2022 elections may proceed under H.B. 384.

## II.   THE STATE OF MISSISSIPPI HAS PRODUCED A CONSTITUTIONAL CONGRESSIONAL REDISTRICTING PLAN THAT SATISFIES ALL STATE AND FEDERAL STATUTORY AND CONSTITUTIONAL REQUIREMENTS, THUS SATISFYING THE CONDITIONS OF THE FINAL JUDGMENT.

When determining whether H.B. 384 satisfies all state and federal constitutional requirements, this Court must afford the Legislature substantial deference.  The Fifth Circuit has consistently "acknowledge[d] the presumption of constitutionality of legislative acts."  *Seoane v. Ortho Pharm., Inc.*, 660 F.2d 146, 151 (5th Cir. 1981).  The Court has said that "[a] statute is presumed constitutional and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."  *League of United Latin American Citizens v. Edwards Aquifer Auth.*, 937 F.3d 457, 471 (5th Cir. 2019), quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993) (brackets added in *LULAC*).  The Supreme Court has explained that the presumption is particularly strong in redistricting cases:

> Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State.  *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 481 (1997).  This rule takes on special significance in districting cases.

*Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018).  The Court added that "the 'good faith of [the] state legislature must be presumed.'"  *Id.*, quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995).  "Electoral districting is a most difficult subject for legislatures, and so the States must have

discretion to exercise the political judgment necessary to balance competing interests." 515 U.S. at 915. This principle has long been applied in the Southern District. "We approach our decision today on the premise that federal courts should not order around the state legislature unless the legislature has acted in violation of the United States Constitution." *Miss. St. Conf. of N.A.A.C.P. v. Barbour*, 2011 WL 1870222, at \*1 (S.D. Miss. May 16, 2011), *aff'd*, 565 U.S. 972 (2011).

Here, this Court should rely on the presumption, but not only on the presumption. The Party has introduced substantial evidence to support the presumption that the Legislature acted consistently with constitutional and statutory principles in adopting H.B. 384. Presumptions may ordinarily be rebutted, but the *Buck* plaintiffs have admitted, as they must, that they bear the burden of proof in challenging the legality of H.B. 384. [Dkt. #152 at 8]. Because they cannot "negative every conceivable basis which might support" H.B. 384, *Heller*, 509 U.S. at 320, this Court should grant the Party's motion and declare that H.B. 384 meets all state and federal statutory and conditional requirements.

A.   **H.B. 384 achieves substantial population equality.**

There can be no serious dispute that H.B. 384 satisfies the constitutional requirement of substantial population equality.[4] Given the inability to split human bodies, a perfect plan would have three districts of 740,320 people and one district of 740,319. The statute has two districts with 740,319 people, one with 740,320, and a fourth with 740,321, a deviation between the largest and smallest district of only two people. The plan adopted by this Court in 2002 had a deviation of 10 people from largest to smallest. *Smith v. Clark*, 189 F. Supp. 2d 529, 539 (S.D. Miss. 2002), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003). This Court explained that the Constitution

---

[4] A map displaying the new statutory plan, together with demographic statistics, is attached as Exhibit 3.

required nothing more precise because "[i]n order to achieve absolute perfection, we would have to split precincts."  189 F. Supp. 2d at 539 n.5.[5]  While the 2011 plan splits nine of the present precincts, presumably because of boundary changes after the issuance of the injunction, H.B. 384 reduces that number to five.  [Dkt. #151-1 at 6, #151-2 at 6].  The statute's satisfaction of the constitutional requirement of equality cannot be disputed.

**B.      H.B. 384 exhibits no invidious discrimination on the basis of race.**

Other than substantial population equality, the Constitution imposes no affirmative requirements on the drawing of Congressional districts.  The principal negative requirement is that States may not engage in "'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification."  *Abbott v. Perez*, 138 S.Ct. at 2314, citing *Shaw v. Reno*, 509 U.S. 630, 641 (1993).  Here, plaintiffs have suggested no direct evidence of intentional discrimination, and circumstantial evidence proves that the choices made by the Legislature are entirely explicable on non-racial grounds.

The Supreme Court has explained how a litigant may establish discriminatory intent on the part of a legislative body:

> The impact of the official action whether it "bears more heavily on one race than another," *Washington v. Davis*, 426 U.S. [229,] 242 [(1976)], may provide an important starting point.  Sometimes a clear pattern unexplainable on grounds other than race emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . .
>
> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. . . . The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. . . .

---

[5] The total deviation in 2011 was 86 people, splitting no precincts.  [Dkt. #127 at 14].

> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977) (footnotes and citations omitted).

The *Buck* plaintiffs have full access to all these sources of information. The record here is full of evidence of the historical background of congressional redistricting in Mississippi. The *Buck* plaintiffs monitored this year's redistricting process, and their own evidence shows that they have access to the public files. The policy of the Standing Joint Congressional Redistricting Committee expressly declares that "[a]ll public information will be made available on the Committees' website." [Dkt. #151-4 at 7 ¶A.4]. They have acknowledged they have access to the floor debates. [2/2/22 Tr. 24]. Their brief due on February 24 should be able to give a full explanation of whether any of that evidence rebuts the presumption of legality.

The sort of circumstantial evidence which may be considered under *Arlington Heights* permits no inference of invidious racial discrimination. As for demography, there is very little difference between the new statutory plan and those considered and adopted by this Court ten years ago. When this Court adopted its current plan in 2011, the black voting age population of District 2 was 61.36%. [Dkt. #128-2 at 5]. The plan then proposed by the *Buck* plaintiffs would have had a black voting age population of 61.81%. [Dkt. #6-5]. The new statute adopted by the Legislature has a black voting age population of 61.05%. [Dkt. #143-3]. These numbers provide no support at all for an inference that racial considerations dominated the Legislature's decision.

While demography remains substantially identical to past plans, geography does not. The so-called Delta district has been losing population ever since the District Court created it in 1982. Because the existing District 2 has only 674,491 people under the 2020 census, the Legislature had

to add over 65,000 new people to achieve substantial population equality. That it did so without changing the black voting age population percentage from prior plans indicates that invidious racial discrimination was not at work.

To achieve this consistent result, the Legislature chose to add four new counties in southwest Mississippi. This Court's existing plan, like the *Buck* plaintiffs' 2011 proposal, assigned those counties to District 3. The *Buck* plaintiffs now propose to keep those four counties in District 3, while assigning all of Hinds County and more of Madison County to District 2 to make up the population shortfall. A historical review sheds some light on past decisions to divide or not divide Mississippi counties, particularly with regard to the evolution of District 2.

The Court that created the Delta district in 1982 tried to leave counties intact, splitting only Simpson and Tallahatchie. All of Madison County was in the Delta district, while all of Hinds County remained in the southwest Mississippi district, then known as District 4. *Jordan v. Winter*, 541 F. Supp. 1135, 1145, (N.D. Miss. 1982), *vacated sub nom. Brooks v. Winter*, 461 U.S. 921 (1983). In 1984, after considering the effect of the 1982 amendments to § 2 of the Voting Rights Act, the Court added the western part of Hinds County to District 2 but left the entire City of Jackson in the southwest Mississippi district. The Court extended District 2 down the Mississippi River, extracting Jefferson and Claiborne Counties from the southwest Mississippi district. The Court also divided Madison County for the first time, adding the Ridgeland precinct to District 3, then encompassing east central Mississippi. Finally, the Court removed the east half of Simpson County and southern portions of Rankin County from District 3, adding them to District 4 in southwest Mississippi. No municipalities were divided. *Jordan v. Winter*, 604 F. Supp. 807 (N.D.

Miss.), *aff'd sub nom. Mississippi Republican Executive Committee v. Brooks,* 469 U.S. 1002 (1984).[6]

The City of Jackson was split for the first time, not by a court, but by the Legislature's adoption of Miss. Code Ann. § 23-15-1037 in 1992 and its prompt approval by the Attorney General under § 5 of the Voting Rights Act. Much of the City of Jackson was added to District 2, leaving the rest of Hinds County in the southwest Mississippi district. The Legislature added more Madison County precincts to the east central Mississippi district.

This Court extended these tendencies when it imposed the first four-district plan in 2002. More of the City of Jackson was added to District 2, leaving only 15 precincts and 31,832 people in northeast Jackson in District 3, which included much of the old southwest Mississippi district. The Court removed Copiah County from the old southwest Mississippi district and added it to District 2. More of southern Madison County was severed from District 2 and added to District 3. *Smith*, 189 F. Supp. 2d at 512. This Court explained that it wished to assign the high-growth area of southern Madison County and Rankin County to District 3, while placing "almost all of Hinds County" and "the Nissan Plant/Gluckstadt area of Madison County" in District 2. *Id*. at 544. The Court added that the decision to continue to divide the City of Jackson was supported by the Mayor's testimony "that he preferred that the City be represented by two congresspersons." *Id*.,

---

[6] For the Court's convenience, maps of Mississippi congressional districts as they have changed over the last 40 years are attached as the following numbered exhibits:

4.  1982 – *Jordan,* 541 F. Supp. at 1146;
5.  1984 – *Jordan,* 604 F. Supp at 820;
6.  1992 – Reprinted in *Buck*  [Dkt. #1-3 at 3];
7.  2002 – Reprinted in *Buck*  [Dkt. #1-3 at 23];
8.  2011 – [Dkt. #128-1].

at 543.  This Court's 2011 plan reassigned some precincts in the City of Jackson and added Gluckstadt in southern Madison County to District 3.  [Dkt. #127 at 14].[7]

H.B. 384 continues the divisions that have evolved in southern Madison County and northeast Hinds County since the District Court first divided those two counties in 1984.  It can hardly be discriminatory to adhere to a practice initiated by one District Court and extended by another.  Rather than bring those urban and suburban areas into rural District 2, the Legislature extended the expansion of the 1982 Delta district further into the old southwest Mississippi district, which had also been taking place since 1984.  Whatever the wisdom of that decision, adherence to the practices approved by two District Courts and the Attorney General in 1992 can hardly be considered evidence of intentional racial discrimination.

Twenty years ago, this Court described different factors on which it had relied in drafting its first injunction.  *Smith*, 189 F. Supp. 2d at 541.  Although these factors are not mandated by state or federal statutory or constitutional law, the Legislature satisfied them in drafting H.B. 384.  This Court achieved "placement of the major research universities and military bases, respectively, in separate districts."  *Id.*  The four largest universities continue to be spread among the four districts, and the military bases in Lowndes, Lauderdale, and Harrison Counties are all in separate districts.  As much as possible, H.B. 384 places "at least one major growth area in each district," *id.*, by dividing the Jackson municipal area between Districts 2 and 3.  "[R]espect for county and municipal boundaries," *id.,* is maintained.  The new statute unifies Clarke County, although Jones County is now split to achieve population equality.  The cities of Jackson and Ridgeland are split as before, while a city in Jones County is newly split for purposes of equality.

---

[7] The *Buck* plaintiffs supported the retention of much of northeast Jackson in District 3, as well as surrendering the high-growth area of Gluckstadt and other precincts in southern Madison County to District 3.  [Dkt. #6-6 at 6-7].

As in 2002, it remains difficult to take account of "compactness and contiguity," as well as "consideration of the distances of travel within each district." *Id.*[8] While all four districts consist of contiguous territory, the Court long ago identified the problem with compactness:

> The ability to create compact districts in Mississippi is limited by the distribution of population. Much of the State is rural, with large concentrations of population in only a few areas of the State. Districts that contain many sparsely populated counties in large rural areas necessarily will be less compact than districts that contain heavily populated counties and urban areas, as a result of the population equality requirement.

*Id.*, at 541. This continues to present a problem for predominantly rural District 2, as it did 20 years ago. "The new District 2 is slightly larger than the former district 2, but this is unavoidable in the light of the population deficit in former district 2, which grew more slowly than any other district in the State." *Id.*, at 545. Once again, because District 2 continues to lose population, it has been necessary to add voters and territory, thereby increasing travel time.[9] Yet the addition of four southwest Mississippi counties to District 2 causes a corresponding reduction in travel time for new District 3.

As the Court will remember, the extension of District 2 further down the Mississippi River into southwest Mississippi was supported at trial by the testimony of Senator Henry Kirksey, accepted as an expert by all parties. He explained that all counties along the Mississippi River, from Tennessee to Louisiana, share historical and regional interests. He said that "the Mississippi River is known worldwide," and "the population from Tunica all the way to Louisiana, Wilkinson County, is black majority." [1/28/02 Tr. 29]. Along with these common cultural characteristics,

---

[8] This Court recognized that compactness is not one of "the constitutional and statutory criteria" which apply to all plans. *Id.*, at 540. Courts must consider compactness in devising a remedy, *id.*, at 541, but legislative decisions are not so bound.

[9] The *Buck* plaintiffs have not explained how increased travel time injures them. A cognizable injury is essential to standing.

Senator Kirksey relied on historical factors: "[T]here have been districts drawn years ago, one called the Shoe String District, that included every county on the river from all the way from Tennessee to Louisiana."  [1/28/02 Tr. 30].  Senator Kirksey reasoned:

> [T]his district is one that incorporates a population that is pretty much the same from Tunica all the way down to Wilkinson County.  And my view was that if you could really cause the state leadership to focus on that fact, something can be done, because it needs to be done.

[1/28/02 Tr. 29].  The Legislature has now done that.  Following the advice of Henry Kirksey can hardly be considered indicative of invidious racial discrimination.

The types of evidence considered probative in *Arlington Heights* offer no support at all for an inference of invidious discrimination.[10]  There is no reason to believe the *Buck* plaintiffs can carry their burden of proof on this issue.

### C.   H.B. 384 complies with the Voting Rights Act.

This Court's prior injunctions have anticipated the need for the State to secure approval of any new statutory plan under § 5 of the Voting Rights Act.   [Dkt. #60 at 2; Dkt. #128 at 2].  However, as the Court knows, Mississippi is no longer covered by § 5.  *Shelby County, Ala. v. Holder*, 570 U.S. 529, 557 (2013).  For that reason, H.B. 384 does not and cannot violate § 5.

This Court should still consider whether H.B. 384 violates § 2 of the Act, which forbids enforcement of any "standard, practice or procedure . . . which results in the denial or abridgment of the right of any citizen of the United States to vote on account of race or color."[11]  The factors

---

[10] To this point, the *Buck* plaintiffs have not identified "[d]epartures from the normal procedural sequence."  429 U.S. at 267.  The February 4, 2022, order of the Mississippi Ethics Commission rejecting such an allegation is attached as Exhibit 9.

[11] Courts must consider § 2 in remedial decisions since the Supreme Court remanded the 1982 plan "for further consideration in light of Section 2 of the Voting Rights Act of 1965." *Brooks*, 461 U.S. at 921.

to be considered in a § 2 challenge to a redistricting plan which lacks a black majority district were set out by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986).  As this Court noted 20 years ago, the major consideration is whether "[t]he minority population . . . is sufficiently large and geographically compact to constitute a majority in a district."  *Smith*, 189 F. Supp. 2d at 540.  That could be done 20 years ago, and it can be done today.  For that reason, the new statutory plan includes District 2 as a black majority district.  Once again, as this Court observed, where a "plan creates a majority-minority district, . . . it does not result in minority vote dilution in violation of § 2."  *Id*.

At the hearing on February 2, 2022, the *Buck* plaintiffs attacked this Court's holding of two decades' standing.  They have an expert who will testify that, because of certain supposed characteristics of black voters in southwest Mississippi, District 2 as established by H.B. 384, despite its black voting age population of 61.05%, does not satisfy the results test added to § 2 by Congress in 1982.  Section 2(b) says that the results test has been violated "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  The expert apparently intends to testify that the 61.05% black voting age majority has "less opportunity . . . to elect representatives of their choice" than the remaining 38.95% of the electorate.  No court has ever accepted an argument so patently at odds with the statutory language.

When, as here, the borders of a single-member district are challenged, the Supreme Court has set a simple standard for the application of § 2:

> Do minorities make up more than 50 percent of the voting-age population in the
> relevant geographic area?  …  Where an election district could be drawn in which

> minority voters form a majority but such a district is not drawn, … then -- assuming the other *Gingles* factors are also satisfied -- denial of the opportunity to elect the candidate of choice is a present and discernable wrong that is not subject to the high degree of speculation and prediction attendant upon the analysis of crossover claims.

*Bartlett v. Strickland*, 556 U.S. 1, 18-19 (2009) (opinion of Kennedy, J.) (citation omitted).  Equal opportunity consists of having "no better or worse opportunity to elect a candidate than does any other large group of voters with the same relative voting strength."  *Id*., at 14 (opinion of Kennedy, J.).  Where a minority "make[s] up more than 50 percent of the voting age population," a group having "the same relative voting strength" cannot exist.  *Id*., at 18, 14 (opinion of Kennedy, J.).[12] The group having a majority cannot have "less opportunity" than smaller groups, as § 2(b) requires.[13]

When "such a district is not drawn," *id*., at 18 (opinion of Kennedy, J.), plaintiffs can show that more such districts should be created:

> [I]n the context of a challenge to the drawing of district lines, "the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice."  [*Johnson v.*] *DeGrandy*, [512 U.S. 997,] 1008 [(1994)].

*LULAC v. Perry*, 548 U.S. 399, 430 (2006).  The Supreme Court found that another Latino-majority district should be created in that case.  "Latinos, to be sure, are a bare majority of the

---

[12] The dissent read the controlling opinion as providing that "a district with a minority population making up 50% or more of the citizen voting age population (CVAP) can provide a remedy to minority voters lacking an opportunity 'to elect representatives of their choice.'"  *Id*., at 27 (Souter, J., dissenting) (quoting § 2(b)).  Because H.B. 384 provides such a district, no remedy is required.

[13] Relying on *Bartlett*, one court held that § 2 could not require the addition of more black residents to a 52.88% black voting age population district because it was "*already* a majority-minority district under *Bartlett*'s definition." *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 932 (E.D. Ark. 2012) (emphasis in original).  This holding was not criticized by the Eighth Circuit when it struck down an at-large form of government, despite a majority black voting age population, in *Missouri St. Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924 (8th Cir. 2018).

voting-age population in new District 23, but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship." *Id*., at 429. Here, plaintiffs cannot possibly prove that any portion of the 61.05% black voting age population majority is hollow or illusory because of ineligibility to vote, lack of citizenship, or for any other reason.

Counsel for the *Buck* plaintiffs argues that black voters in southwest Mississippi cannot be relied on to vote in accordance with blacks in the rest of District 2 because too many of them over three decades ago had supported white candidates in Woodville. [2/2/22 Tr. 20-21]. Long before *Bartlett* and *LULAC v. Perry*, in *Monroe v. City of Woodville*, 819 F.2d 507 (5th Cir. 1987), the Fifth Circuit held that it was at least possible that § 2 might require an at-large local government to be broken into single-member districts despite a black majority. On remand, however, the District Court found that black voters did not have less opportunity than the white minority to elect candidates of their choice, and the Fifth Circuit affirmed. 688 F. Supp. 255 (S.D. Miss. 1988), *aff'd*, 881 F.2d 1327 (5th Cir. 1989), *modified*, 897 F.2d 763 (5th Cir. 1990).[14] The free decision of black voters to choose white candidates, if it happens, does not violate § 2.[15] "[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *De Grandy*, 512 U.S. at 1014 n.11.

The Republican Party concedes that a decision in the Southern District found § 2 to have been violated by the drawing of a legislative district having a 50.8% black voting age majority. *Thomas v. Bryant*, 366 F. Supp. 3d 786 (S.D. Miss.), *aff'd*, 938 F.3d 134 (5th Cir. 2019), *vacated*

---

[14] Another at-large government survived a similar challenge because plaintiffs failed to prove that their "registered voter majority is illusory." *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992).

[15] "The Plaintiffs' attorney argued that black crossover votes for white candidates should be counted with the white bloc vote, but there is no authority to support this proposition." 688 F. Supp. at 263.

*and complaint dismissed*, 961 F.3d 800 (5th Cir. 2020) (en banc).  No other District Court has ever invalidated a single-member district having a black voting age majority.  Whatever the merits of the analysis in the *Thomas* decision, it cannot be stretched to cover the overwhelming 61.05% black voting age majority in this case.  As a matter of law, then, this Court got it right 20 years ago.  When a "plan creates a majority-minority district, . . . it does not result in minority vote dilution in violation of § 2."  *Smith*, 189 F. Supp. 2d at 540.

Of course, § 2 also prohibits intentional racial discrimination.  That said, for the reasons already discussed as to the constitutionality of the new statutory plan, intentional discrimination cannot be shown on this record.  The new plan does not violate the Voting Rights Act.

III.   **WHETHER THE DISTRICTS MANDATED BY THE FINAL JUDGMENT NOW ARE UNCONSTITUTIONALLY MALAPPORTIONED, THUS RENDERING IT INEQUITABLE THAT THE FINAL JUDGMENT SHOULD REMAIN IN EFFECT.**

This is the second of the two issues on which the Republican Party moved this Court to request briefing.  [Dkt. #143 ¶8].  There is no dispute among the parties on this issue.  Evidence submitted by the Republican Party shows that substantial population disparities now exist among the four districts established by the current injunction.  [Dkt. #143-2].  The *Buck* plaintiffs have provided additional data showing those disparities.  [Dkt. #151-1].  They explicitly "agree that the 2020 Decennial on Census reveals that the current congressional districts are unconstitutionally malapportioned."  [Dkt. #151 ¶9 (footnote omitted)].

Based on the evidence and the admissions of the parties, unconstitutional malapportionment has been clearly established.  Because it is inequitable for the existing injunction to remain in place, this Court should vacate it under Rule 60(b)(5).

IV.   **THIS COURT WAS "FULLY CONVINCED" IN 2002 THAT IT SHOULD NOT EXTEND THE STATUTORY MARCH 1 QUALIFYING DEADLINE, AND THAT DEADLINE SHOULD NOT BE EXTENDED NOW.**

The qualifying deadline for both party and independent candidates for U.S. House of Representatives is March 1, 2022.  *See* Miss. Code Ann. § 23-15-299(3)(a-b).  As an initial matter, no party in this case, potential intervenor or anyone else is requesting that the statutory March 1 qualifying deadline be extended.  When the Court inquired about this issue at the February 2, 2022, status conference, no party requested an extension. In fact, counsel for the *Buck* plaintiffs repeatedly argued that the March 1 deadline should <u>not</u> be extended.  [*See, e.g.*, 2/2/22 Tr. 25:9-10].[16]  For that reason alone, the deadline should not be moved.  However, since the Court inquired about this issue at the February 2 status conference, the Republican Party would like to remind the Court and reemphasize the compelling reasons why the deadline should not be extended.

In 2002, this Court in *Smith,* 189 F. Supp. 2d 503, 510-11 (S.D. Miss. 2002), rejected the suggestion that the March 1 candidate qualification deadline should be moved, stating the Court was

> fully convinced, however, that such an election change would create confusion, misapprehension and burdens for the voters, for the political parties, and for the candidates. Many voters want to participate in the election process to a greater extent than mere voting. They want to personally know the candidates, to select their choice, to give money to their selection and to organize the people in their precincts or counties in the campaign for their choice. . . .  If we begin to delay the establishment of election districts and advance qualifying dates, such voters who want to become fully involved in the process will not timely know in which district they are going to be, and thus will not timely know where and with whom to become involved. The same situation will exist for the candidates. Postponing the election schedule means that the candidates and political parties would encounter campaign and election burdens, that is, significant time constraints on getting acquainted with new voters, establishing organizations in new election districts and the multiple new precincts and counties therein, raising campaign funds within the new districts, developing strategies for particular geographic areas, etc.

---

[16] Although the *Buck* plaintiffs suggested in their brief of authorities in support of their opposition to the Republican Party's motion that the Court "should consider whether to push back the candidate qualification deadline" [Dkt. #152 at 8], they abandoned that suggestion at the February 2 status conference.

***

… Furthermore, changing the March 1 date is inconsistent with the position taken by the [*Branch*] Intervenors in their amended complaint filed in Chancery Court, in which they assert that, if a plan is not adopted in time for it to be implemented in advance of the March 1 deadline, "the interests of the plaintiffs and all Mississippi voters in enforcement of Mississippi's election laws will be compromised, and their rights under Mississippi law to participate in a congressional election process conducted in a timely manner will be violated." It is also significant to us that changing the deadline would also contravene the Mississippi Supreme Court's recognition of the importance of such deadlines under state election law. *See Adams County Election Comm'n v. Sanders*, 586 So.2d 829, 832 (Miss.1991) (an election schedule that violates the state election code is adverse to the public interest).

In sum, we agree with the State, the [*Branch*] Intervenors, and the State Supreme Court that changing the dates of the election schedule would be deleterious to the rights of the voters, the candidates and the political parties, and accordingly we are determined to avoid such a change of dates.

*Id.,* at 510-11 (footnotes omitted).  *See also Smith,*189 F. Supp. 2d at 535-36.

Subsequent case law, including from the United States Supreme Court, proved the Court correct.  Four years later, in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court established the principle that federal courts should ordinarily not move election deadlines.  The Sixth Circuit later applied this principle to support the non-extension of deadlines, noting that extensions often beget more extensions and cause a disruption in the orderly election process.  *See Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020) ("moving deadlines rarely ends with one court order. Moving one piece on the game board invariable leads to additional moves.").  The Seventh Circuit has also recognized the importance of deadlines, stating that "[d]eadlines are essential to elections, as to other endeavors such as filing notices of appeal or tax returns."  *Common Cause of Indiana v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) (finding constitutional the requirement that mail-in ballot be received by election day even if Covid-19 imposed delays meant it was foreseeable some ballots would not be received in time).  Other federal courts have invoked *Purcell* in pre-election proceedings conducted on a tight timeframe.  *See Husted v. Ohio State Conf. of NAACP*, 573 U.S.

988 (2014) (staying a lower court order changing election laws 61 days before election day); *Thompson*, 959 F.3d at 813 (election day was "months away but important, interim deadlines … [we]re imminent" and "moving or changing a deadline or procedure now will have inevitable, other consequences"); *Perry v. Perez*, 565 U.S. 1090 (2011) (22 days before the candidate-registration deadline); *Purcell*, 549 U.S. at 4-5 (33 days before election day); *North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014) (32 days before election day).

The *Purcell* principle precludes moving the March 1 qualifying deadline here.  Indeed, just ten days ago, in *Merrill v. Milligan*, 595 U.S. ____, 2022 WL 354467 (Feb. 4, 2022), Justice Kavanaugh explained this point clearly in his concurring opinion staying a District Court's injunction of Alabama's Congressional redistricting plan:

> This Court has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and this Court in turn has often stayed lower federal court injunctions that contravened that principle. *See ibid.*; see also *Merrill v. People First of Ala.*, 592 U.S. ___ (2020); *Andino v. Middleton*, 592 U.S. ___ (2020); *Merrill v. People First of Ala.*, 591 U.S. ___ (2020); *Little v. Reclaim Idaho*, 591 U.S. ___ (2020); *Republican National Committee v. Democratic National Committee*, 589 U.S. ___ (2020) (*per curiam*); *Democratic National Committee v. Wisconsin State Legislature*, 592 U.S. ___ (2020) (declining to vacate stay).
>
> That principle – known as the *Purcell* principle – reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Id.,* at *4 (Kavanaugh, J., concurring) (footnote omitted).

 Particularly compelling reasons support application of the *Purcell* principle in this case. Local, state, party officials, and the public have been acting in reliance on the March 1 qualification deadline since at least December 2021 when the 2022 Elections Calendar and 2022 Candidate

Qualifying Guide were made available to the public.  *See* Exhibits 10 (Elections Calendar) & 11 (Candidate Qualifying Guide).  These local officials understandably have internal deadlines all based on the March 1 qualification deadline, and any extension of that deadline would "lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others."  *Merrill*, at *4 (Kavanaugh, J., concurring).

Moreover, there is much to be done in a short period of time following the March 1 qualifying deadline.  After the qualifying deadline, the appropriate state executive committee for party candidates will be required to meet and determine whether a candidate meets the appropriate qualifications to appear on the ballot.  *See* Miss. Code Ann. § 23-15-299(7).  Until the state executive committees meet, neither the candidates nor the public knows if the candidate will officially appear on the ballot for their respective party primary election.  *Id.*  Further, once the appropriate state executive committee meets and determines the qualifications of candidates, that information must be transmitted to counties and inputted into the Statewide Election Management System ("SEMS").  *See* Miss. Code Ann. §§ 23-15-163 *et seq*.  This information must be transmitted with sufficient time to prepare and print absentee ballots, which are required to be made available to voters 45 days before a primary election.  *See* Miss. Code Ann. § 23-15-649.  This year, the primary election date is set by statute as June 7.  *See* Miss. Code Ann. § 23-15-1031, § 23-15-649.  Additionally, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), which was enacted by Congress in 1986, requires that certain groups of citizens can register and vote absentee for all federal offices.  52 U.S.C. § 2302.  This includes oversees armed services personnel.  The deadline to mail these ballots is set by state statute and is also 45 days before the primary.  *See* Miss. Code Ann. §§ 23-15-683, 23-15-691, 23-15-692, and 23-15-699; *see also* Ex. 10 (Elections Calendar).

The Republican Party also offers the affidavit of Taylor Lewis, Executive Director of the Mississippi Republican Party, Exhibit 1, as support for applying the *Purcell* principle here.  As set forth in Lewis's affidavit, ten individuals have already filed qualifying papers relying on the March 1 deadline and the district boundaries as drawn in H.B. 384.  Records of the Federal Election Commission show that 20 individuals, including Republicans, Democrats, and independents, have taken steps to become candidates.  *See* Exhibit 2.  Extending the deadline adds uncertainty about where and against whom these candidates will run.  Additionally, while no independent candidates have filed qualifying papers as of this filing, any such candidate who intends to file must submit a petition with the signatures of 200 or more registered voters from the Congressional district in which the person intends to run.  *See* Miss. Code Ann. § 23-15-359.  Any such candidate who may be preparing to file is relying on the March 1 deadline and the district boundaries drawn in H.B. 384, and changes to the deadline and boundaries could negatively affect whether these persons meet the signature requirement.

Related to the March 1 deadline and the need for time and expediency with respect to the election process, critical work for the 2022 election cannot move forward until this Court finds H.B. 384 constitutional and vacates its injunction.  Elections officials cannot enter data into the Statewide Election Management System ("SEMS") to implement the redistricting plan in H.B. 384 and prepare ballots until this Court vacates the injunction, which currently binds officials to the 2011 Court-crafted plan.  All voter information, including the district in which a voter will cast their ballot, is stored in SEMS.  *See* Miss. Code Ann. § 23-15-163 *et seq*.  Redistricting requires local elections officials to reassign addresses for voters to the appropriate districts in SEMS.  *Id*. The current federal injunction prohibits implementation of any new plan and the reassignment of

addresses to new districts, which in turn prevents local election officials from implementing the changes called for in H.B. 384.

As the Court may recall, Sue Sautermeister, a former elections commissioner and State Director of Census 2000, testified in 2002 about the on-the-ground difficulties of implementing a redistricting plan.  [1/29/02 Tr. 167:7-197:4; *see also* 1/29/02 Tr. 241:7-253:24, (testimony of Leslie Scott, Assistant Secretary of State, Elections Division, discussing how elections are implemented at the local level in 82 different counties and not directly from the Secretary of State's Office, which adds complexity)].  The process has become more complicated since Sautermeister testified because of the passage of the Help America Vote Act of 2002, 52 U.S.C. §§ 20901 *et seq*., and subsequent introduction of SEMS in 2005.  *See* Miss. Code Ann. §§ 23-25-169 – 23-15-169.6 (providing methods for compliance with the Help America Vote Act including the adoption of SEMS).  While SEMS may improve the overall efficiency of the voting process and storage of voter data, it is another variable to be contended with by elections officials on short time schedules and step in the process that did not exist when Sautermeister testified.  It is for all these timing considerations, among others, that this motion was filed immediately upon the Governor signing H.B. 384 and is urgent and necessitous and needs an expedited ruling.

## CONCLUSION

For these reasons, this Court should declare that H.B. 384 meets all state and federal constitutional and statutory requirements, thus satisfying the conditions set forth for in the existing final judgment.  [Dkt. #128].  This Court should therefore vacate the final judgment and dismiss the complaint with prejudice as to all parties.

RESPECTFULLY SUBMITTED, this the 14th day of February, 2022.

**MISSISSIPPI REPUBLICAN**
**EXECUTIVE COMMITTEE**

By:     */s/ Michael B. Wallace*
        MICHAEL B. WALLACE

**OF COUNSEL**:

Michael B. Wallace (MSB #6904)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Ph: (601) 968-5500
Fax: (601) 968-5519
mbw@wisecarter.com
cec@wisecarter.com

## CERTIFICATE OF SERVICE

I, Michael B. Wallace, one of the attorneys for the Mississippi Republican Party Executive

Committee, do hereby certify that I have this date filed the foregoing with the Clerk of the Court

using the ECF system which sent notification of such filing to all counsel of record with ECF.

**SO CERTIFIED**, this the 14th day of February, 2022.

        */s/ Michael B. Wallace*
        MICHAEL B. WALLACE