## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**JOHN ROBERT SMITH, SHIRLEY HALL**
**AND GENE WALKER**                                        **PLAINTIFFS**


**VS.**                                    **Civil Action No. 3:01-cv-855-HTW-DCB-EGJ**


**DELBERT HOSEMANN, Secretary of State of**
**Mississippi; JIM HOOD, Attorney General for the State of**
**Mississippi; HALEY BARBOUR,**
**Governor of the State of Mississippi; MISSISSIPPI**
**REPUBLICAN EXECUTIVE COMMITTEE; and**
**MISSISSIPPI DEMOCRATIC EXECUTIVE**
**COMMITTEE**                                              **DEFENDANTS**


**and**


**BEATRICE BRANCH, RIMS BARBER,**
**L.C. DORSEY, DAVID RULE,**
**JAMES WOODWARD, JOSEPH P. HUDSON,**
**and ROBERT NORVEL**
**INTERVENORS**

### CONSOLIDATED WITH

**KELVIN BUCK, ET AL.**                                    **PLAINTIFFS**


**VS.**                                    **Civil Action No. 3:11-cv-717-HTW-LRA**


**HALEY BARBOUR, ET AL.**                                  **DEFENDANTS**

**SUPPLEMENTAL MEMORANDUM OF AUTHORITIES OF THE PLAINTIFFS, KELVIN BUCK, THOMAS PLUNKETT, JEANETTE SELF, CHRISTOPHER TAYLOR, JAMES CROWELL, CLARENCE MAGEE, AND HOLLIS WATKINS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, OPPOSING THE MOTION OF THE DEFENDANT MISSISSIPPI REPUBLICAN PARTY EXECUTIVE COMMITTEE TO VACATE INJUNCTION AND FOR OTHER RELIEF**

## INTRODUCTION

In 2011, this Court, pursuant to a Rule 60(b)(5)[1] motion filed by the Mississippi Republican Party Executive Committee ("the Republican Party"), held that Mississippi's congressional districts were unconstitutionally malapportioned. *Smith v. Hosemann*, 852 F. Supp.2d 857 (S. D. Miss. 2011) (three-judge Court).  The Buck plaintiffs[2] intervened in the case and requested the Court to enjoin use of the court-ordered 2002 congressional redistricting plan because it was malapportioned.  The Court granted the parties requested relief by amending its 2002 injunction[3] and adopting a new congressional redistricting plan for the 2012 and subsequent congressional primary and general elections until "the State of Mississippi produce[s] a constitutional congressional redistricting plan that [has been] precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965."  *Smith v. Hosemann*, supra, at 767.  Although the 2011 court-ordered plan was constitutionally apportioned and non-discriminatory when it was

---

[1] Fed. R. Civ. P. 60(b)(5).
[2] The "Buck plaintiffs" are Kelvin Buck, Thomas Plunkett, Jeanette Self, Christopher Taylor, James Crowell, Clarence Magee, and Hollis Watkins.
[3] The Court is faced with the same dilemma it faced in 2002 and 2011. In 2002, the Court entered an injunction implementing a four-district congressional districting scheme after the state's congressional seats were reduced from five to four and the state failed to timely redistrict and preclear its own congressional redistricting plan.  The court-drawn plan was implemented for the 2002 and subsequent "congressional primary and general elections … until the State of Mississippi produce[d] a constitutional congressional redistricting plan that [had been] precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965."  *Smith v. Clark*, 189 F. Supp.2d 548, 559 (S. D. Miss. 2002) (three-judge court), *aff'd sub nom.*, *Branch v. Smith*, 538 U. S. 254 (2003).  The 2002 court ordered plan became malapportioned by 2011, and the state, again, failed to timely redistrict and preclear a congressional redistricting plan.  The Court, once again, was forced to implement a court-drawn plan for congressional elections. *Smith v. Hosemann*, supra.

adopted, the 2020 Decennial Census has revealed that the plan is now malapportioned.[4]

State leaders have known since August, 2021 when 2020 census data revealed that the state's congressional districts are malapportioned.  Yet, a special legislative session was not called to remedy the malapportionment.  Instead, state leaders waited until after the candidate qualification period opened on January 3, 2020[5] to adopt a new congressional redistricting plan – House Bill ("H.B.") 384.[6]  H.B. 384 was adopted on January 24, 2022.[7]

The Republican Party filed a Rule 60(b)(5) motion the same day, January 24, 2022, requesting the Court to (1) vacate its 2011 injunction and determine (2) whether the 2011 court-ordered plan is malapportioned and can no longer be used for congressional elections and (3) whether the defendants have produced a congressional redistricting plan "that satisfies all state and federal constitutional requirements."[8]  The Buck plaintiffs filed their response opposing the Republican Party's motion which essentially seeks to vacate the court's 2011 injunction and allow the state's plan to go into effect.[9]  The Buck plaintiffs request the Court to amend its 2011 injunction by (1) enjoining congressional elections under the 2011 malapportioned plan; and, either (2) implement the Mississippi State Conference of the National Association for the Advancement of Colored People's ("NAACP's") congressional redistricting plan as an interim plan until the state complies with the Court's 2011 injunction; or (3) make the least changes to the 2011 plan in order to have a properly apportioned constitutional plan that also complies with the Voting Rights Act of 1965 ("the VRA").[10]

The Court has jurisdiction to consider these matters since it retained jurisdiction when it

---

[4] See Doc. No. 151-1.
[5] See Doc. No. 156-10.
[6] See Doc. No. 146-1.
[7] See Doc. No. 146-1.
[8] See Doc. No. 143, p. 5.
[9] See Doc. No. 151.
[10] 52 U.S.C. Sections 10301, *et seq*.

issued the 2011 injunction. *Board of Educ. v. Dowell*, 498 U.S. 237 (1990); *Smith v. Hosemann*, supra.

The Court has instructed the parties to provide additional briefing on these issues with the defendants' rebuttal brief being due on February 28, 2022 – one day before the candidate qualification deadline.[11]   The Court inquired, during the Status Conference held on February 2, 2022, whether the Court has the authority to extend the candidate qualification deadline.  The Buck plaintiffs will address the Court's inquiry.

### THE RULE 60(b)(5) BURDEN

The Republican Party's Rule 60(b)(5) motion seeks to vacate the Court's 2011 injunction and allow the state plan to go into effect.  The remaining defendants and Smith plaintiffs[12] have joined the motion.

On a Rule 60(b)(5) motion, the movants have the burden of establishing an entitlement to relief. *Board of Educ. v. Dowell*, supra; *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992); *Agostini v. Felton*, 521 U.S. 203 (1997); *Frew v. Hawkins*, 401 F. Supp.2d 619 (E.D. Tex. 2005), *aff'd sub nom., Frazer v. Ladd*, , 457 F.3d 432 (5th Cir. 2996); Fed. R. Civ. P. 60(b)(5).  In order to have an injunction or consent decree amended, vacated, or dissolved, the movants bear the burden of showing a significant change in the factual conditions or law. *Rufo v. Inmates of Suffolk County Jail*, supra, at 384; *Agostini v. Felton*, supra; *Board of Educ. v. Dowell*, supra; *Frew v. Hawkins*, supra.  A significant change in law occurs when the law upon which the injunction is based is no longer good law. *Agostini v. Felton*, supra.

Although the court-ordered 2011 injunction was not technically a consent decree, it was in the nature of one.  After the Court drafted the 2011 plan, all parties were instructed to make any

---

[11] The candidate qualification deadline is March 1, 2022.  See Doc. No. 156-10.

[12] The "Smith plaintiffs" are John Robert Smith and Gene Walker since Shirley Hall is deceased.  See Doc. No. 147.

comments, objections, or suggestions concerning the plan by a certain date and no party made any comments, objections, or suggestions. *Smith v. Hosemann*, supra, at 762. In essence, "all parties accepted the court-drawn plan." *Id*. In this regard, the 2011 court-ordered plan was essentially a consent decree. Nevertheless, in seeking to amend, vacate, or dissolve an injunction or consent decree, the defendants have the burden of establishing a significant change in the factual conditions or law. *Rufo v. Inmates of Suffolk County Jail*, supra, at 384; *Agostini v. Felton*, supra; *Board of Educ. v. Dowell*, supra; *Frew v. Hawkins*, supra. Additionally, the defendants have a heavy burden of convincing the Court that they made reasonable efforts to comply with the injunction. *Rufo v. Inmates of Suffolk County Jail*, supra, at 384; *Frew v. Hawkins*, supra. Therefore, the defendants have the burden to prove that applying the Court's 2011 injunction "prospectively is no longer equitable." *Rufo v. Inmates of Suffolk County Jail*, supra; *Board of Educ. v. Dowell*, supra; *Frew v. Hawkins*, supra; Fed. R. Civ. P. 60(b)(5).

However, as discussed below, the defendants have not shown (1) a significant change in the law, or (2) their good faith compliance with the injunction.

### THE PROCEDURAL AND FACTUAL HISTORY THIS REDISTRICTINGCYCLE

The 2020 census data was released in August,2021. On November 12, 2021, the Standing Joint Congressional Redistricting Committee ("the Joint Committee") sent a notice to its members informing them that a meeting would be held in the New Capitol Building on November 19, 2021 to, *inter alia*, adopt criteria for congressional redistricting.[13] The Joint Committee met on November 19, 2021 and adopted the following criteria for congressional redistricting: (a) "[d]istrict population should be as equal as practicable;" (b) each district should be contiguous; (c) the congressional plan should comply with all applicable federal and state laws "including Section 2 of the Voting Rights Act of 1965, as amended;" and (d) "[t]he Committee  should consider the

---

[13] See Doc. No. 151-4.

neutral redistricting factors employed by the Court in *Smith v. Hosemann*."[14]

The neutral redistricting factors employed by the Court in *Smith v. Hosemann* were: (a) compactness; (b) avoid splitting county and municipal boundaries; (c) preserve, as much as possible, historical and regional interests; (d) maintain the major universities and military bases in separate districts; (e) place growth areas in separate districts; (f) avoid pitting incumbents against each other; and (g) keep the distance of travel within districts "approximately the same as they were under the Court's 2002 Plan." *Smith v. Hosemann*, supra, at 766-767.

The NAACP submitted its proposed congressional redistricting plan to the Joint Committee on November 30, 2011.[15]  Race was not a predominant factor in drawing the NAACP's plan, and its plan does not subordinate racially neutral criterial to racial considerations.  The plan satisfies all the Joint Committee's criteria, including the racially neutral criteria listed in *Smith v. Hosemann*, and it complies with Section 2 of the Voting Rights Act of 1965[16] ("the VRA"). Importantly, the plan, like the 2011 court-ordered plan, makes only minor adjustments to the current congressional district lines to comply with both the federal and state constitutions and Section 2 of the VRA. [17]

---

[14] See Doc. No. 151-4.

[15] See Doc. No. 151-3.

[16] 52 U. S. C.  Section 10301.

[17] Although the Court's 2011 injunction requires the defendants to produce a constitutional redistricting plan that has been precleared pursuant to Section 5 of the VRA, recent decisions of this Court have held that Mississippi is no longer a covered jurisdiction as defined by Section 4(b) of the VRA [52 U.S.C. Section 10303].  States that fit within the coverage formula of Section 4(b) were required to obtain preclearance of new voting changes.  See *Thompson v. AG of Miss.*, 129 F. Supp.3d 430 (S.D. Miss. 2015) (three-judge court), *later case*, 2021 WL 3673108, 2021 U.S. Dist. LEXIS 155628 (2021). However, in 2013, the Supreme Court held that Section 4(b) was unconstitutional. *Shelby County v. Holder*, 570 U. S. 529 (2013).  Thereafter, this Court, in 2015 and again in 2021, held that the State of Mississippi was no longer required to voluntarily obtain preclearance of voting changes because Section 4(b)'s coverage formula had been invalidated. *Thompson v. AG of Miss.*, supra. However, this Court's 2011 injunction has not been invalidated, and the defendants are still required to obtain preclearance.  The Court's 2011 injunction requires the defendants to obtain preclearance of any congressional redistricting plan they want to use for congressional elections instead of the 2011 court-ordered plan.  "An injunction duly issuing out of a court of general jurisdiction within equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case." *Walker v. Birmingham*, 388 U.S. 307, 314 (1967). Therefore, the defendants are required by court order to obtain preclearance of the state's redistricting plan in order for the Court to vacate or dissolve its 2011 injunction. *Id*. Section 4(b) of the VRA is not the only avenue for obtaining

Without considering the NAACP's plan,[18] the Joint Committee drafted its own plan on December 15, 2021.[19] The Legislature and Governor enacted the Joint Committee's plan on January 24,2022 as House Bill ("H.B.") 384. H. B. 384 is constitutionally infirm because it was drawn for a racially discriminatory purpose.[20] Race was the predominant factor the Joint Committee considered in drawing the lines for the Second Congressional District ("CD2"). Furthermore, the Joint Committee subordinated racially neutral redistricting criteria to racial considerations in drawing CD2's lines.

The floor debate on H.B. 384 in both the Mississippi House of Representatives and the Mississippi Senate clearly show that race was a predominant factor in drawing CD2's lines. State Representative Jim Beckett, the Chair of the Joint Committee, admitted, during the House floor debate, that the Joint Committee did not consider the NAACP's plan at all.[21] State Representative

---

Section 5 preclearance. Section 3(c) of the VRA, [52 U.S.C. Section 10302(c) - the bail-in provision], requires preclearance of voting changes when a court has retained jurisdiction and ordered a state or political subdivision to obtain preclearance. See *Patino v. City of Pasadena*, 230 F. Supp.2d 667 (S. D. Texas 2017); *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990) (three-judge court), *aff'd* 498 U.S. 1019 (1991); *Perez v. Abbott*, 390 F. Supp.3d 803 (W.D. Texas 2019) (three judge court). Section 3(c) provides, *inter alia*, that "the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 4(f)(2) [52 U.S.C. Sectuib10303(f)(2)]…"53 U.S.C. Section 10302(c). Since the *Shelby* County decision, a federal district Court has required a municipality to obtain preclearance of voting changes under this section of the VRA. *Patino v. City of Pasadena*, supra. Furthermore, the Department of Justice ("DOJ") still conducts Section 5 reviews of voting changes pursuant to Section 3(c). The Buck plaintiffs request the Court to take judicial notice of the DOJ's policy on preclearance pursuant to FRE 201. A copy of the DOJ's Section 5 policy on preclearance is attached hereto as Exhibit "A". Thus, the defendants are still required, by court order, to obtain Section 5 preclearance of their congressional redistricting plan.

[18] See Doc. No. 151-3.

[19] See Doc. No. 151-2.

[20] Senator Dean Kirby, the Vice-Chair of the Joint Committee who shepherded H.B. 384 through the Mississippi State Senate, admitted, during the floor debate, that race was the dominant factor in the drawing of CD2. The Buck plaintiffs request the Court, pursuant to F.R.E. 201, to take judicial notice of the floor debate in the Mississippi State Senate. The Senate floor debate is recorded and may be found at the following website: https://m.youtube.com/watch?v=FdtZfyW15bo. The Buck plaintiffs will file a Notice of Conventional Filing with a copy of the Senate's floor debate attached. A jump drive containing the Senate's floor debate will be attached to the Notice of Conventional Filing as Exhibit "2".

[21] The Buck plaintiffs request the Court, pursuant to F.R.E. 201, to take judicial notice of the floor debate in the Mississippi State House of Representatives. The House floor debate is recorded and may be found at the following website: https://m.youtube.com/watch?v=bf0ErpQPBo&t=1973s.

Robert Johnson from Adams County stated, during the House's floor debate, that the state's plan was not compact, not contiguous, unnecessarily combined divergent communities of interest into CD2 primarily for a racial purpose, CD2 is unnecessarily and unusually large, the Joint Committee deliberately did not include population growth areas in CD2, the Joint Committee added counties losing population to CD2, and the overall plan intentionally separated voters into CD2 because of race.[22]   Representative Johnson also stated that the Joint Committee did not invite or consider public input, comment, or alternative plans.[23]   Representative Johnson offered an alternative plan during the floor debate.  The alternative plan is more compact than H.B. 384, more contiguous, does not intentionally separate voters into districts because of race, and CD2 has fewer miles than H.B. 384.[24]  The House of Representatives rejected the alternative plan. [25]  Senator Dean Kirby, the Vice-Chair of the Joint Committee, stated, in the Senate floor debate, that the Joint Committee could not make the numbers in the NAACP's plan work.[26]  Senator Kirby also admitted that CD2 is unusually large in the state's plan because the Joint Committee wanted to keep the BVAP percentage the same as it was in the existing plan by adding Adams, Wilkinson, Franklin, and Amite counties. [27]   In other words, the Joint Committee had a target BVAP before the Committee began drawing CD2.  State Senator Derrick Simmons offered an alternative plan that meets the equal population requirement, closely mirrors the court-drawn 2011 plan in the shape and size of the districts, has fewer split counties than the state's plan, is more compact than the state's plan, has fewer miles than the state's plan, and gives the current congressman for CD2 all of his home

---

The Buck plaintiffs will file a Notice of Conventional Filing with a copy of the House's floor debate attached.  A jump drive containing the Senate's floor debate will be attached to the Notice of Conventional Filing as Exhibit "1".

[22] See floor debate in the State House of Representatives.

[23] See floor debate in the State House of Representatives.

[24] See floor debate in the State House of Representatives.

[25] See floor debate in the State House of Representatives.

[26] See floor debate in the Mississippi State Senate.  However, the NAACP's plan deviation is the same as the state's plan, and the majority black voting age percentage is about the same in both plans.

[27] See floor debate in the State House of Representatives.  Senator Kirby admitted that the Committee sought to keep the same BVAP percentage as contained in the Court's plan.  In other words, he admitted to a target BVAP percentage.

county – Hinds County – just as the other congressmen have all of their home counties in their congressional districts. [28]   The amendment failed. [29]

Although the candidate qualification period for congressional candidates opened on January 3,2022 and closes on March 1, 2022, the Governor did not call a special legislative session to deal with congressional redistricting.  Instead, the regular legislative session began on January 3, 2022, and the Legislature and Governor did not enact the state's congressional redistricting plan - H.B. 834 - until January 24, 2022.

Anthony ("Tony") Fairfax, an expert demographic analyst and GIS[30] map drawer, performed a comparative analysis of the state's plan and the NAACP's plan for compliance with the Joint Committee's criteria including the neutral criteria in *Smith v. Hosemann*, supra. Mr. Fairfax also performed a comparative analysis of the state's plan and NAACP's plan with the 2011 court-drawn plan.  Mr. Fairfax has submitted a declaration[31] containing his opinion that the NAACP's plan is more compact than the state's plan and current plan and splits fewer counties and voting tabulation districts than the state plan or current plan.  Mr. Fairfax also opined that the state's plan performed substandard to the NAACP's plan under the neutral redistricting factors of not splitting county and municipal boundaries, compactness, and travel district in the district.\

Kareem Crayton, J.D./Ph.D., an expert political scientist and data analyst, has performed a socio-economic analysis for the existing CD2 and the added counties under the state plan.  Dr. Crayton has submitted a declaration[32] containing his opinion that the four counties added to CD2

---

[28] See floor debate in the Mississippi State Senate.  The Buck plaintiffs request the Court to take judicial notice that CD2's current Congressman is African-American and the Congressmen in the three other congressional districts are Caucasian.

[29] See floor debate in the Mississippi State Senate.

[30] Geographic Information System.

[31] Mr. Fairfax's declaration with attached reports containing his opinions will be filed as an affidavit opposing the defendants' motion.

[32] Dr. Crayton's declaration with his report attached containing his opinions will be filed as an affidavit opposing the defendants' motion.

under H.B. 384 appear to be a distinct community of interest from the existing district and there appears to be no rational basis for adding these four counties. Dr. Crayton opines that adding these four counties to CD2 "poses special practical challenges for political candidates and voters to organize and communicate in the district that are not present for other districts in the state.[33] This will pose a particular problem for the ability of black voters in CD2 to elect a candidate of their choice in an open seat election.

**ARGUMENT**

### 1. THE COURT HAS JURISDICTION TO RESOLVE ALL ISSUES.

The Buck plaintiffs agree with the defendants that the Court has jurisdiction to resolve all issues. See *Rufo v. Inmates of Suffolk County Jail*, supra, at 384; *Agostini v. Felton*, supra; *Board of Educ. v. Dowell*, supra. However, they disagree that the Court should resolve all issues at the pleadings and briefing stage of this litigation without affording them an evidentiary hearing. The Buck plaintiffs also have pending a limited Rule 60(b)(5) motion to amend the 2011 injunction. They request that the Court enjoin congressional elections under the 2011 plan and implement either another court-drawn plan or the NAACP plan until the defendants fully comply with the 2011 injunction or the Court rules on the defendants' motion after an evidentiary hearing.. The Buck plaintiffs maintain that the Court has the authority to grant their request for an evidentiary hearing. See *Ferrell v. Trail Mobile, Inc.*, 223 F.2d 697 (5th Cir. 1955).

### 2. H.B. 384 IS NOT CONSTITUTIONAL NOR PRECLEARED

The defendants argue that H.B. 384 meets all federal constitutional requirements. Of course, the Buck plaintiffs disagree. Importantly, the defendants do not address the issue of whether H.B. 384 has been precleared. The plaintiffs will, as discussed below, establish that CD2 mentioned in H.B. 384 is an intentional racial gerrymander that has not been precleared. First,

---

[33] See Dr. Crayton's Report at page 8.

however, the plaintiffs will address the defendants' burden of proof on their Rule 60(b)(5) motion.

### a. The Presumption of Legality and the Burden of Proof.

The defendants argue, in reliance on *Abbott v. Perez,*[34] that the Buck plaintiffs bear the burden of proving that the state's redistricting plan was enacted for a discriminatory purpose. They also argue, in reliance on *League of United Latin American Citizens v. Edwards Aquifer Auth.*,[35] that they are entitled to the presumption that H.B. 384 is constitutional. The enactments and actions of state officials are presumed to be constitutional, and the plaintiffs who challenge those enactments and inactions bear the burden of proving the enactments and inactions are unconstitutional. That is a correct statement of the law for parties not subject to an existing injunction. See *Abbott v. Perez*, supra, and *League of United Latin American Citizens v. Edwards Aquifer Auth.*, supra. However, in the instant case, the defendants are subject to a permanent injunction. Parties who are subject to a permanent injunction and seek to vacate it pursuant to Rule 60(b)(5) bear the burden of showing a significant change in the factual conditions or law. *Rufo v. Inmates of Suffolk County Jail*, supra, at 384; *Agostini v. Felton*, supra; *Board of Educ. v. Dowell*, supra; *Frew v. Hawkins*, supra. They also bear the burden of convincing the Court that they made reasonable efforts to comply with the injunction. *Rufo v. Inmates of Suffolk County Jail*, supra, at 384; *Board of Educ. v. Dowell*, supra; *Frew v. Hawkins*, supra. Although H.B. 384 is presumed to be constitutional, that presumption fades when plaintiffs challenge the bill as being an unconstitutional racial gerrymander with supporting evidence.

### b. Shifting Burdens.

The state's congressional redistricting plan is entitled to the presumption of constitutionality. *Abbott v. Perez*, supra. However, the Buck plaintiffs challenge that plan on

---

[34] 585 U.S. ___, 138 S. Ct. 2305, 2324 (2018).
[35] 937 F.3d 457, 471 (5th Cir. 2019).

grounds that CD2 is an unconstitutional racial gerrymander.  The Buck plaintiffs have the burden of proving that  '"race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper v. Harris*, 581 U. S. ___, 137 S. Ct. 1455, 1463 (2017), quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U. S. ___, 137 S. Ct. 788 (2017); *Abbott v. Perez*, supra.  To meet their burden, the Buck plaintiffs must "prove that the legislature subordinated *traditional race-neutral districting principles* … to racial considerations." *Ala. Legis. Black Caucus v. Alabama*, supra, at 272. (*Emphasis supplied*).  They can meet their burden of proof by "demonstrating that the legislature 'subordinated' other factors – compactness, respect for political subdivision, partisan advantage, what have you – to racial considerations." *Cooper v. Harris*, supra, 137 S. Ct. at 1463-64.   The Buck plaintiffs have produced evidence that the legislature subordinated compactness[36], adding growth areas to the underpopulated CD2, not making CD2 unnecessarily and unusually large, and not purposefully placing different unconnected communities of interest in CD2 to create or maintain a majority-minority district.  Additionally, they have produced evidence that the Chair and Vice-Chair of the Joint Committee admitted that race was a predominant factor in shaping CD2.  The Chair and Vice-Chair also admitted, during floor debates, that the Joint Committee had

---

[36] "[T]he [Section] 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Abrams v. Johnson*, 521 U.S. 74, 92 (1997).  The Buck plaintiffs have produced evidence that the drafters of H.B.384 did not take into account communities of interest in Hinds and Madison counties in drawing CD2, and they added four counties with dissimilar communities of interest.  Most of Hinds and a substantial part of Madison counties are already in CD2.  The drafters did not consider preserving these communities of interest.  Instead, they brought in four counties with different communities of interest.  The defendants seem to argue that the communities of interest of the people in the four added counties and the existing CD2 is race. "But where the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls,' it engages in racial stereotyping at odds with the equal protection mandates." *Miller v. Johnson*, 515 U. S. 900, 920 (1995).  Senator Johnson stated in the Senate's floor debate that the communities of interest in the four added counties are different from the Delta counties in CD2 Furthermore, Dr. Crayton has provided an opinion that the communities of interest in the four added counties are dissimilar from the existing CD2.

12

a target BVAP[37] percentage they wanted to meet in CD2. The VRA does not require artificial

targets of the number of voting age blacks needed in a district to afford black voters an opportunity

to elect a representative of their choice. *Ala. Legis. Black Caucus v. Alabama*, supra (Section 5 of

the VRA does not require a target number of minority voters to satisfy the non-retrogression

standard.). Representative Robert Johnson and Senator Derrick Simmons, in floor debates,

informed legislators that the state's plan subordinates the race-neutral redistricting criteria of

compactness, not splitting existing communities of interests or combining divergent communities

of interests[38], not unnecessarily enlarging the distance of travel in CD2, placing all of the

incumbent Congressmen home counties in their respective districts, and placing population growth

areas in each congressional district to the Joint Committee's consideration of race. They offered

alternative plans in their respective legislative chambers that maintained a black majority CD2

without subordinating racially neutral criteria to race. Legislators voted along racial lines to reject

the alternative plans and adopt H.B. 384. This evidence is sufficient to prove that race was a

predominant factor in the shape and racial composition of CD2.[39]

Since the Buck plaintiffs have established race as a motivating factor in the drawing of

CD2, the burden shifts back to the defendants "to 'demonstrate that its districting legislation is

narrowly tailored to achieve a compelling interest.'" *Bethune-Hill v. Va. State Bd. of Elections*,

supra, 137 S. Ct. at 801; *Cooper v. Harris*, supra, 137 S. Ct. at 1464; *Shaw v. Hunt (Shaw II)*, 517

U.S. 899 (1996). The Supreme Court has assumed that compliance with the VRA is a compelling

state interest. *Bethune-Hill v. Va. State Bd. of Elections*, supra; *Cooper v. Harris*, supra; *Abbott v.*

---

[37] Black voting age population.

[38] During the House floor debate, Representative Johnson informed House members that the four Southwest Mississippi counties added to CD2 in H.B. 384 has the same interests as Pike County, Mississippi. All four counties plus Pike County are currently in CD3. H.B. 384 split that community of interest. Representative Johnson further informed House members that the four Southwest Mississippi counties have interests divergent from counties in the Mississippi Delta that currently are in CD2.

[39] However, the Buck plaintiffs request an evidentiary hearing before the Court rules on this issue. The Buck plaintiffs desire to engage in discovery prior to the hearing.

*Perez*, supra.  The defendants argue that H.B. 384 is narrowly tailored because it complies with Section 2 of the VRA.  The Court should determine whether CD2 in H.B. 384 complies with Section 2 of the VRA or, instead, was crafted for a racially discriminatory purpose.  See *Shaw II*, supra, at 916-918. To comply with Section 2, the three *Gingles* preconditions must be satisfied. *Thornburg v. Gingles*, 478 U.S. 30 (1986).  Those preconditions are: (1) the minority group being large and geographically insular enough to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) white bloc voting is legally significant.  See *Thomas v. Bryant*, 366 F. Supp.3d 786, 800 (S.D. Miss.2019), *aff'd* 938 F.3d 134 (5th Cir. 2019). A majority-minority district drawn to comply with Section 2 of the VRA that is not geographically compact "is not narrowly tailored to the state's asserted interest in complying with [Section] 2 of the Voting Rights Act." *Shaw II* at p. 918.  In drawing the black majority CD2, the defendants must also prove that they did not subordinate race-neutral redistricting criteria to the consideration of race. *Ala. Legis. Black Caucus v. Alabama*, supra, at 272.

The Buck plaintiffs have proven that CD2 in H.B. 384 is not geographically compact.[40] The Buck plaintiffs have also proven that other racially neutral factors such as not necessarily drawing an unusually large district, placing population growth areas in separate congressional districts, not splitting communities of interest or combining divergent communities of interest to create a majority-minority district, avoid splitting counties and populated precincts.  Since CD2 in H.B. 384 is not geographically compact[41] and other racially neutral factors were subordinated to

---

[40]The 2011 court-drawn plan remedies vote dilution claims of African American voters in the Mississippi Delta and the Jackson Metro Area.  The plan does not remedy vote dilution claims of African American voters in Southwest Mississippi.  The Second Congressional District in the 2011 court-drawn plan is compact and addresses vote dilution claims of African American voters in the Delta and Jackson Metro Area.  The 2020 census data has revealed that CD2 needs to add 65,829 persons to be an ideal district.  The data also reveals that CD2 can add 65,828 persons from the Jackson Metro Area and still be an ideal and geographically compact black majority district.

[41] The defendants cite the testimony of former Senator Henry J. Kirksey in 2002 in support of CD2 in H.B. 384. Senator Kirksey's testimony is misinterpreted by the defendants.  Senator Kirksey testified that a black majority congressional district could still be created although Mississippi lost a congressional seat after the 2000 Decennial

race in its drawing the district, it "is not narrowly tailored to the State's asserted interest in complying with [Section] 2 of the Voting Rights Act." *Shaw II* at p. 918.

### c.   The Ultimate Burden.

The defendants bear the ultimate burden on their Rule 60(b)(5) motion. *Rufo v. Inmates of Suffolk County Jail*, supra; Fed. R. Civ. P. 60(b)(5); *Agostini v. Felton*, supra; *Frew v. Hawkins*, supra. The 2011 permanent injunction requires congressional elections to be conducted under the 2011 court-ordered plan until the defendants produced (1) a constitutional redistricting plan (2) that has been precleared pursuant to the provisions of the VRA. Under Rule 60(b)(5), the defendants have the burden of proving there has been a significant change in the factual circumstances or law, *Board of Educ. v. Dowell*, supra; *Rufo v. Inmates of Suffolk County Jail*, supra; Fed. R. Civ. P. 60(b)(5); *Agostini v. Felton*, supra; *Frew v. Hawkins*, supra, and they have complied with the 2011 permanent injunction. *Board of Educ. v. Dowell*, supra; *Frew v. Hawkins*, supra. As discussed below, the defendants have not met their burden.

### 1.   A Significant Change in Factual Conditions.

The Buck plaintiffs agree that there has been a significant change in factual conditions since the 2011 injunction was issued. The congressional districts are now malapportioned such that the Court may amend its 2011 injunction to address that malapportionment. See *Smith v. Hosemann*, supra.

---

Census. Senator Kirksey essentially testified that the state's black population is concentrated on the western side of the state from the Tennessee line to the Louisiana line. Senator Kirksey did not testify that a black majority district should be drawn from the Tennessee line to the Louisiana line as was done when John R. Lynch, the state's first black congressman, was elected. The legislature drew such a shoe-string district for Congressman Lynch causing him not to seek re-election because of the distance he would have to travel to campaign and see constituents. The defendants also misinterpret Senator Kirksey's testimony concerning the black population on the western side of the state. Senator Kirksey was simply testifying that state leaders needed to focus on that population because something needed to be done to improve their quality of life. H.B. 834 does not address the concerns that Senator Kirksey raised in his 2002 testimony.

### 2. **There Has Not Been a Significant Change in the Law.**

A significant change in law occurs when the law upon which the injunction is based has been overturned. *Agostini v. Felton*, supra. The injunction required the State of Mississippi to produce a constitutional redistricting plan. The law concerning the authority of courts to enjoin racially discriminatory redistricting plans has not been overturned. See *Cooper v. Harris*, supra; *Miller v. Johnson*, supra; *Ala. Legis. Black Caucus v. Alabama*, supra; *Bethune-Hill v. Va. State Bd. of Elections*, supra. The 2011 injunction remains in effect until the State of Mississippi produces a constitutional plan. As argued above, the defendants have not produced a constitutional plan. In fact, the plan they produced is an unconstitutional racial gerrymander. Therefore, there has not been a significant change in the law on this issue. See *Cooper v. Harris*, supra; *Miller v. Johnson*, supra; *Ala. Legis. Black Caucus v. Alabama*, supra; *Bethune-Hill v. Va. State Bd. of Elections*, supra.

There has not been a significant change in the law concerning the legality of Section 5 of the VRA since the 2011 injunction was issued. The injunction also required the State of Mississippi to obtain preclearance of any new congressional redistricting plan pursuant to Section 5 of the VRA. Although the Supreme Court, in 2013, held the coverage formula of the VRA[42] was unconstitutional, the Court did not hold that Section 5 of the VRA was unconstitutional. *Shelby County v. Holder*, supra. In fact, the Court specifically stated "[w]e issue no holdings on [Section] 5 itself, only on the coverage formula." *Shelby County v. Holder*, supra, at 557. Since the *Shelby County* decision, a federal district court has required a political subdivision to preclear voting changes. *Patino v. City of Pasadena*, supra. The Court required preclearance pursuant to Section 3(c) of the VRA. [43]

---

[42] Section 4(b) of the VRA [52 U.S.C. Section 10303(b).

[43] Section 3(c), of the VRA [52 U. S. C. Section 10302(c)]. Section 3(c) provides, *inter alia*, that "the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 4(f)(2) [52 U.S.C. Sectuib10303(f)(2)]

"Section 3(c) contains a 'bail-in' process by which the jurisdictions that fall outside the coverage formula of Section 4(b) may become subject to preclearance." *Hall v. Louisiana*, 108 F. Supp.3d 419, 423, fn.2 (M. D. La. 2015). Although the bail-in provision requires a court finding intentional racial discrimination before the district court issue an order requiring preclearance, that fact is inconsequential in this case.  In this case, the Court's 2011 injunction specifically orders the State of Mississippi to obtain preclearance of any new congressional redistricting plan for the Court to lift the injunction.  The injunction requiring preclearance is valid until and unless it is declared void or is overturned. *Walker v. Birmingham*, supra.  The injunction has not been invalidated or overturned. Section 5 of the VRA is still good law.  Therefore, there has not been a significant change in the law.

### d.  **The Defendants Have Not Complied with the Injunction.**

The Court required the defendants to produce a constitutional and precleared redistricting plan to have the injunction lifted.  They have not produced a constitutional plan that complies with the Fourteenth Amendment's Equal Protection Clause's prohibition of intentional racial discrimination in redistricting. As argued above, the plan produced, H.B. 384, was drafted and enacted for a racially discriminatory purpose.  Therefore, they have not fully complied with the Court's injunction requiring them to produce a constitutional plan.  Furthermore, they have not complied with the Court's requirement to produce a plan that has been precleared pursuant to Section 5 of the Voting Rights Act.  For the injunction to be vacated, the defendants "would have to satisfy a heavy burden to convince a court that [they] agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Rufo*, supra, at 385.  The defendants have not met this burden.

The defendants have known since June 25, 2013[44] that Section 4(b)'s coverage formula

---

[44] The date the Supreme Court handed down *Shelby County v. Holder*.

was unconstitutional.  Yet, they have not requested the Court to amend its injunction to relieve the State of Mississippi from the requirement of obtaining preclearance of any new congressional redistricting scheme.   Furthermore, the defendants have not attempted to obtain either administrative or judicial preclearance of H.B. 384.  "In deciding whether to modify or dissolve [an injunction], a [defendant's] compliance with previous court orders is obviously relevant." *Board of Educ. v. Dowell*, supra, at 249.  The Court "should address itself to whether the [defendants have] complied in good faith with the [injunction] since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Board of Educ. v. Dowell*, supra, at 249-50.  The Buck plaintiffs have submitted proof that the vestiges of past voting discrimination have not been eliminated to the extent practicable. H.B. 384 was drafted for a racially discriminatory purpose, and the defendants have not obtained its preclearance. Therefore, the defendants have not met their burden of proving that they complied with the Court's injunction in good faith.

**3.   H.B. 384 Does Not Fully Comply with the Voting Rights Act.**

The defendants argue that H.B. 384 complies with the VRA.  It does not.  As argued above, the defendants were ordered to obtain preclearance of any new redistricting plan, including H.B. 384.  Thus far, the bill has not been precleared.  Any voting change subject to the preclearance requirement that has not been precleared is unenforceable as a matter of law. *NAACP v. Hampton County Election Comm'n*, 470 U. S. 166 (1985).

**4.   THE COURT SHOULD AMEND ITS INJUNCTION INSTEAD OF VACATING IT.**

All parties agree that the 2011 court-ordered plan is now unconstitutional.  The defendants argue that the Court should vacate the 2011 injunction.  However, as argued above, the defendant have not met their burden to have the injunction vacated.  Instead, the Court should, as the Buck plaintiffs urge, amend its injunction by making the least changes to the 2011 plan to cure the

malapportionment while not diluting the black voting strength, or adopt the NAACP plan as an interim plan until the defendants fully comply with the injunction.  As the Court found in 2011, it has the authority to amend its injunction and cure the malapportionment in the current plan.

**5.    THE COURT SHOULD CONSIDER EXTENDING THE QUALIFYING DEADLINE.**

The defendants argue that the Court did not extend the March 1 candidate qualification deadline in 2002 and should not do it now.  However, in 2002, the Court adopted a plan by February 4, 2002 – almost a month before the candidate qualification deadline.  That afforded any potential candidates in the newly drawn districts to assess whether to qualify in the new districts. However, in the instant case, the parties will not complete briefing until February 28, 2022 –one day before the candidate qualification deadline.  The Court will not have sufficient time to review the briefs and supporting evidence submitted by the parties and make a decision prior to the candidate qualification deadline.  There will not be a congressional redistricting plan in place before the candidate qualification deadline.  Consequently, potential candidates will not have sufficient time to assess the new districts and decide whether to be a candidate prior to the qualification deadline.[45]In other words, the Court is faced with extenuating circumstances which would justify extending the March 1 qualification deadline.

The defendants rely on *Smith v. Clark*, 189 F. Supp.2d 503 (2002) (three-judge court); *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam); and *Merrill v. Milligan*, 595 U.S. ___ (2022), in arguing that federal courts should not interfere with states election processes on the eve of an election.  That is generally true.  The Buck plaintiffs are aware of only one case since the *Purcell* decision where the court extended the candidate qualification deadline for two weeks to allow the Alabama Legislature to remedy a Section 2 violation concerning its congressional districts.  That

---

[45] The defendants seemingly argue that the candidates who have already qualified for congressional elections did so under the state plan.  However, many of those candidates qualified to run prior to December 15, 2021 – the date the Joint Committee first unveiled the plan (H.B. 384).

case is *Caster v. Merrill*, 2022 WL 264819, 2022 U.S. Dist. LEXIS 16996 (N.D. Ala. 2022) (three-judge court).  The *Caster* case was consolidated with *Milligan v. Merrill* which the Supreme Court stayed *sub nom. Merrill v. Milligan*, supra.  However, because of voter, candidate, political party, and election official confusion concerning which congressional redistricting plan will be used for the 2022 election cycle and the candidate qualification deadline would have passed by the time the Court decides that issue, extenuating circumstances exist which would justify extending the March 1 qualification deadline. See *Caster v. Merrill*, supra, stay granted *sub nom. Merrill v. Milligan*.

### CONCLUSION

Since the current congressional districts are unconstitutionally malapportioned, the Court should amend its 2011 final judgment by enjoining use of the current districts in the 2022 and succeeding congressional elections until the State of Mississippi produces a plan that complies with this Court's 2011 injunction.  The Court should consider whether to push back the candidate qualification deadline to schedule an evidentiary hearing on the issue of whether the state plan complies with the United States Constitution and has been precleared.  The Court should implement the NAACP Plan, or a court-drawn plan, as an interim basis, and allow congressional elections to proceed as scheduled with a short extension of the candidate qualification deadline to remedy voter, candidate, party, and election official confusion.

This the 24th day of February,2022.

**RESPECTFULLY SUBMITTED,**
**KELVIN BUCK, ET AL., on Behalf of Themselves**
**and All Others Similarly Situated,**

**PLAINTIFF**

By:     */s/ Carroll Rhodes*
          CARROLL RHODES

## CERTIFICATE OF SERVICE

I, Carroll Rhodes, one of the attorneys for the Buck plaintiffs, do hereby certify that I have this date filed the foregoing with the Clerk of the Court using the PACER/ECF system which sent notification of such filing to all counsel of record with PPACER/ECF.

This the 24th day of February,2022.

/s/ Carroll Rhodes
CARROLL RHODES


CARROLL RHODES, ESQ., MSB # 5314
LAW OFFICES OF CARROLL RHODES
POST OFFICE BOX 588
HAZLEHURST, MISSISSIPPI 39083
TELEPHONE: (601) 894-4323
FACSIMILE: (601) 894-1451
e-mail: crhode@bellsouth.net

JOHN L. WALKER, ESQ., MSB # 6883
WALKER LAW GROUP, PC
1410 LIVINGSTON LANE, SUITE A
POST OFFICE BOX 22849
JACKSON, MISSISSIPPI 39225-2849
TELEPHONE: (601) 948-4589
FACSIMILE: (601) 354-2507
e-mail: jwalker@walkergrouppc.com

E. CARLOS TANNER, III, ESQ.
MSB NO. 102713
TANNER & ASSOCIATES, LLC
POST OFFICE BOX 3709
JACKSON, MISSISSIPPI 39207
TELEPHONE: (601) 460-1745
FACSIMILE: (662) 796-3509
e-mail: carlos.tanner@thetannerlawfirm.com

COUNSEL FOR PLAINTIFFS
KELVIN BUCK, ET AL.