## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| **JOHN ROBERT SMITH, et al.** | |
| *Plaintiffs*, | |
| | **3:01-cv-855-HTW-DCB** |
| v. | |
| | |
| **DELBERT HOSEMAN, et al.,** | |
| *Defendants* | |
| | |
| and | |
| | |
| **BEATRICE BRANCH, et al.,** | |
| *Intervenors* | |
| **KELVIN BUCK, et al.,** | |
| *Plaintiffs*, | **3:11-cv-717-HTW-LRA** |
| | |
| v. | |
| | |
| **HALEY BARBOUR, et al.,** | |
| *Defendants*. | |

## BRIEF OF THE NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., MISSISSIPPI STATE CONFERENCE OF THE NAACP, ONE VOICE, AND BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE AS *AMICI CURIAE* OPPOSING VACATUR OF THE INJUNCTION

Fred L. Banks, Jr. (Bar No. 1733)
Phelps Dunbar LLP
4270 I-55 North
Jackson, MS 39211-6391
Telephone: (601) 360-9356
Facsimile: (601) 360-9777
fred.banks@phelps.com

Leah Aden *(pro hac forthcoming)*
Stuart Naifeh *(pro hac forthcoming)*
Amir Badat *(pro hac forthcoming)*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

laden@naacpldf.org
snaifeh@naacpldf.org
abadat@naacpldf.org

Deuel Ross *(pro hac forthcoming)*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
dross@naacpldf.org

Jessica L. Ellsworth *(pro hac forthcoming)*
Dana A. Raphael *(pro hac forthcoming)*
HOGAN LOVELLS US LLP
555 Thirteenth St. NW
Washington, DC 20005
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
jessica.ellsworth@hoganlovells.com

*Attorneys for amici curiae*

Dated:   February 24, 2022

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................. i

CORPORATE DISCLOSURE STATEMENT .................................................................v

STATEMENT OF INTEREST .........................................................................................1

INTRODUCTION .............................................................................................................3

BACKGROUND ...............................................................................................................4

ARGUMENT .....................................................................................................................9

I.     THE STATE'S ENACTED MAP IS LIKELY AN UNCONSTITUTIONAL
       RACIAL GERRYMANDER..................................................................................10

       A.     The State allowed race to predominate by setting a mechanical racial
              target for CD 2 and subordinating race-neutral criteria to meet that target. ..........11

       B.     The State's plan is unlikely to satisfy strict scrutiny because the State
              lacked a pre-enactment strong basis in evidence to show that its racial
              target was narrowly tailored to achieve Section 2 compliance.............................18

II.    THE COURT SHOULD PERMIT DISCOVERY, ORDER AN EVIDENTIARY
       HEARING, AND TOLL THE CANDIDATE FILING DEADLINE. .............................22

CONCLUSION.................................................................................................................24

CERTIFICATE OF SERVICE ........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018)...............................................................................18, 20

*Ala. Leg. Black Caucus v. Alabama,*
    231 F. Supp. 3d 1026 (M.D. Ala. 2017) ...................................................15

*Ala. Legis. Black Caucus v. Alabama,*
    575 U.S. 254 (2015)................................................................................ *passim*

*Bethune-Hill v. Va. State Bd. of Elections,*
    137 S. Ct. 788 (2017)..........................................................................11, 18, 20

*Bethune-Hill v. Va. State Bd. of Elections,*
    368 F. Supp. 3d 872 (E.D. Va. 2019) ......................................................15

*Bush v. Vera,*
    517 U.S. 952 (1996)....................................................................................1

*Chisom v. Roemer,*
    501 U.S. 380 (1991)....................................................................................1

*Connor v. Johnson,*
    402 U.S. 690 (1971)..................................................................................23

*Cooper v. Harris,*
    137 S. Ct. 1455 (2017)........................................................................ *passim*

*Covington v. North Carolina,*
    283 F. Supp. 3d 410 (M.D.N.C.) .............................................................15

*Easley v. Cromartie,*
    532 U.S. 234 (2001)....................................................................................1

*Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs,*
    118 F. Supp. 3d 1338 (N.D. Ga. 2015) .....................................................1

*Georgia v. Ashcroft,*
    539 U.S. 461 (2003)....................................................................................5

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960)....................................................................................1

*Harris v. McCrory*,
    159 F. Supp. 3d 600 (M.D.N.C. 2016) .................................................................17

*Houston Lawyers' Assn. v. Attorney General of Tex.*,
    501 U.S. 419 (1991).................................................................................................1

*Jordan v. Winter*,
    604 F. Supp. 807 (N.D. Miss. 1984).............................................................4, 9, 14

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006).........................................................................................17, 18

*Martin v. Mabus*,
    700 F. Supp. 327 (S.D. Miss. 1988)........................................................................1

*Miller v. Johnson*,
    515 U.S. 900 (1995).............................................................................................17

*Milligan v. Merrill*,
    No. 21-cv-1530, 2022 WL 265001 (N.D. Ala. Jan. 24, 2022) .................................1

*Miss. State Chapter, Operation PUSH, Inc. v. Mabus*,
    932 F.2d 400 (5th Cir. 1991) ..................................................................................1

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009).................................................................................................1

*Personhuballah v. Alcorn*,
    155 F. Supp. 3d 552 (E.D. Va. 2016) ....................................................................15

*Rogers v. Lodge*,
    458 U.S. 613 (1982).................................................................................................1

*Shaw v. Hunt*,
    517 U.S. 899 (1996).................................................................................................1

*Shaw v. Reno*,
    509 U.S. 630 (1993).........................................................................................17, 18

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013).................................................................................................1

*Sixty–Seventh Minnesota State Senate v. Beens*,
    406 U.S. 187 (1972)...............................................................................................23

*Smith v. Clark*,
    189 F. Supp. 2d 529 (S.D. Miss. 2002).........................................................5, 6, 13

*Smith v. Hosemann*,
   852 F. Supp. 2d 757 (S.D. Miss. 2011)..................................................................6

*Thomas v. Bryant*,
   919 F.3d 298 (5th Cir. 2019) ..............................................................................24

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)..................................................................................1, 18, 19

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ................................................................................1

*Wesberry v. Sanders*,
   376 U.S. 1 (1964)..................................................................................................9

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)..............................................................................................1

**Statutes**

Miss. Gen. Laws Ch. ____ (H.B. 384) ........................................................................8

Voting Rights Act Section 2 .......................................................................... *passim*

Voting Rights Act Section 5 ........................................................................... 5, 19

**Other Authorities**

Sid Salter, *Redistricting: Time Running Out; Minority voting rights evolved after
   civil rights struggles*, Clarion-Ledger – Mississippi's Redistricting News (Oct.
   28, 2001),
   http://archive.fairvote.org/redistricting/reports/remanual/msnews3.htm..................3

*Candidate Detail – Thompson, Bernie*, Our Campaigns (Aug. 10, 2019),
   https://www.ourcampaigns.com/CandidateDetail.html?CandidateID=1371 .........................21

*Bennie Thompson*, Ballotpedia,
   https://ballotpedia.org/Bennie_Thompson (last visited Feb. 24, 2022) .................................15

Mississippi Legislature, *MS Senate Floor - 12 JAN 2022, 10 AM*, YouTube (Jan.
   12, 2022)
   https://www.youtube.com/watch?app=desktop&v=FdtZfyWf5bo&feature=yo
   utu.be..............................................................................................................3, 12

Mississippi Legislature, *Congressional Redistricting Committee - Room 216, 15
   December 2021 10:00 A.M.*, YouTube (Dec. 15, 2021),
   https://www.youtube.com/watch?v=-mDs-EzHZUg&t=942s..................................................7

Mississippi Legislature, *Senate - Redistricting Committee - Room 216, 30 June 2021, 3:30PM*, YouTube (June 30, 2021), https://www.youtube.com/watch?v=i13Dj0xYp84&t=314s ......................................................7

Mississippi Legislature, *Legislative Redistricting Committee - Room 216, 19 November 2021 10:00 A.M.*, YouTube (Nov. 19, 2021), https://www.youtube.com/watch?v=PhQAS6o3jXM ..............................................................7

## CORPORATE DISCLOSURE STATEMENT

The NAACP Legal Defense and Educational Fund, Inc., Mississippi State Conference of the NAACP, One Voice, and Black Voters Matter Capacity Building Institute certify the following:

1.   The NAACP Legal Defense and Educational Fund, Inc., is a nonprofit organization with its principal place of business in New York.  It has no parent corporation and no publicly-held company owns ten percent or more of the party's stock.

2.   The Mississippi State Conference of the NAACP is a nonprofit organization that is a subsidiary of the NAACP with its principal place of business in Mississippi.  No publicly-held company owns ten percent or more of the party's stock.

3.   One Voice is a nonprofit organization with its principal place of business in Mississippi. It has no parent corporation and no publicly-held company owns ten percent or more of the party's stock.

4.   Black Voters Matter Capacity Building Institute is a nonprofit corporation with its principal place of business in Georgia.  It has no parent corporation and no publicly-held company owns ten percent or more of the party's stock.

## STATEMENT OF INTEREST[1]

**The NAACP Legal Defense and Educational Fund, Inc.** (LDF) is a nonprofit, nonpartisan legal organization founded in 1940 under the leadership of Justice Thurgood Marshall. LDF's mission is to achieve racial justice and to ensure the full, fair, and free exercise of constitutional and statutory rights for Black people and other people of color. Because the franchise is "a fundamental political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), LDF has worked for over 80 years to combat threats to Black people's right to vote and political representation. LDF has been counsel of record or served as an *amicus* in many of the precedent-setting cases regarding racial discrimination in voting in the U.S. Supreme Court, the federal courts of Mississippi, and other courts. *See, e.g.*, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015) ("*ALBC*"); *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009); *Easley v. Cromartie*, 532 U.S. 234 (2001); *Shaw v. Hunt*, 517 U.S. 899 (1996); *Bush v. Vera*, 517 U.S. 952 (1996); *Houston Lawyers' Assn. v. Attorney General of Tex.*, 501 U.S. 419 (1991); *Chisom v. Roemer*, 501 U.S. 380 (1991); *Thornburg v. Gingles*, 478 U.S. 30 (1986); *Rogers v. Lodge*, 458 U.S. 613 (1982); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (*en banc*); *Miss. State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991); *Milligan v. Merrill*, No. 21-cv-1530, 2022 WL 265001 (N.D. Ala. Jan. 24, 2022) (three-judge court); *Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015); *Martin v. Mabus*, 700 F. Supp. 327, 329 (S.D. Miss. 1988). As such, LDF has a significant interest in ensuring the full, proper, and continued enforcement of the Voting Rights

---

[1]     No counsel for a party in this case authored this brief in whole or in part, and no party or party's counsel made a monetary contribution to fund preparation or submission of this brief. No person or entity other than *amicus curiae* made a monetary contribution to the preparation or submission of this brief.

Act and the Constitution.  LDF submits this brief to help the Court appreciate and understand the negative impact of Mississippi's Congressional Redistricting Plan on Black voters in Mississippi.

**The Mississippi State Conference of the NAACP** (MS NAACP) was at the forefront of major battles of the civil rights movement in Mississippi during the 1950s, '60s, and '70s.  The first Mississippi NAACP branch was chartered in Vicksburg, Mississippi in 1918 and re-chartered on April 8, 1940.  In 1945, members of branches from across the state came together to charter the Mississippi State Conference NAACP to coordinate the efforts of local branches and to carry out the mission and vision of the national organization statewide.  The MS NAACP mission includes ensuring the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination.  The MS NAACP has a significant interest in this case because of its mission and the interests of its members across the state.

**One Voice** is a nonprofit organization whose purpose is to improve the quality of life for African Americans and other disenfranchised communities while building local and regional ability to sustain hard-won battles.  This is a vision that connects justice to political and economic opportunity.  One Voice's work focuses on building power within underserved communities as a tactic to address the ongoing systemic disparities that plague these communities.  For the past two years, One Voice has hosted workshops and community discussions about the importance of the redistricting process.  COVID-19 has introduced a new reality for civic engagement work.  One Voice has hosted a number of tele-townhalls, Zoom coalition meetings and Facebook Live events to discuss civic engagement and redistricting.  One Voice's work has helped to bring a level of transparency to Mississippians who would otherwise be left out of the process.  This case also represents inclusion for communities that continue to be disfranchised.

**Black Voters Matter Capacity Building Institute** (BVM) is a nonprofit, nonpartisan organization founded in 2017 to build political power in black communities in eleven core states. The work includes voter education and finding ways to make voting more accessible and inclusive for all communities, particularly historically marginalized communities. This work includes filing litigation against those states that have passed legislation that creates barriers to voting for Black and marginalized communities. As such, BVM has a significant interest in ensuring the full, proper, and continued enforcement of the Voting Rights Act and the Constitution. BVM submits this brief to help the Court appreciate and understand the negative impact of Mississippi's Congressional Redistricting Plan on Black voters in Mississippi.

## INTRODUCTION

Early this year, in response to the release of the 2020 Census data, the Mississippi Legislature redrew the state's four Congressional districts. Before the State Legislature considered traditional redistricting principles such as compactness and preserving communities of interest, it made the central choice to set the exact racial makeup of one Congressional district: Congressional District 2 (CD 2). From the outset, the Legislature decided that CD 2 would have a Black voting age population (BVAP) of about 61%.

The State hit that target with surgical precision. Doing so required packing thousands of Black Mississippians into a district that already elected a Black-preferred candidate by generous margins, splitting more counties than necessary, and drawing a line through the state capital. The foreseeable consequence of the State's reliance on a racial target to pack CD 2 is the diminishment of Black political influence in the State's other three Congressional districts.

When the Vice-Chair of the Redistricting Committee defended the packed CD 2 on the Senate floor, he admitted the Legislature's predominant racial motive. He explained that the State

*could have* made CD 2 more compact, but the "numbers just didn't work"—because it would have "decrease[d] [the district's] BVAP" below the State's racial target.[2]

The Constitution's Equal Protection Clause forbids the predominate use of race in the redistricting process unless it is narrowly tailored to achieve a compelling state interest—like compliance with the Voting Rights Act (VRA). Absent narrow tailoring to satisfy a compelling interest, a state cannot arbitrarily set a racial target for a voting district and then subordinate race-neutral criteria to ensure that target is reached. *Cooper v. Harris*, 137 S. Ct. 1455 (2017); *ALBC*, 575 U.S. 254 (2015). Neither Mississippi, nor the Republican Party, presents any evidence to suggest that, prior to the enactment of the 2021 plan, the Legislature even considered the VRA's requirements before assigning its racial target, nor do they present any evidence that the Legislature conducted any analysis of racial voting patterns or other election data to determine the Black population level needed to avoid vote dilution and satisfy the State's VRA obligations. As the *Buck* Plaintiffs argue, this Court should allow discovery and an evidentiary hearing to allow the parties and *amici* to present evidence that the State's congressional redistricting plan constitutes a racial gerrymander that discriminates against Black Mississippians.

## BACKGROUND

### The History of Congressional District 2

For decades, federal courts have closely scrutinized Mississippi's congressional redistricting process. Following years of litigation after the 1980 Census, a three-judge court ordered that Section 2 of the Voting Rights Act required the creation of CD 2, a Black-majority district in the Delta region of Mississippi. *See Jordan v. Winter*, 604 F. Supp. 807, 808–09 (N.D. Miss. 1984) (three-judge court), *aff'd sub nom. Miss. Republican Exec. Comm. v. Brooks*, 469 U.S.

---

[2]    Mississippi Legislature, *MS Senate Floor - 12 JAN 2022, 10 AM*, YouTube (Jan. 12, 2022), https://www.youtube.com/watch?app=desktop&v=FdtZfyWf5bo&feature=youtu.be (at 38:00).

1002 (1984). Two years later, residents of CD 2 elected the first Black federal representative from Mississippi since Reconstruction in the late 1800s.

The court-ordered plan created CD 2 with a Black voting age population (BVAP) of 52.83%. *Id.* at 814. Based on "[c]redible expert testimony," the *Jordan* court concluded that this 52.83% BVAP was sufficient for Black voters to elect candidates of their choice. *Id.* It rejected plans that would pack CD 2 with significantly more Black residents, acknowledging that doing so "would diminish the impact of [B]lack voters" in an adjacent district. *Id.* at 815.

Following the 1990 Census, the Legislature redrew Mississippi's Congressional map and for the first time, split Jackson between two districts. The Legislature significantly increased the BVAP of CD 2 as compared to the prior plan, creating a district with approximately at 58% BVAP.[3] This set the basis for the district's BVAP for the next two redistricting cycles.

Mississippi lost a Congressional seat following the 2000 Census, going from five districts to four districts. Due to the Legislature's inability to enact a new plan, this Court enjoined the State from using its then-existing five-district plan and instituted a four-district plan. *Smith v. Clark*, 189 F. Supp. 2d 529 (S.D. Miss. 2002) (three-judge court), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003). In drawing its plan, the Court was concerned with the risk of retrogression in violation of Section 5 of the Voting Rights Act, which prohibited covered jurisdictions from enacting redistricting plans that weakened the "position of racial minorities with respect to their effective exercise of the electoral franchise" as compared to the jurisdiction's prior redistricting plan. *Georgia v. Ashcroft*, 539 U.S. 461, 477 (2003). The Court did not focus on the BVAP necessary to avoid Black vote dilution in CD 2; rather, it noted only that "[i]t is certain that

---

[3]    *See* Sid Salter, *Redistricting: Time Running Out; Minority voting rights evolved after civil rights struggles,* Clarion-Ledger – Mississippi's Redistricting News (Oct. 28, 2001), http://archive.fairvote.org/redistricting/reports/remanual/msnews3.htm.

significant retrogression would result in District 2 if Black voting age population is shifted from District 2 to increase the percentage of Black voting age population in District 3." *Clark*, 189 F. Supp. 2d at 538. Out of this concern of retrogression, the Court redrew CD 2 to include a BVAP of 59.2%. *Id.* at 540. In its opinion, however, the Court did not analyze whether this BVAP was necessary to comply with Section 2 or Section 5 of the VRA, instead simply noting that the one majority-minority district must be drawn to satisfy the VRA and that the Court's plan did not result in vote dilution or retrogression. *Id.*

In drafting the state's Congressional plan following the 2000 Census, this Court considered several "secondary criteria" in addition to the requirements of federal law, including (in order of priority):

> (1) compactness and contiguity; (2) respect for county and municipal boundaries; (3) preservation of historical and regional interests; (4) placement of the major research universities and military bases, respectively, in separate districts; (5) placement of at least one major growth area in each district, and avoidance of placement of several major growth areas in the same district, so as to minimize population deviation among the districts as Mississippi's population changes; (6) inclusion of as much as possible of southwest Mississippi from former district 4, and east central Mississippi from former district 3, in the new District 3; (7) protection of incumbent residences; and (8) consideration of the distances of travel within each district.

*Clark*, 189 F. Supp. 2d at 541.

This Court again had to step in to draw the state's Congressional plan after the 2010 Census. *Smith v. Hosemann*, 852 F. Supp. 2d 757 (S.D. Miss. 2011) (three-judge court). Using most of the same criteria it laid out in its opinion explaining its drafting of the state's prior Congressional plan, the Court made relatively minor changes.[4] Again concerned with avoiding retrogression under the VRA, the Court drew CD 2 to include a BVAP of 61.36%, but the Court

---

[4]    The Court noted that some of the criteria it established in its previous opinion were not required, such as maintaining major research universities and military bases in separate districts and considering incumbent residences.

again did not conduct or describe any analysis showing whether this specific BVAP was necessary to comply with the VRA. *Id.* at 765–66.

Outside of CD 2, Black Mississippians have continued to be unable to elect a representative of their choice to Congress.

**The 2021-2022 Redistricting Process**

The Mississippi Joint Congressional Redistricting and Legislative Reapportionment Committee (the "Redistricting Committee") is tasked with redrawing Mississippi's Congressional map following each Census. Miss. Code Ann. § 5-3-121. Much of the Committee's work was done in private. Despite numerous statements by members of the Committee about the "great deal of work" that went into the process of developing the Committee's map,[5] the Committee met in public only three times over the course of approximately six months for a total of about 45 minutes, during which it elected the leadership of the Committee on June 30, 2021, adopted redistricting criteria on November 19, 2021, and proposed a Congressional redistricting plan on December 15, 2021.[6] The Committee held nine hearings across the state to solicit input from members of the public between August 5 and August 23, 2021, but most were held before U.S. Census data was even released in August and September 2021, and all of them were held before the Committee had put forth any proposed plan that members of the public could review and respond to. In addition, the Committee took deliberate steps to shield its map drawing process from public scrutiny,

---

[5]      *See, e.g.*, Mississippi Legislature, *Congressional Redistricting Committee - Room 216, 15 December 2021 10:00 A.M.*, YouTube (Dec. 15, 2021), https://www.youtube.com/watch?v=-mDs-EzHZUg&t=942s (at 1:34).

[6]      Mississippi Legislature, *Senate - Redistricting Committee - Room 216, 30 June 2021, 3:30PM*, YouTube (June 30, 2021), https://www.youtube.com/watch?v=i13Dj0xYp84&t=314s; Mississippi Legislature, *Legislative Redistricting Committee - Room 216, 19 November 2021 10:00 A.M.*, YouTube (Nov. 19, 2021), https://www.youtube.com/watch?v=PhQAS6o3jXM; Mississippi Legislature, *Congressional Redistricting Committee - Room 216, 15 December 2021 10:00 A.M.*, YouTube (Dec. 15, 2021), https://www.youtube.com/watch?v=-mDs-EzHZUg&t=942s.

adopting policies requiring that records "generated in the course and scope of carrying out redistricting activities" are "confidential and not subject to public records release."  Dkt. No. 151-4.  At no point did the public have the opportunity to provide public comment about the Committee's proposed map.

The full Legislature took up the Committee's proposed map as soon as the legislative session began on January 4, 2022, less than three weeks after the map was made available to the public.  During the floor hearings, it became clear that the Committee had drawn the lines for CD 2 with a specific BVAP in mind.  In response to a question about why the Committee chose to compensate for the more than 65,000 people that CD 2 lost by expanding the district southward, Senator Dean Kirby, the Vice-Chair of the Redistricting Committee, explained that CD 2 was not as compact as it could have been because the Committee chose to keep CD 2's "[BVAP] percentage as close as it was" in the State's prior court-drawn map, and adding people from more compact counties meant the "numbers just didn't work" and would "decrease the BVAP" below the previous map's 61.36%.[7]  There is no evidence that the Committee performed a racially polarized voting[8] (RPV) or any other analysis to determine whether its BVAP target, in the presence of RPV, was necessary to provide Black voters in CD 2 an opportunity to elect candidates of their choice, and the Republican Party does not contend that it did so.  *See* Dkt. No. 156.

The Mississippi Legislature adopted and the Governor signed the four-district congressional plan in January 2022.  2022 Miss. Gen. Laws Ch. _____ (H.B. 384).  Hours later, the Republican Party, asked this Court to "vacate the current final judgment, declare that the new

---

[7]    Jan. 12, 2022 Mississippi Legislature, *supra* note 2 at 38:00.
[8]    Racially polarized voting refers to the continued pattern of voting along racial lines in which voters of the same race tend to support the same candidate, who is different from the candidate supported by voters of a different race.

statutory plan satisfies all state and federal statutes and constitutional requirements, and permit it to go into effect." Dkt. No. 144 at 9.

### **The Enacted Map**

The State's congressional plan added the requisite number of votes to CD 2 to satisfy the one-person-one-vote requirement, which requires that districts generally attain equality of population "as nearly as is practicable." *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964). And it maintained one district comprised of a majority of Black voters ("majority-Black district"), as it has done since after the 2000 Census. But it satisfied those basic obligations by violating another: the Legislature subordinated traditional redistricting principles to pack CD 2 with an unnecessarily high BVAP that deprives the remaining districts of Black population and that "diminish[es] the impact of [B]lack voters" in other districts. *Jordan*, 604 F. Supp. at 815.

Mississippi drew CD 2 with a 62.15% BVAP (Exhibit 1, Cooper Decl. ¶ 12)[9]—slightly *higher* than its stated racial target. Of the four counties added to CD 2, three have a BVAP equal or higher than Mississippi's state-wide BVAP of 36.14%. One of those counties—Wilkinson—contains one of the highest BVAP of any county not already included in CD 2. The State also split Hinds County to add several majority-Black voting precincts to CD 2, including one precinct with a 76% BVAP. Meanwhile, eleven precincts in Hinds County were excluded from CD 2—eight of which were predominantly white.

The State's map makes CD 2 the largest district in the State, comprising 40% of the land mass and adding four counties to the southern end of the district to stretch it from the top of the State to the bottom. The map also splits the City of Jackson, the state's capital, and fails to include any high-growth areas of the state in CD 2, such as areas in northeast Jackson or southern Madison

---

[9]    Unless otherwise noted, this brief uses the "Any Part Black" measure of BVAP, which includes persons of two or more races and some part Black. *See* Cooper Decl. ¶ 9 n.2.

County.  While a carryover from the prior map, Jackson's split is largely along racial lines.  These decisions violated multiple of the Committee's stated redistricting criteria, including compactness, avoiding county and municipal splits, avoiding long distances to travel districts, and including high-growth areas in districts.

## ARGUMENT

The State's enacted plan is likely a racial gerrymander.  The available evidence suggests that the Legislature subordinated traditional redistricting principles for the predominately racial purpose of achieving a BVAP target for CD 2.  This racial target for CD 2 was unnecessarily high to achieve Section 2 compliance, and it arbitrarily maintains a low BVAP in the surrounding Congressional districts.  Neither the Legislature, nor the other proponents of the State's plan, provided any evidentiary basis to show that the Legislature's BVAP target was reasonably necessary to avoid a Section 2 violation.  Indeed, it was not.  Alternative maps show that CD 2 can be drawn with a BVAP below the State's target that *both* provides Black voters with the ability to elect a candidate of their choice and complies with traditional redistricting principles.  Drawing such a district has the effect of avoiding BVAP reduction in surrounding districts such that Black voters will have the ability to impact, including influence, elections in districts outside of CD 2.  To allow full development of the factual record concerning the Legislature's consideration of race in drawing district lines and the process for developing its map, the Court should permit discovery and order an evidentiary hearing to allow the Court to consider the Defendants' motion and any potential contrary evidence from Plaintiffs or *amici* based on a complete record.

## I.    THE STATE'S ENACTED MAP IS LIKELY AN UNCONSTITUTIONAL RACIAL GERRYMANDER.

Racial gerrymandering claims pursuant to the Equal Protection Clause of the Fourteenth Amendment require a two-step inquiry.  First, a plaintiff must prove that race was the

"predominant factor" in a state's choice to move voters in or out of a particular district. *Cooper v. Harris*, 137 S. Ct. 1455, 1463–64 (2017) (citation omitted). Second, if race predominated, strict scrutiny applies, and the state must prove that its predominate use of race was narrowly tailored to advance a compelling interest. *Id*. Compliance with Section 2 of the VRA is a compelling state interest. *Id.* However, the narrow tailoring requirement means that race must be considered only to the extent necessary to satisfy the State's Section 2 obligations. *Id.* Applying that inquiry here, Mississippi's plan is unlikely to pass constitutional muster.

**A.  The State allowed race to predominate by setting a mechanical racial target for CD 2 and subordinating race-neutral criteria to meet that target.**

Racial considerations likely predominated the Legislature's drawing of CD 2. Race predominates when a State prioritizes "racial considerations" above "traditional race-neutral districting principles," such as compactness, contiguity, or maintaining communities of interest without a "strong basis in evidence" for doing so. *ALBC*, 575 U.S. at 272 (citations omitted). To determine whether a state allowed race to predominate, courts conduct a "holistic analysis," heeding the "actual considerations" a legislature used in drawing districts. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799–800 (2017). A plaintiff can show racial predominance using either "direct evidence going to legislative purpose" or "circumstantial evidence of a district's . . . demographics." *ALBC*, 575 U.S. at 266–67 (quotation omitted). But in defending a plan, the legislature cannot rely on "*post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799–800. Here, for example, the Legislature cannot rely on evidence developed in litigation—after the enactment of the plan—to justify its use of racial targets.

The Equal Protection Clause limits a state's ability to use "mechanical racial targets" in redistricting. *ALBC*, 575 U.S. at 267. New census data often requires a state to redraw district

boundaries—either by adding or subtracting voters.  *Id.* at 273.  While on its own, a state's adoption of a "mechanical racial target[]" is not enough to establish that race predominated in a challenged plan, a plaintiff can demonstrate predominance by showing that the state decided which voters to add or subtract to a particular district based on that target or by showing that a state subordinated race-neutral redistricting criteria in a particular district to meet that target.  *Id.* at 267.

Here, ample evidence shows that Mississippi set a mechanical racial population target for CD 2 and subordinated traditional criteria to ensure that CD 2 reached that target.  Indeed, the Vice-Chair of the Redistricting Committee, Senator Kirby, admitted as much during the Senate debate on the Committee's proposed map.  During the debate, Senator Horhn noted that the Committee's plan made CD 2 less compact and asked why the Committee chose not to compensate for CD 2's population loss by adding voters from counties adjacent to CD 2's eastern border, like DeSoto County—an addition that would have improved CD 2's compactness.[10]  Senator Kirby explained that the Committee considered this option, but it chose to keep CD 2's "[BVAP] percentage as close as it was" in the state's prior map.[11]  Thus, the Committee chose not to add counties to the east of CD 2 because "those numbers just didn't work," meaning that doing so would "decreas[e] the BVAP" in CD 2 below what it was in the prior map: 61.36%.[12]  In other words, the Committee *could have* drawn a district more aligned with traditional criteria like compactness, but it *chose not to* because prioritizing traditional criteria over racial consideration would decrease CD 2's BVAP below the Committee's mechanically-assigned racial target.

The Committee hit its target with surgical precision.  Despite significant population and demographic changes in the 2020 Census that required the Legislature to add more than 65,000

---

[10]     Jan. 12, 2022 Mississippi Legislature, *supra* note 2 at 37:08.
[11]     *Id.* at 38:00.
[12]     *Id.* at 38:50.

voters to CD 2 to satisfy the one-person-one-vote rule, the Legislature managed to draw a district with a 62.15% BVAP—about 0.79% more than its stated racial target—a task that required adding tens of thousands of Black voters to the district.  Cooper Decl. ¶ 14.  The majority of the voting age population added to CD 2 was Black—with a 50.35% BVAP, higher than the state's overall BVAP.  *Id.*  Indeed, the State added four counties to CD 2, three of which have a BVAP equal to or higher than Mississippi's state-wide BVAP of 37%.  One of those counties—Wilkinson—features one of the highest Black voting populations of any county not already included in CD 2.

### Counties Added to CD 2:[13]

| County | BVAP |
|--------|------|
| Adams | 55.36% |
| Franklin | 33.19% |
| Wilkinson | 66.86% |
| Amite | 37.77% |

The State also maintained the split of Hinds County, but added several precincts to CD 2 with significant BVAPs to maintain the artificially high BVAP of CD 2.

### Precincts Added to CD 2:[14]

| Hinds County Precinct | BVAP |
|-----------------------|------|
| 47 | 77.38% |
| 1 | 57.48% |
| 37 | 49.75% |
| 45 | 30.58% |

To hit its racial target, the State ignored its own redistricting criteria, including compactness, avoiding county splits, minimizing travel distance, and including high-growth areas

---

[13]     Cooper Decl. Ex. B.
[14]     *Id.*

in each district.  For instance, as compared to the benchmark plan enacted by this Court, the State's plan reduces CD 2's compactness based on two separate measures.  *Compare* Dkt. No. 151-1, at 4 (showing CD 2's compactness scores in the benchmark plan), *with* Dkt. No. 151-2, at 2 (showing CD 2's compactness scores in the State's plan).  It likewise splits the state's capital, the City of Jackson, into two separate Congressional districts.[15]  And while the State's redistricting principles call for including a high-growth area in each district, under the State's plan, CD 2 is the only district without one.

There were other possible alternatives more consistent with the State's non-racial redistricting principles while maintaining CD 2 as a majority-Black district that would satisfy the requirements of the VRA.  For example, in the attached declaration of Mr. William Cooper, both illustrative plans create a more compact CD 2 than the State's plan.  Using the Reock score, one of the most common measures of compactness, the CD 2 in both of *amici*'s illustrative plans score higher than the State's plan on compactness, and both of *amici*'s illustrative plans are virtually identical to the State's plan on the compactness of the overall map.  Cooper Decl. ¶ 28.  *Amici's* illustrative plans also avoid extending CD 2 down the entire length of the state, instead expanding it to the east to include Madison County (a high-growth area) and part of Rankin County.  Cooper Decl. Figures 2 & 3.  Both plans split fewer counties (three in both Plan 1 and 2) and precincts (zero in Plan 1 and three in Plan 2) than the State's plan (four and five respectively).  *Id*.  And both

---

[15]     The court's two prior plans also split Jackson, but it noted that it did so only because then-Mayor of Jackson preferred the city be represented by two members of Congress.  *Smith*, 189 F. Supp. 2d at 542–43.  The current mayor has said no such thing.  And Black members of the legislature stated during floor debates that it was not useful for Jackson to have two representatives in Congress when one of them consistently voted against the interests of Jackson's residents.  *See* Mississippi Legislature, *MS House Floor – 6 JAN 2022*, YouTube (Jan. 6, 2022), https://www.youtube.com/watch?v=bf0ErpQPBKo&t=1292s (at 30:40).

plans keep the City of Jackson wholly within CD 2, avoiding the split of Mississippi's capital city in the State's map. *Id.*

Both illustrative plans include a BVAP between 54%-55% in CD 2. Cooper Decl. ¶¶ 16, 22. Dr. Baodong Liu, *amici's* expert, conducted analyses showing that, in the presence of racial bloc voting, Black-preferred candidates in statewide elections would win a substantial majority of the votes in CD 2 under both illustrative plans. Exhibit 2, Liu Report at 6. In the last decade, Congressman Bennie Thompson won each election in CD 2 by at least two-thirds of the vote.[16] And by unpacking CD 2, both illustrative plans increase the BVAP in CD 3. Cooper Decl. ¶¶ 16, 22. *Cf. Jordan*, 604 F. Supp. at 815 (rejecting proposed plans that increased the BVAP in a majority-Black congressional district in order to avoid reducing the Black population in an adjoining district below 41.99%). Indeed, the invalidation of a plan where race predominates "will require that many [B]lack voters formerly subjected to race-based inclusion in the invalidated districts will be assigned to surrounding non-challenged districts" resulting in an increase "in the BVAP of adjacent non-challenged districts." *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 879 (E.D. Va. 2019); *see also Covington v. North Carolina*, 283 F. Supp. 3d 410, 455-56 (M.D.N.C.) (three-judge court) (ordering a 13%-point decrease of the BVAP in a challenged district, which increased the BVAP in an adjacent district from 11% to 40%), *aff'd in relevant part* 138 S. Ct. 2548, 2554 (2018); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 565 (E.D. Va. 2016) (three-judge court) (ordering that the BVAP in a challenged district be lowered to 45% and increasing the BVAP in a neighboring district from 30% to 41%).

In *ALBC*, the Supreme Court held that Alabama had likely engaged in unconstitutional racial gerrymandering by assigning a "mechanical racial target" for a particular district and then

---

[16]   *Bennie Thompson*, Ballotpedia, https://ballotpedia.org/Bennie_Thompson (last visited Feb. 24, 2022) (66% in 2020; 71.8% in 2018; 67.1% in 2016; 67.7% in 2014; 67.1% in 2012).

subordinating other redistricting criteria to ensure that target was reached without narrowly tailoring its use of race to achieve a compelling interest.  575 U.S. at 266–67.  New census data required Alabama to redraw the lines of a majority-minority voting district.  *Id.* at 259.  At the outset, Alabama sought to ensure the district's BVAP would remain about 72%.  *Id.* at 259–60.  To achieve its goal, the State added thousands of Black voters to the district (State Senate District 26) even though doing so subordinated criteria like maintaining compactness and avoiding county-splitting.  *Id.* at 260.  The Supreme Court concluded that Alabama's "policy of prioritizing mechanical racial targets above all other districting criteria" was "evidence that race motivated" the State's maps, and the Court vacated the order upholding the maps.  *Id.* at 267–68.  On remand, the three-judge court ruled that Senate District 26 and eleven other districts were unconstitutional racial gerrymanders.  *See Ala. Leg. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1048 (M.D. Ala. 2017) (three-judge court).

The same logic applies to this case.  Here, as in *ALBC*, Mississippi needed to add thousands of voters to a majority-Black district to balance the population following the 2020 U.S. Census.  Here, as in *ALBC*, Mississippi set a "mechanical racial target" for that district.  And here, as in *ALBC*, Mississippi pursued that racial target at the expense of race-neutral criteria, adding thousands of Black voters to a district with an already-high BVAP.

The Republican Party, joined by the State, contends that it could not maintain the compactness of and distance to travel CD 2 because the Legislature had to add voters to CD 2.  Dkt. No. 156, at 13.  But again, the two illustrative plans created by *amici's* expert show that, but for Mississippi's fixed racial target, it could have drawn maps that more closely comply with traditional redistricting principles while still maintaining CD 2 as a district that provides Black

voters with the ability to elect candidates of their choice.[17]  These illustrative maps do not use an inflated BVAP target, but as revealed by an analysis of racial voting patterns, would still provide Black voters in CD 2 with an opportunity to elect candidates of their choice in compliance with the VRA.  And these maps adhere to traditional redistricting principles in drawing CD 2 better than the State's enacted map while avoiding the packing of CD 2, allowing Black voters in another district to have greater impact, including influence, in elections in those surrounding districts.

For its part, Mississippi concedes that it sought to avoid "changing the [B]lack voting age population" in CD 2, but it argues that race still did not predominate because "achiev[ing] a [BVAP] consistent" with prior maps does not constitute invidious discrimination.  Dkt. No. 156-8, at 10.  First, Defendants misstate the law.  The Constitution prohibits *both* intentional racial discrimination and racial gerrymandering.  It is true that racial gerrymandering is a type of Equal Protection claim and so requires proof of intent or motive.  But racial gerrymandering claims are "analytically distinct" from discriminatory purpose claims, which allege that "the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities."  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation and internal quotation marks omitted).  Unlike the discriminatory purpose cases that Defendants cite, racial gerrymandering claims require only proof that race was the predominant motive in the state's redistricting decisions.  *Shaw v. Reno*, 509 U.S. 630, 642–43 (1993) ("*Shaw I*").  For that reason, in a racial gerrymandering claim, it is irrelevant whether legislators acted for "benign" reasons, *id.*, or based on "good faith."  *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016) (three-judge court), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017).  In contrast, in discriminatory purpose cases, a plaintiff must prove the State had the goal of disadvantaging voters

---

[17]     The Legislature considered and rejected two alternative maps offered as amendments to H.B. 384 that also reduced the BVAP in CD 2.

based on race.  *See, e.g., League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*").

In *ALBC*, the Supreme Court rejected Defendants' argument that simply maintaining the BVAP in CD 2 satisfies its statutory and constitutional duties.  There, Alabama likewise sought to "maintain[] roughly the same [B]lack population percentage in existing majority-minority districts" from its prior maps.  575 U.S. at 254.  Far from accepting such a tactic as nondiscriminatory, the Court held that "adopt[ing] and apply[ing] a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines" in violation of the constitutional prohibition against racial gerrymandering.  *Id.* at 267.

**B.  The State's plan is unlikely to satisfy strict scrutiny because the State lacked a pre-enactment strong basis in evidence to show that its racial target was narrowly tailored to achieve Section 2 compliance.**

When a plaintiff shows that race predominated a State's line-drawing, strict scrutiny applies, and the State bears the burden of proving that the use of race was narrowly tailored to serve a compelling interest.  *Cooper*, 137 S. Ct. at 1464.  Senator Kirby appears to have suggested that the Committee established a racial target for CD 2 to ensure compliance with the VRA.[18]  To be sure, complying with the VRA is a compelling interest, *Cooper*, 137 S. Ct. at 1464, given the "significant state interest in eradicating the effects of past racial discrimination."  *Shaw I*, 509 U.S. at 656.  But a State's use of race must be narrowly tailored to achieve that interest.  *Cooper,* 137 S. Ct. at 1463.  The use of race is narrowly tailored to comply with the VRA only when the State has "good reasons" for drawing the specific majority-Black district.  *ALBC*, 575 U.S. at 278.

---

[18]     Jan. 12, 2022 Mississippi Legislature, *supra* note 2 at 38:00 (explaining that Committee sought to keep the BVAP percentage in CD 2 "as close as it was" to the 2011 map's BVAP so that it remained a minority-majority district).

A state will have "good reasons" if it conducts a "pre-enactment analysis with justifiable conclusions" of what the VRA demands before placing a significant number of minorities into a district. *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). Section 2 of the VRA requires that a state create a majority-minority district where the *Gingles* preconditions are satisfied and the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choice. *LULAC*, 548 U.S. at 425. The *Gingles* preconditions are satisfied where: (1) Black voters are "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) Black voters are "politically cohesive;" and (3) the white majority "votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Id.* at 425 (2006) (cleaned up). Together, the *Gingles* preconditions require an analysis of racial voting patterns and the effectiveness of a given majority Black voting age population in electing their candidate of choice in a potential district.

A state that uses race as the predominant factor in drawing a district must perform this type of analysis to survive strict scrutiny. In particular, a state must conduct a "meaningful legislative inquiry" into what the VRA requires and develop "a strong basis in evidence" for arriving at its chosen racial target. *Cooper*, 137 S. Ct. at 1461. That inquiry requires the state to perform a "functional analysis of the electoral behavior within the particular . . . election district." *Bethune-Hill*, 137 S. Ct. at 797. And when a state's racial target is not supported by such an analysis, it fails strict scrutiny. *See Cooper*, 137 S. Ct. at 1461; *ALBC*, 575 U.S. at 275.

Here, there is no evidence that Mississippi *ever* considered whether a 61% BVAP is necessary to achieve Section 2 compliance with respect to CD 2. The State has presented no evidence that it performed a pre-enactment analysis of racially polarized voting, election returns,

or any other data.  To the contrary, the State began with its assumption that CD 2 must retain at least a 61% BVAP and went on to accomplish that goal by any means necessary.

In *ALBC*, Alabama invoked VRA compliance to justify prioritizing its mechanical racial targets.  575 U.S. at 275.  The district court found that avoiding retrogression under Section 5 of the VRA required the State to maintain BVAPs in its majority-minority districts that were roughly similar to those in its prior map.  *Id.*  But the Supreme Court rejected that reasoning.  *Id.*  To satisfy strict scrutiny under such a justification, States must ask: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?"  *Id.* at 279.  Instead, Alabama—like Mississippi—assumed from the beginning that the VRA required the same BVAP it had enacted in a prior map, and it merely considered the feasibility of maintaining those percentages without ever questioning whether they had become outdated.  *Id.*  Thus, the state failed strict scrutiny because it failed to ask the right question at the outset.  *Id.*

Nor can Mississippi justify setting a 62% BVAP for CD 2 simply because this Court once ordered it to impose a map featuring a majority-minority district with a similar BVAP.  That argument misunderstands the redistricting process and ignores recent Supreme Court precedent.  In reality, a district's voting population often changes substantially between each decennial Census.  A BVAP appropriate after one Census might very well be a poor fit after the next.  For that very reason, the Supreme Court requires a State to re-examine the legality of its maps after each Census—in other words, the State must examine whether the VRA requires "the new districts [it] contemplates," not "the old ones it sheds."  *Cooper*, 137 S. Ct. at 1471.  A court order requiring a state to draw a majority-minority district with a certain BVAP is not a judicial blessing to forever

impose that same BVAP, no matter how much a district's or a State's population, demographics, and voting tendencies change.

The State's failure to conduct any analysis prior to establishing its racial target falls woefully short of the legislative inquiry the Supreme Court requires to satisfy strict scrutiny. In comparison to Mississippi's inaction, in *Bethune-Hill*, the Court held that Virginia's target BVAP satisfied strict scrutiny because, in choosing that racial target, the state's lead mapmaker conducted "functional analysis of the electoral behavior" in the redrawn districts by "careful[ly] assess[ing] . . . local conditions and structures." 137 S. Ct. at 801. The mapmaker discussed the target with incumbents from majority-minority districts, considered turnout rates and recent election results, and even accounted for "the district's large population of disenfranchised [B]lack prisoners." *Id*. Thus, the state satisfied strict scrutiny because, far from applying an arbitrary target carried over from a prior map, it instead enacted a redistricting plan that "reflected the good-faith efforts of [the mapmaker] and his colleagues to achieve an informed bipartisan consensus." *Id.* In stark contrast, there is no evidence that Mississippi engaged in that kind of careful assessment here. "[I]t is the State's burden to prove narrow tailoring," and Mississippi has failed to do so. *Perez*, 138 S. Ct. at 2335.

Moreover, there is ample reason to believe that the state's racial target is *not* necessary to ensure that minority voters can elect their preferred candidates in CD 2. Only *once* since the incumbent representative in CD 2 was initially elected[19] in 1993 has he won reelection in CD 2 with less than 55% of the vote.[20] Since 2002, when CD 2 has had a BVAP of approximately 60%,

---

[19]     An analysis of voting patterns leaves no question that the incumbent representative, Bennie Thompson, is the candidate of choice of Black voters in CD2. For example, in 2020, Representative Thompson was the choice of over 94% of Black voters in the district. Liu Report at 4.

[20]     *Candidate Detail – Thompson, Bernie*, Our Campaigns (Aug. 10, 2019), https://www.ourcampaigns.com/CandidateDetail.html?CandidateID=1371.

the Black-preferred candidate in CD 2 has won all but two elections with over 61% of the vote, and he has won more than 66% of the vote in every election since the previous map was enacted in 2011.[21]   When a district has a history of electing Black-preferred candidates by "handy margins," the State is less likely to be justified in adding voters to that district on the basis of race in its purported pursuit of VRA compliance.  *Cooper*, 137 S. Ct. at 1466.

To be clear, all parties agree that the VRA still requires a majority-Black district in Mississippi.  Thus, the central question is not whether a majority-Black district is required; rather, it is whether the VRA requires Mississippi to draw such a district *with a 62% BVAP*.  And the State has presented no evidence to suggest that it even bothered to ask—much less seriously consider—that question.

Of course, strict scrutiny does not require the legislature to "guess precisely what percentage" BVAP is required.  *ALBC*, 575 U.S. at 278.  Rather, the state need only conduct a "meaningful legislative inquiry" based on present census data and develop a "strong basis in evidence" for its conclusion regarding the district configuration needed to satisfy Section 2. *Cooper*, 137 S. Ct. at 1464.  What a state cannot do—and what Mississippi by its own admission has done here—is simply assume that a more-than-decade-old racial target remains the right fit for its present-day voters.

## II.   THE COURT SHOULD PERMIT DISCOVERY, ORDER AN EVIDENTIARY HEARING, AND TOLL THE CANDIDATE FILING DEADLINE.

The facts raised in this brief establish that race likely predominated in the State's drawing of CD 2 and that its consideration of race was not narrowly tailored to achieve a compelling government interest.  However, these facts are but a small portion of the potentially relevant facts that the State has shielded from the public's view.

---

[21]     *Id.*

On numerous occasions during the deliberations in the Legislature, legislators acknowledged the significant effort that went into the Committee's work.[22]  But the Redistricting Committee held only three public meetings, which lasted for a total of approximately 45 minutes, during which there was minimal deliberation about how the map should be drawn and no opportunity for public comment on the Committee's proposed map.[23]  Moreover, the Committee's policies require that records "generated in the course and scope of carrying out redistricting activities" are "confidential and not subject to public records release."  Dkt. No. 151-4.  In fact, contrary to the Republican Party's representation, Dkt. No. 156, at 9, the Committee has not even made the public's proposed alternative maps, which are a matter of public record, Dkt. No. 151-4, at 5, available on its website.

As a result, beyond the facts recited in this brief, the public has very little insight into the process through which the map was drawn.  Given the lack of transparency in the legislative process, the parties should have the opportunity to conduct discovery to obtain additional information about the legislature's process in drafting its map.  The Court should also allow an evidentiary hearing for the parties and *amici* to present evidence to support their positions.

Finally, given the impending date of the candidate filing deadline on March 1, 2022, just one day following the due date for Defendants' reply briefs, the Court should toll the candidate filing deadline to allow for full development of the record.  *Sixty–Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 201 n.11 (1972) ("[T]he district court has the power appropriately to extend the time limitations imposed by state law."); *Connor v. Johnson*, 402 U.S. 690, 693 (1971)

---

[22]    Mississippi Legislature, *MS House Floor – 6 JAN 2022*, YouTube (Jan. 6, 2022), https://www.youtube.com/watch?v=bf0ErpQPBKo&t=1292s.

[23]    The Committee held nine public hearings across the state, but these were non-deliberative meetings that largely occurred prior to the release of census data.  None of these meetings occurred after the Committee proposed its map.

(directing district court to suspend candidate filing deadline while it developed a new redistricting plan for Hinds County); *Thomas v. Bryant*, 919 F.3d 298, 316 (5th Cir. 2019) (affirming the suspension of election deadlines during development of remedial plan).

## CONCLUSION

For these reasons, this Court should allow discovery and conduct a hearing to determine whether the map drawn by H.B. 384 meets constitutional and statutory requirements and it should reject the State's request to dissolve the final judgment.

Respectfully submitted,

February 24, 2022

/s/ *Fred L. Banks, Jr.*
Fred L. Banks, Jr. (Bar No. 1733)
Phelps Dunbar LLP
4270 I-55 North
Jackson, MS  39211-6391
Telephone: (601) 360-9356
Facsimile: (601) 360-9777
fred.banks@phelps.com

Leah Aden *(pro hac forthcoming)*
Stuart Naifeh *(pro hac forthcoming)*
Amir Badat *(pro hac forthcoming)*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
laden@naacpldf.org
snaifeh@naacpldf.org
abadat@naacpldf.org

Deuel Ross *(pro hac forthcoming)*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
dross@naacpldf.org

Jessica L. Ellsworth *(pro hac forthcoming)*
Dana A. Raphael *(pro hac forthcoming)*
HOGAN LOVELLS US LLP
555 Thirteenth St. NW
Washington, DC 20005
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
jessica.ellsworth@hoganlovells.com
dana.raphael@hoganlovells.com


*Attorneys for amici curiae*


## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2022, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all counsel, who are registered users.

 /s/ *Fred L. Banks, Jr.*