UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOHN ROBERT SMITH, SHIRLEY HALL
and GENE WALKER                                                    PLAINTIFFS

VS.                                           Civil Action No. 3:01-cv-855-HTW-DCB

DELBERT HOSEMANN, Secretary of State of
Mississippi; JIM HOOD, Attorney General for the State of
Mississippi; HALEY BARBOUR,
Governor of the State of Mississippi; MISSISSIPPI
REPUBLICAN EXECUTIVE COMMITTEE; and
MISSISSIPPI DEMOCRATIC EXECUTIVE COMMITTEE              DEFENDANTS

and

BEATRICE BRANCH, RIMS BARBER,
L.C. DORSEY, DAVID RULE,
JAMES WOODWARD, JOSEPH P. HUDSON,
and ROBERT NORVEL                                                 INTERVENORS

**CONSOLIDATED WITH**

KELVIN BUCK, ET AL.                                               PLAINTIFFS

VS.                                           Civil Action No. 3:11-cv-717-HTW-LRA

HALEY BARBOUR, ET AL.                                             DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

The Mississippi Republican Executive Committee ("MREC") has moved pursuant to Rule 60(b)(5) for this court to vacate its final judgment, entered on December 30, 2011, in this congressional redistricting case. That judgment amended this court's February 26, 2002 redistricting final judgment. The December 30, 2011 final judgment ordered that

1

defendants implement the congressional redistricting plan adopted by this court in its December 19, 2011 order "for conducting congressional primary and general elections for the State of Mississippi in 2012" and for "all succeeding congressional primary and general elections for the State of Mississippi thereafter, until such time as the State of Mississippi produces a constitutional congressional redistricting plan that is precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965." To date, every congressional primary and general election in the State of Mississippi since December 30, 2011 has occurred under the court-drawn plan.

In 2020, the Decennial Census rendered the four districts in the court-drawn plan malapportioned. On January 24, 2022, Mississippi Governor Tate Reeves signed into law a new four-district congressional redistricting statute for the State of Mississippi, House Bill 384 ("H.B. 384"). The MREC now requests that this court vacate its 2011 final judgment because the 2011 court-drawn plan is now malapportioned and H.B. 384 satisfies this court's instruction for the State of Mississippi to produce a constitutional congressional redistricting plan.

## I

### A

The facts and procedural history of this case are set out in our previous orders and opinions. *See Smith v. Clark*, 189 F. Supp. 2d 503 (S.D. Miss. Jan. 15, 2002); *Smith v. Clark*, 189 F. Supp. 2d 529 (S.D. Miss. Feb. 19, 2002); *Smith v. Clark*, 189 F. Supp. 2d 548 (S.D. Miss. Feb. 26, 2002); *Smith v. Hosemann*, 852 F. Supp. 2d 757 (S.D. Miss. Dec. 30, 2011). To resolve the issues presently before us, we set forth further background facts.

On February 26, 2002, this court entered its first reapportionment judgment in this case. The February 26, 2002 final judgment, which drew the congressional districts, was based on, *inter alia*, "the failure of the timely preclearance under § 5 of the Voting Rights Act of the Hinds County Chancery Court's plan."[1] *Smith*, 189 F. Supp. 2d at 559, *aff'd sub. nom. Branch v. Smith*, 538 U.S. 254, 265 (2003) ("[W]e affirm the injunction on the basis of the District Court's principal stated ground that the state-court plan had not been

---

[1] The initial redistricting plan that was challenged in this case in 2001 was adopted by the Hinds County Chancery Court. *Smith*, 189 F. Supp. 2d at 506.

precleared."). As a result, this court enjoined defendants from "implementing the congressional redistricting plan adopted by the Chancery Court for the First Judicial District of Hinds County, Mississippi." *Smith*, 189 F. Supp. 2d at 559. The court further ordered that defendants "implement the congressional redistricting plan adopted by this court in its order of February 4, 2002, for conducting congressional primary and general elections for the State of Mississippi in 2002," and

> use the congressional redistricting plan adopted by this court in its order of February 4, 2002, in all succeeding congressional primary and general elections for the State of Mississippi thereafter, until the State of Mississippi produces a constitutional congressional redistricting plan that is precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965.

*Id.* After entry of this final judgment in 2002, every subsequent congressional primary and general election in the State of Mississippi until 2011 occurred under this four-district plan drawn by the court because the Mississippi Legislature failed to produce a precleared redistricting plan.

Then came the next Decennial Census of 2010. And once again, it became the duty of this court to draw the Mississippi congressional map. Consequently, on December 30, 2011, we entered our second final judgment amending our February 26, 2002 final judgment. The 2011 final judgment provided as follows:

> For the reasons stated in this Court's Order of December 19, 2011 and Memorandum Opinion of December 30, 2011, this court's Final Judgment of February 26, 2002, is hereby amended.
>
> It is ordered that the defendants implement the congressional redistricting plan adopted by this court in its order of December 19, 2011, and attached to this Final Judgment, for conducting congressional primary and general elections for the State of Mississippi in 2012.
>
> It is further ordered that the defendants shall use the said congressional redistricting plan in all succeeding congressional primary and general elections for the State of Mississippi thereafter, until such time as the State of Mississippi produces a constitutional congressional redistricting plan that is

> precleared in accordance with the procedures in Section 5 of
> the Voting Rights Act of 1965.

> This court shall retain jurisdiction to implement, enforce, and
> amend this judgment as shall be necessary and just.

*Smith v. Hosemann*, No. 3:01-cv-855-HTW-DCB, ECF No. 128 (S.D. Miss. Dec. 30, 2011).
After this court entered final judgment in 2011, every subsequent congressional primary
and general election in the State of Mississippi has occurred under the four-district plan
drawn by this court because Mississippi again failed to produce a precleared redistricting
plan.

The federal government has now completed the 2020 Decennial Census. Although
the results of the census do not change the State of Mississippi's number of congressional
representatives, there is no dispute among the parties that the four districts now stand
malapportioned because of population shifts among the districts.

## B

On January 24, 2022, for the first time since this court entered its 2002 final
judgment, a new four-district congressional redistricting statute for the State of
Mississippi, H.B. 384, was signed into law by the Governor of the State of Mississippi. The
same day that H.B. 384 was signed into law, the MREC moved pursuant to Rule 60(b)(5)
to vacate the 2011 final judgment.[2] The MREC's motion to vacate was joined by Governor

---

[2] Previously on November 8, 2021, Hester Jackson McCrary, Kelly Jacobs and Mississippi Early
Voting Initiative, a Mississippi non-profit ("Proposed Intervenors"), moved to intervene in this action. The
Proposed Intervenors seek intervention to request that this court modify its 2011 final judgment

> to clarify: 1) That the Final Judgment Order only addressed the conduct of
> congressional elections to meet the requirements of federal law; 2) That
> the Judgment did not change the five congressional Districts for any
> purpose beyond the conduct of federal elections; specifically, the Order
> did not abolish the five districts existing on February 26, 2002, or on
> December 30, 2011; 3) That the Judgment did not void any provision of
> Mississippi Constitution Section 273.

Proposed Intervenors explicitly state that they "do not seek to overturn any election results or to modify in
any way the Court's congressional redistricting plan that it ordered the defendants in its Final Judgment to
implement." Governor Tate Reeves, Attorney General Lynn Fitch, Secretary of State Michael Watson,
and the MREC opposed the motion to intervene. As set forth in a separate order, the motion to intervene
is denied as moot.

Tate Reeves,[3] Attorney General Lynn Fitch,[4] Secretary of State Michael Watson,[5] and plaintiffs John Robert Smith and Gene Walker (plaintiff Shirley Hall is now deceased). On February 1, 2022, plaintiffs Kelvin Buck, Thomas Plunkett, Jeanette Self, Christopher Taylor, James Crowell, Clarence Magee, and Hollis Watkins, on behalf of themselves and all others similarly situated ("the Buck Plaintiffs"), filed their opposition to the MREC's motion to vacate.

On February 2, 2022, and again on April 8, 2022, this court conducted a status conference with the parties. At the status conferences, the parties presented their respective positions regarding MREC's motion to vacate the 2011 injunction and other procedural and jurisdictional issues. The court directed the parties to file supplemental briefing addressing the motion to vacate our 2011 injunction.

C

On February 14, 2022, the MREC filed a supplemental brief in support of its motion to vacate. Governor Reeves, Attorney General Fitch, Secretary of State Watson, and plaintiffs Smith and Walker all joined the MREC's supplemental brief in support of the motion to vacate. On February 24, 2022, the Buck Plaintiffs filed a supplemental brief in opposition to the motion to vacate. The Buck Plaintiffs' opposition was joined by defendant Mississippi Democratic Executive Committee ("MDEC"). On February 28, 2022, the MREC filed a reply in support of their motion to vacate. Additionally, the NAACP Legal Defense and Educational Fund, Inc., the Mississippi State Conference of the NAACP, One Voice, and Black Voters Matter Capacity Building Institute, as *amici curiae*, filed a brief in opposition to the MREC's motion to vacate.[6]

---

[3] Pursuant to Rule 25(d), Governor Tate Reeves is substituted for former Governor Haley Barbour. *See* Fed. R. Civ. P. 25(d).

[4] Pursuant to Rule 25(d), Attorney General Lynn Fitch is substituted for former Attorney General Jim Hood. *See* Fed. R. Civ. P. 25(d).

[5] Pursuant to Rule 25(d), Secretary of State Michael Watson is substituted for former Secretary of State Delbert Hosemann. *See* Fed. R. Civ. P. 25(d).

[6] Governor Reeves and Attorney General Fitch, joined by the MREC and Secretary Watson, oppose the motion for leave for file a brief as *amici curiae*. The *amici* filed a reply in support of their motion on March 1, 2022. The filing of amicus briefs is governed by Federal Rule of Appellate Procedure 29. Fed. R. App. P. 29. As the Fifth Circuit has recently explained, courts would be "well advised to grant motions for leave to file amicus briefs unless it is obvious that the proposed briefs do not meet Rule 29's criteria as broadly interpreted." *Lefebure v. D'Aquilla*, 15 F.4th 670, 676 (5th Cir. 2021). We conclude that the *amici's* brief in

As a result of the status conferences and subsequent briefing, the positions of the parties have been defined. In its filings, the MREC argues that "this Court should vacate the current final judgment, declare that the new statutory plan satisfies all state and federal statutes and constitutional requirements, and permit it to go into effect," because (1) "the State has satisfied the conditions set out in the final judgment" by adopting a constitutional congressional redistricting plan that satisfies all federal constitutional and statutory requirements and (2) "the 2020 census demonstrates that the districts specified in the final judgement have become malapportioned over time." The MREC also states that the court has jurisdiction to resolve all the issues before it that relate to its motion to vacate the 2011 final judgment.

The Buck Plaintiffs argue in their briefs that this court should deny the motion to vacate and instead amend the 2011 final judgment by:

> (1) enjoining congressional elections under the 2011 malapportioned plan; and, either (2) implement the Mississippi State Conference of the National Association for the Advancement of Colored People's ("NAACP's") congressional redistricting plan as an interim plan until the state complies with the Court's 2011 injunction; or (3) make the least changes to the 2011 plan in order to have a properly apportioned constitutional plan that also complies with the Voting Rights Act of 1965.

Specifically, the Buck Plaintiffs argue that H.B. 384 has not been precleared, and is also an impermissible racial gerrymander in violation of Section 2 of the Voting Rights Act of 1965 ("VRA"), so the defendants have not satisfied this court's 2011 final judgment. Additionally, the Buck Plaintiffs assert that there "has not been a significant change in the law concerning the legality of Section 5 of the VRA since the 2011 injunction was issued," which would justify vacating the 2011 final judgment. The Buck Plaintiffs, however, agree with the MREC that the congressional districts set forth in the 2011 Final Judgment are now malapportioned and that this court has jurisdiction to consider the issues raised by the MREC's motion to vacate.

---

this case complies with Rule 29 and would assist the court in resolving the issues before it. *See id.* at 673 ("Courts enjoy broad discretion to grant or deny leave to amici under Rule 29."). Accordingly, the motion for leave to file a brief as *amici curiae* is granted.

The NAACP Legal Defense and Educational Fund, Inc., the Mississippi State Conference of the NAACP, One Voice, and Black Voters Matter Capacity Building Institute argue in their *amicus* brief that H.B. 384 is "likely a racial gerrymander." The *amici* contend that H.B. 384 violates the Equal Protection Clause of the Fourteenth Amendment because the Mississippi Legislature subordinated traditional redistricting principles to pack District 2 with an unnecessarily high percentage of Black voting age population ("BVAP"), which deprives the remaining congressional districts of Black population, which in turn diminishes the influence of Black voters in other districts. The NAACP *amici* argue that the Legislature, when drafting its plan, began with a specific BVAP target in mind for District 2 and proceeded to hit that target; in doing so, however, the Legislature failed to conduct an analysis to determine whether its BVAP target was necessary to provide Black voters in District 2 with an opportunity to elect candidates of their choice. According to the argument, the Mississippi Legislature failed to support its racial BVAP target with an analysis to show that its consideration of race in District 2 was narrowly tailored. The *amici* request that the court permit discovery, order an evidentiary hearing, and toll the candidate filing deadline.[7]

## II

As previously discussed, the MREC, joined by Governor Reeves, Secretary Watson, Attorney General Fitch, and plaintiffs Smith and Walker have moved under Rule 60(b)(5) to vacate the final judgment entered on December 30, 2011, which, *inter alia*, implemented the current four-district plan. The Buck Plaintiffs and the MDEC oppose the motion to vacate. So, we now turn to consider the MREC motion under Rule 60(b)(5).[8]

---

[7] The candidate filing deadline was March 1, 2022. No party filed a motion to extend the deadline.

[8] We find it unnecessary, however, to address the MREC's argument that H.B. 384 satisfies this court's 2011 final judgment because we conclude, within the meaning of Rule 60(b)(5), that it is inequitable to apply the 2011 final judgment prospectively. *See Horne v. Flores*, 557 U.S. 433, 454 (2009) ("Use of the disjunctive 'or' [in Rule 60(b)(5)] makes it clear that each of the provision's three grounds for relief is independently sufficient and therefore that relief may be warranted even if petitioners have not 'satisfied' the original order."). We have pretermitted the merits of the new map because it is unnecessary to even address this issue and there is some discretionary question whether this panel should exercise its jurisdiction to draft a new map when we can resolve the Rule 60(b)(5) question without deciding the merits of Mississippi's new plan. To be sure, it is usually the better part of discretion not to decide a question when it is unnecessary to do so. *See generally Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 375 (2010) (Roberts, C.J., concurring) ("[I]f it is not necessary to decide more, it is necessary not to decide more."); *PDK Lab'ys Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[T]he

Federal Rule of Civil Procedure 60(b)(5) permits a court to relieve a party from a final judgment or order if, among other things, "applying [the judgment or order] prospectively is no longer equitable." FED. R. CIV. P. 60(b)(5); *Horne v. Flores*, 557 U.S. 433, 447 (2009). The Rule "provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)); *United States v. Texas*, 601 F.3d 354, 373 (5th Cir. 2010) (discussing the requirement of a "significant change in factual conditions or the law" for Rule 60(b)(5) relief); *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 903 (8th Cir. 2005) ("When prospective relief is at issue, a change in decisional law provides sufficient justification for Rule 60(b)(5) relief.").

Rule 60(b)(5) serves a particularly important function in institutional reform litigation because "injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Horne*, 557 U.S. at 447-48. In the context of institutional reform litigation, the Supreme Court has instructed that lower courts "must take a 'flexible approach' to Rule 60(b)(5)" and seek "to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Id.* at 450 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004)).

To obtain relief under Rule 60(b)(5) when applying the final judgment prospectively is no longer equitable, "[t]he party seeking relief bears the burden of establishing that changed circumstances warrant relief." *Horne*, 557 U.S. at 447; *Texas*, 601 F.3d at 373 ("The party seeking to modify an injunction bears the burden."). Thus, as the party seeking relief, the MREC must show that changed circumstances warrant relief from the 2011 final judgment. Before we turn to whether the MREC has shown that change

---

cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more."). That principle seems particularly applicable here when the relief that the plaintiffs seek is readily available to them in a separate action brought under § 2 of the Voting Rights Act.

circumstances warrant relief, we must first determine the jurisdictional fit under Rule 60(b)(5), notwithstanding that all the parties agree that this court has jurisdiction over the issues presented by the MREC's motion to vacate. *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 467 (5th Cir. 2009) ("Although neither party raises the issue of subject matter jurisdiction, this court must consider jurisdiction *sua sponte*."); *Hosemann*, 852 F. Supp. 2d at 762 (considering the court's jurisdiction under Rule 60(b)(5) despite no party challenging the court's jurisdiction).

## III

As this court has previously stated, "Rule 60(b)(5) applies only to judgments that have prospective effect as contrasted with those that offer a present remedy for a past wrong." *Hosemann*, 852 F. Supp. 2d at 762 (quoting *Cook v. Birmingham News*, 618 F.2d 1149, 1152 (5th Cir. 1980)). As the Fifth Circuit explained, judgments operate "prospectively" within the meaning of Rule 60(b)(5) if they "involve the supervision of changing conduct or conditions." *Cook*, 618 F.2d at 1152; *see also Griffin v. Sec'y, Fla. Dep't of Corr.*, 787 F.3d 1086, 1091 (11th Cir. 2015) (adopting the definition of "prospective" used by the Fifth Circuit in *Cook*). Thus, we must question whether the 2011 final judgment has prospective application. It does.[9]

First, it *orders* defendants to perform a future act, *i.e.*, to use the court-drawn congressional redistricting map in all succeeding elections. *See Cook*, 618 F.2d at 1152; *Hosemann*, 852 F. Supp. 2d at 762. Thus, the 2011 final judgment is executory by its terms.

Second, the 2011 final judgment requires this court to supervise changing conditions between the parties. The conditions underlying the final judgment, that is, the populations and the racial makeup of the districts, are not nearly so permanent as to be substantially impervious to change. It is a geographical fact that populations of this state shift over time, and as a result, the court has been required to supervise the final judgment on the basis of such changed conditions. *See Hosemann*, 852 F. Supp. 2d at 763.

Third, the court's express retention of "jurisdiction to implement, enforce, and amend [the] order as shall be necessary and just" supports the conclusion of the

---

[9] This court previously concluded in its December 30, 2011 decision that the final judgment entered on February 26, 2002 had prospective application. *See Hosemann*, 852 F. Supp. 2d at 762. The 2011 final judgment mirrors the language of the 2002 final judgment.

prospective nature of the 2011 final judgment. This express retention demonstrates that the court intended to continue to supervise the parties' compliance with the order and any changed conditions that could make the defendants' compliance with the final judgment problematic. *See Cook*, 618 F.2d at 1153 ("One further indication that the decree should not be regarded as a continuing injunction is that the court . . . did not state that it reserved power to modify the decree or that it retained jurisdiction over the case. It would have been natural for the decree to have contained such a provision if it had been intended that the court supervise the parties' compliance." (citation omitted)); *Hosemann*, 852 F. Supp. 2d at 763 (same).

Accordingly, we have the jurisdictional and procedural authority to interpret our 2011 final judgment under the third clause of Rule 60(b)(5) because the 2011 final judgment has prospective application. *See* FED. R. CIV. P. 60(b)(5) (permitting relief from final judgment if "applying [the final judgment] prospectively is no longer equitable").

## IV

Because we have decided that the final judgment has prospective application, we now turn to the question of whether the MREC has shown that changed circumstances warrant relief from the court's 2011 final judgment under Rule 60(b)(5).

First, there is no dispute among the parties that the 2011 congressional map drawn by this court is now unconstitutional; that is, its districts are malapportioned because the population has shifted over the past ten years. Indeed, the 2020 Decennial Census shows that all four districts from the 2011 court-drawn congressional map are now malapportioned. Thus, continuing to use the 2011 court-drawn congressional map would violate the constitutional right of Mississippians to the one-person, one-vote principle protected by the Equal Protection Clause. *See Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (requiring congressional districts to be drawn with equal populations); *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) (discussing the development of the one-person, one-vote principle). Changed factual conditions therefore warrant relief under Rule 60(b)(5) since Mississippians would be denied an established constitutional right affecting their vote.

Second, the Supreme Court's *Shelby County* decision represents a significant change in the law that also warrants relief from the terms of the injunction. Prior to *Shelby County*, the State of Mississippi had been subject to preclearance under § 5 of the VRA from 1965

until 2013. *Thompson v. Att'y Gen. of Miss.*, 129 F. Supp. 3d 430, 435 (S.D. Miss. 2015) (three-judge panel). A review of the history of the cases illustrates how Mississippi's compliance with § 5 preclearance was a firmly rooted principle of law. *E.g.*, *Allen v. State Bd. of Elections*, 393 U.S. 544, 548 n.3 (1969) ("Both States involved in these cases [Mississippi and Virginia] have been determined to be covered by the Act."); *Connor v. Waller*, 421 U.S. 656, 656 (1975) (per curiam) (applying § 5 of the Voting Rights Act to new Mississippi statutes); *Hathorn v. Lovorn*, 457 U.S. 255, 265 (1982) ("Respondents do not dispute that the change in election procedures ordered by the Mississippi courts is subject to preclearance under § 5 [of the Voting Rights Act.]"); *Young v. Fordice*, 520 U.S. 273, 275 (1997) ("The question before us is whether § 5 of the Voting Rights Act . . . requires preclearance of certain changes that Mississippi made in its voter registration procedures . . . ."). Indeed, in this case, this court's original 2002 final judgment was based on "the failure of the timely preclearance under § 5 of the Voting Rights Act of the Hinds County Chancery Court's plan." *Smith*, 189 F. Supp. 2d at 559. Furthermore, the Supreme Court affirmed this basis for the 2002 final judgment. *Branch*, 538 U.S. at 265 ("[W]e affirm the injunction on the basis of the District Court's principal stated ground that the state-court plan had not been precleared."). In 2011, we amended our 2002 final judgment because the districts were malapportioned in the light of the 2010 Decennial Census and because the State of Mississippi failed to produce a congressional redistricting plan that had been precleared under § 5. *See Hosemann*, 852 F. Supp. 2d at 760-61.

Two years after this Court's 2011 final judgment, the Supreme Court issued *Shelby County*, which declared that the coverage formula set forth in § 4(b) of the VRA was unconstitutional. *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). As a result, Mississippi is no longer covered by § 5's preclearance requirement because there is no longer a coverage formula under § 4(b) of the VRA. *See id.* at 556-57; *see also Thompson*, 129 F. Supp. 3d at 435 ("The result of *Shelby County* is that § 5 cannot be enforced at all, and especially not by an injunction. In essence, Mississippi and the other covered jurisdictions were granted a reprieve. They no longer have to seek preclearance for voting changes."). The *Shelby County* decision is plainly a significant change in the law that nullified the requirements of our 2011 final judgment. *See Thompson*, 129 F. Supp. 3d at 435; *Voketz v. Decatur, Ala.*, 904 F.3d 902, 908 (11th Cir. 2018) ("Section 5's preclearance requirements no longer apply because, without § 4(b)'s coverage formula, there are no covered jurisdictions for § 5 to apply to."); *Shelby Cnty.*, 570 U.S. at 587 (Ginsburg, J., dissenting)

("The Court stops any application of § 5 by holding that § 4(b)'s coverage formula is unconstitutional."). This conclusion is further supported by the Supreme Court's instruction for lower courts to take a "flexible approach to Rule 60(b)(5)" and seek "to ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Horne*, 557 U.S. at 450 (quotation marks omitted).[10]

In sum, as noted above, there have been significant changes in both the factual conditions and the law since this court entered the final judgment at issue, and thus movants have borne their burden to show a significant change in circumstances that warrants relief under Rule 60(b)(5). Accordingly, we hold that it is inequitable under Rule 60(b)(5) for our 2011 final judgment to continue to be applied prospectively and to require the State of Mississippi to continue using the 2011 congressional map drawn by this court.[11]

---

[10] Nevertheless, the Buck Plaintiffs argue that "[t]here has not been a significant change in the law concerning the legality of Section 5 of the VRA since the 2011 injunction was issued" because *Shelby County* did not declare § 5 unconstitutional. The Buck Plaintiffs are correct that the Supreme Court did not hold that § 5 of the VRA was unconstitutional. *Shelby Cnty.*, 570 U.S. at 557 ("We issue no holding on § 5 itself, only on the coverage formula."). But, even though § 5 itself has survived, its applicability has not. Following *Shelby County*, no jurisdiction formerly covered by § 4(b), including Mississippi, is currently subject to the requirements of preclearance under § 5 of the VRA. *See Thompson*, 129 F. Supp. 3d at 435; *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 229 (4th Cir. 2014) (finding that "North Carolina began pursuing sweeping voting reform" on June 26, 2013, the day after *Shelby County* was handed down); *Davis v. Abbott*, 781 F.3d 207, 212 (5th Cir. 2015) ("The day after *Shelby County* came down, on June 26, 2013, then-Governor Rick Perry signed the bill repealing the 2011 plan, adopting the new Senate plan . . . , and making the plan immediately effective."). As we have earlier noted, the reason this court originally enjoined the defendants in 2002 was because the State of Mississippi was a covered jurisdiction under § 4(b) and the Hinds County Chancery Court's plan was not precleared under § 5 of the VRA. *Smith*, 189 F. Supp. 2d at 559. Now that the State of Mississippi is no longer a covered jurisdiction under § 4(b) and is therefore no longer subject to § 5 preclearance, the basis for this court's injunction no longer exists.

[11] We note, parenthetically, that H.B. 384 safely preserves the majority-minority balance in District 2 and therefore ensures that the minority citizens will have an opportunity to elect the candidate of their choice in that district. Moreover, H.B. 384 achieves substantial population equality and is thus not malapportioned. Finally, the Buck Plaintiffs have preserved their right to seek the relief they request since they may proceed in another case challenging the constitutionality of H.B. 384, or H.B. 384's compliance with § 2 of the Voting Rights Act. The analysis and requirements of such a § 2 claim seem to be in flux as evidenced by several recent Supreme Court decisions. *See, e.g., Merrill v. Milligan*, 595 U.S. —, 142 S. Ct. 879 (2022) (Kavanaugh, J. concurring); *Wisc. Legislature v. Wisc. Elections Comm'n*, 595 U.S. —, 142 S. Ct. 1245 (2022) (per curiam).

# V

We sum up: the defendants under the 2011 final judgment have asked us to vacate that injunction. The statute that controls whether the defendants are entitled to such relief is Federal Rule of Civil Procedure 60(b)(5), which provides that a court may relieve a party from a final judgment if "applying it prospectively is no longer equitable." We have held that the 2011 final judgment is inequitable in two respects: First, malapportionment denies the constitutional rights of Mississippians; and second, the law upon which the injunction is based is no longer applicable. Additionally, we have considered, but not decided, the Buck Plaintiffs' allegations that H.B. 384 violates § 2 of the VRA and the Equal Protection Clause because it is unnecessary to our decision to vacate the 2011 final judgment under Rule 60(b)(5). Our decision does not impair their right to file a complaint in a new suit raising identical issues seeking the same relief.  At the same time, our decision imposes no legal bar to prevent the congressional elections from proceeding in accordance with the map adopted by the State of Mississippi.  Furthermore, no party has moved the court to stay the election.  And, indeed, *Purcell* suggests that the processes of these congressional elections are too far advanced for the federal courts to interfere.[12] We thus vacate the 2011 final judgment without prejudice to the Buck Plaintiffs' rights to seek the same relief under the procedures of the Voting Rights Act. 52 U.S.C. § 10301, *et seq*. Finally, we hold that there is no barrier under the 2011 final judgment to the implementation of Mississippi's redistricting plan, H.B. 384.

---

[12] The policy considerations that underlie the *Purcell* doctrine—avoiding disruption, confusion, and unanticipated and unfair consequences—counsel against any late judicial tinkering with state election laws. *See Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006) (per curiam); *Merrill*, 142 S. Ct. 879, 881-82 (Kavanaugh, J. concurring).

Accordingly, The Mississippi Republican Executive Committee's Motion to Vacate Injunction and for Other Relief is GRANTED IN PART AND DENIED IN PART, that is, the court's 2011 Final Judgment dated December 30, 2011 is VACATED IN ITS ENTIRETY, but we decline to address the legality or constitutionality of H.B. 384 in this motion seeking relief from an injunction under Federal Rule of Civil Procedure 60(b)(5).

**SO ORDERED**, this 23rd day of May, 2022.

E. GRADY JOLLY
UNITED STATES CIRCUIT JUDGE

DAVID C. BRAMLETTE
UNITED STATES DISTRICT JUDGE

DAVID C. BRAMLETTE, *District Judge*, specially concurring:

Given the undeniable and significant changes in facts and law that have occurred since the court issued its final judgment and injunction in 2011, I concur with today's majority opinion and agree that it is time to vacate our prior judgment and injunction. That is not to say that certain issues raised in our colleague's thoughtful and thorough dissent do not merit further consideration and reflection. The dissent identifies the core question before our panel as whether the Mississippi legislature proceeded arbitrarily when it focused on a Black voting age population that mirrored this panel's 2011 plan. Our dissenting colleague encourages us to determine immediately whether the Mississippi legislature violated the Voting Rights Act by assigning "a preordained racial target for [Congressional District] 2" and by failing to conduct a proper analysis of voting patterns and other criteria as identified in recent Supreme Court cases.

I wholeheartedly agree that the people of Mississippi deserve a redistricting plan that is constitutionally valid, and I also agree that our three-judge panel has the authority to critique House Bill 384 ("H.B. 384") and make adjustments that are constitutionally required, if there should be any. However, in keeping with the Supreme Court's well-established principle of deference to the legislature in redistricting matters, it is this judge's view that our panel should exercise deference at this time and permit the legislature to revisit H.B. 384's redistricting plan in the 2023 legislative session. *See, e.g.*, *Perry v. Perez*, 565 U.S. 388, 392-96 (2012) (Supreme Court vacated district court's interim maps finding that the district court failed to afford sufficient deference to the legislature and noted that "[r]edistricting is 'primarily the duty and responsibility of the State.'") (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)); *accord Abbott v. Perez*, 138 S. Ct. 2305, 2315–16 (2018).

All panel members agree that "the lateness of the hour" dictates that the elections scheduled for 2022 should proceed according to the map adopted by H.B. 384. *See Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006). Because of the timing of this case, the legislature will have ample opportunity, if it so chooses, to take a second look at its redistricting plan in the light of emerging Supreme Court guidance, which was not available when the legislature drew the congressional districts in H.B. 384. It is this judge's view, therefore, that the citizens of Mississippi will be better served by giving their elected representatives the chance to revisit these issues in the upcoming 2023 legislative session.

Henry T. Wingate, *District Judge*, dissenting:

The majority has concluded that this court's 2011 Final Judgment must be vacated in its entirety. Sadly, the majority also has declined to address the constitutionality or legality of the new four-district congressional redistricting statute, House Bill 384 ("H.B. 384"). Should we adopt the majority view, however, we would be shirking our judicial duties.

Currently, this three-judge panel has the jurisdictional authority to decide the merits of Mississippi's new statute under Section 2 of the Voting Rights Act ("VRA").[1] Moreover, we have the concurrence of all the parties. Representatives from the Mississippi Republican Executive Committee ("MREC"), Mississippi Secretary of State, Mississippi Attorney General, Mississippi Governor, the original Plaintiffs, the Buck Plaintiffs, and the *amici curiae*[2] have all asked this panel to determine whether the State of Mississippi has produced a congressional redistricting plan that satisfies all state and federal constitutional requirements, that is, whether H.B. 384 fulfills the mandated conditions of this court's 2011 Final Judgment. That Final Judgment ordered that defendants implement the congressional redistricting plan adopted by this court in its December 19, 2011 order "for conducting primary and general elections for . . . all succeeding congressional primary and general elections for the State of Mississippi thereafter, until such time as the State of Mississippi produces a constitutional congressional redistricting plan that is precleared in accordance with the procedures of Section 5 of the Voting Rights Act of 1965."[3] Since December 30, 2011, every congressional primary and general election in Mississippi has occurred under the court's plan.

---

[1] Section 2 of the Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

[2] The NAACP Legal Defense and Educational, Inc.; the Mississippi State Conference of the NAACP; One Voice; and Black Voters Matter Capacity Building Institute.

[3] Under Section 5 of the VRA, any change with respect to voting in a covered jurisdiction—or any political subunit within it—cannot legally be enforced unless and until the jurisdiction first obtains the requisite determination by the United States District Court for the District of Columbia or makes a submission to the Attorney General. 42 U.S.C. § 1973(c)(a). Such approval is known as "preclearance." Section 4(b) of the VRA provides the "coverage formula" defining the covered jurisdictions, States or political subdivisions, subject to such preclearance.

In 2013, the United States Supreme Court held that it is unconstitutional to use the coverage formula in Section 4(b) of the VRA to determine which jurisdictions are subject to the preclearance requirement of Section 5. *Shelby Cnty. v. Holder*, 570 U.S. 529, 529 (2013). Even though Section 5 itself is still constitutional following the *Shelby County* ruling, no jurisdiction formerly covered by Section 4(b), including Mississippi, is currently subject to the requirements of preclearance under Section 5.

The 2020 Census data showed population shifts, which have called for redrawing of Mississippi's current congressional districts. Although the results of the Census do not change Mississippi's number of congressional representatives, all parties agree that the State's four congressional districts now stand malapportioned because of these population shifts among the districts.

On January 24, 2022, Mississippi Governor Tate Reeves signed into law a new four-district congressional redistricting statute for the State of Mississippi, H.B. 384. The MREC contends that H.B. 384 satisfies this court's previous instruction for the State of Mississippi to produce a constitutional congressional redistricting plan. In drawing the new map, however, the Mississippi legislature packed thousands of Black Mississippians into District 2 ("CD 2"), already a majority Black district which historically had elected a Black-preferred candidate by generous margins.[4] Relevant to this point, the Mississippi Vice-Chair of the Redistricting Committee defended the packed CD 2 on the Senate floor, admitting the Legislature's predominant racial motive. He explained, more specifically, that the State could have made CD 2 more compact,[5] but the "numbers just didn't work"—because it would have "decrease[d] [the district's Black Voting Age Population]" below the State's racial target of at least 61.36%.[6] Apparently, the Mississippi Legislature reached this figure of 61.36% because the Redistricting Committee sought to keep the number "as close as it was" to the Black Voting Age Population ("BVAP") assigned to CD 2 in this court's 2011 Plan.

---

[4] In the last decade, Congressman Bennie Thompson won each election in CD 2 by at least two-thirds of the vote.

[5] Compactness refers to the principle that the constituents residing within an electoral district should live as near to one another as possible.

[6] Mississippi Legislature, MS Senate Floor - 12 JAN 2022, 10 AM, YouTube (Jan. 12, 2022), https://www.youtube.com/watch?app=desktop&v=FdtZfyWf5bo&feature=youtu.be (at 38:00).

Under the State's newly-drawn map, the percentage of BVAP in CD 2 is 62.15%, about 0.79% more than the Legislature's stated target. The Buck Plaintiffs argue that this percentage is unnecessarily high and diminishes Black voting strength elsewhere in the State, thus making H.B. 384 an unconstitutional plan.

The Mississippi Legislature's Plan added four counties to CD 2, as follows:

| County | Black Voting Age Population (BVAP) |
|--------|-------------------------------------|
| Adams | 55.36% |
| Franklin | 33.19% |
| Wilkinson | 66.86% |
| Amite | 37.77% |

As illustrated above, the majority of the voting age population added to CD 2 was Black—with a 50.35% total BVAP. Three of the four newly-added counties have a BVAP equal to, or higher than, Mississippi's state-wide BVAP of approximately 37%. One of those counties—Wilkinson—features one of the highest Black voting populations of any county not already included in CD 2.

None of the parties disputes that the Voting Rights Act requires a majority-Black district in Mississippi. The question before this panel, then, is not whether a majority-Black district is required; rather, the question is whether the VRA required Mississippi to draw such a district with a BVAP of 62.15% with the Legislature having aimed for a BVAP of at least 61.36%.

The Equal Protection Clause[7] of the United States Constitution forbids the predominant use of race in the redistricting process, unless that use is narrowly-tailored to

---

[7] The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Its central mandate is racial neutrality in governmental decision-making. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 11 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 191–192 (1964); *see also Brown v. Board of Education*, 347 U.S. 483 (1954).

achieve a compelling state interest. Examples of "compelling state interest" include compliance with Section 2 of the VRA, as well as remedying past racial discrimination.[8] Absent narrow-tailoring to satisfy a compelling interest, a state cannot arbitrarily set a racial target for a voting district and then subordinate race-neutral criteria to ensure that particular target is reached. *Cooper v. Harris*, 581 U.S.—, 137 S. Ct. 1455, 1463 (2017). Neither the State of Mississippi nor the Republican Party presents any evidence to suggest that, prior to the enactment of H.B. 384, the Mississippi Legislature had considered the VRA's requirements before assigning its stated racial target. Further, these parties failed to present any evidence that the Legislature conducted any analysis, whatsoever, of racial voting patterns, or other election data to determine the population level of Blacks needed to avoid voter dilution of Blacks in other districts. Mississippi's plan, therefore, may fail to pass constitutional muster.

This court should analyze whether Mississippi adopted a racially gerrymandered plan by assigning a preordained racial target for CD 2 and, possibly, ignoring other redistricting criteria to ensure that target was reached without narrowly-tailoring its use of race to achieve a compelling interest. These traditional redistricting principles include: (1) meeting one-person-one-vote requirements; (2) creating reasonably shaped, compact and contiguous districts; (3) respecting communities of interest; (4) preserving political subdivision boundaries; and (5) avoiding dilution of minority voting strength.

In a recent case, *Wisconsin Legislature v. Wisconsin Elections Commission*, 595 U.S.—, 142 S. Ct. 1245 (2022) (per curiam), the United States Supreme Court reiterated its holding from *Cooper v. Harris* that "if race is the predominant factor motivating the placement of voters in or out of a particular district, the State bears the burden of showing that the design of that district withstands strict scrutiny." *Id.* at 1248. To satisfy strict scrutiny, a State must "prove that its race-based sorting of voters" is narrowly-tailored to comply with the VRA. *Cooper*, 137 S. Ct. at 1464. If "a State invokes § 2 [of the VRA] to justify race-based districting, 'it must show (to meet the "narrow-tailoring" requirement) that it had "a strong basis in evidence" for concluding that the statute required its action.'" *Wisc. Legislature*, 142 S. Ct. at 1249. The Supreme Court then held that the Wisconsin Governor had failed to provide any evidence or analysis supporting his claim that the VRA required

---

[8] *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

seven majority Black districts created by the Wisconsin Legislature and, thus, the Governor's plan failed the strict scrutiny test under *Cooper*. *Id.* at 1249-50.

Importantly, the Supreme Court held that the Wisconsin Supreme Court had erred in applying *Cooper* because it had concluded that the VRA *might* support race-based districting, not that the VRA actually *required* it. Mississippi, accordingly, may only adopt a racially gerrymandered plan if, at the time of imposition, the State had judged it necessary under the VRA.

This panel has a duty to consider proposed possible alternatives for Mississippi, which may comply with the strictures of non-racial redistricting principles, while maintaining CD 2 as a majority-Black district that would satisfy the requirements of the VRA. The *amici* propose two such alternative plans, attached hereto as Exhibit A and Exhibit B.

In Plan 1, the BVAP of CD 2 is 54.32%. In Plan 2, the BVAP of CD 2 is 54.58%. Dr. Baodong Liu, the *amici's* expert, concluded that in the presence of racial bloc voting,[9] Black-preferred candidates in statewide elections would win by a substantial majority of the votes in CD 2 under both proposed plans. Further, say the *amici*, by "unpacking" CD 2, both proposed plans increase the BVAP in congressional district 3 ("CD 3"), allowing Black voters in that district to have greater impact, including influence, in upcoming elections. Under Mississippi's 2022 Plan, the BVAP of CD 3 is 33.57%. Plan 1 proposed by the *amici* assigns CD 3 a BVAP of 41.90% and Plan 2 shows the BVAP of CD 3 as 42.12%.

When drafting the State's Congressional Plan following the 2000 Census, this court considered the following criteria, in addition to the requirements of federal law: (1) compactness and contiguity; (2) respect for county and municipal boundaries; (3) preservation of historical and regional interests; (4) placement of the major research universities and military bases, respectively, in separate districts; (5) placement of at least one major growth area in each district, and avoidance of placement of several major growth areas in the same district, so as to minimize population deviation among the districts as Mississippi's population changes; (6) inclusion of as much as possible of southwest Mississippi from former District 4, and east central Mississippi from former District 3, in

---

[9] Racial bloc voting describes a cohesive electorate in which white voters favor and vote for white candidates and their propositions, and minority voters vote for their candidates and propositions.

the new District 3; (7) protection of incumbent residences; and (8) consideration of the distances of travel within each district. *Smith v. Clark*, 189 F. Supp. 2d 529, 541 (S.D. Miss. 2002) (three-judge court), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003).

The *amici* include a report from their analyst, Mr. William Cooper.[10] According to Mr. Cooper, both illustrative plans better adhere to this court's criteria than the State's plan. Using the Reock score,[11] supposedly one of the most common measures of compactness, CD 2, in both of *amici's* illustrative plans, scores higher than the State's plan on compactness.

The *amici's* illustrative plans also avoid extending CD 2 down the entire length of the State, instead expanding CD 2 to the east to include Madison County (a high-growth area) and part of Rankin County. Both *amici* plans split fewer counties, three in both Plan 1 and 2, contra four in the State's plan. The *amici's* plans also split fewer precincts-zero in Plan 1 and three in Plan 2- than the State's plan which splits five precincts. Both plans keep the City of Jackson, the State's Capitol, wholly within CD 2, contra the State's plan, which splits the State's Capitol into two separate congressional districts.

Importantly, the *amici* propose that by unpacking CD 2, both illustrative plans increase the BVAP in CD 3. The invalidation of a plan where race predominates "will require that many [B]lack voters formerly subjected to race-based inclusion in the invalidated districts will be assigned to surrounding non-challenged districts" resulting in an increase "in the BVAP of adjacent non-challenged districts." *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 879 (E.D. Va. 2019); *see also Covington v. North Carolina*, 283 F. Supp. 3d 410, 455-56 (M.D.N.C.) (three-judge court) (ordering a 13%-point decrease of the BVAP in a challenged district, which increased the BVAP in an

---

[10] William S. Cooper is a private consultant, currently serving as a redistricting and demographics expert for the *amici*. Mr. Cooper has a B.A. in Economics from Davidson College in Davidson, North Carolina. Since 1986, Mr. Cooper has allegedly "prepared proposed redistricting maps of approximately 750 jurisdictions for Section 2 litigation, Section 5 comment letters, and for use in other efforts to promote compliance with the Voting Rights Act of 1965." [Docket No. 169-1].

[11] "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." Maptitude For Redistricting software documentation (authored by the Caliper Corporation). [Docket No. 169-1, n.3].

adjacent district from 11% to 40%), *aff'd in relevant part* 138 S. Ct. 2548, 2554 (2018); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 565 (E.D. Va. 2016) (three-judge court) (ordering that the BVAP in a challenged district be lowered to 45% and increasing the BVAP in a neighboring district from 30% to 41%).

These alternative maps show that CD 2 can be drawn with a BVAP below the State's preordained target that provides Black voters with the ability to elect a candidate of their choice and also complies with traditional redistricting principles. Drawing such a district, if feasible, would have the effect of avoiding BVAP reduction in surrounding districts such that Black voters would have the ability to impact elections in districts outside of CD 2.

The conclusions reached by the majority simply lift this court's injunction mandating use of this court's four-district plan, and reserves the Section 2 question for another day, possibly with another panel, should the Buck plaintiffs choose to pursue their Section 2 claims.

The people of Mississippi, however, deserve a ruling—a swift ruling—that we, this three-judge panel, have the capacity to provide. We are fully cognizant of this litigation's long juridical history and are best-suited to make this determination. As stated *supra*, all parties agree that this three-judge panel should address the Section 2 issue and determine whether H.B. 384 passes constitutional muster.

On April 8, 2022, this court heard oral arguments from the parties, during which time the parties expressed their positions. The Mississippi Republican Party Executive Committee's attorney, Michael Wallace, stated as follows:

> Judge Wingate: Mr. Wallace . . . tell me whether you feel this court should go beyond just  looking at the injunctive life and address Section 2, as it might apply here, or the constitutionality of the House Bill 384 . . .
>
> Attorney Michael Wallace: The answer is that I think you can and I think you should, although I certainly understand the concerns expressed by Judge Jolly. . . . Here, it is necessary for some court to decide whether H.B. 384 is unconstitutional. The Buck plaintiffs have told you they're not going away. They've told you that if they have to file another lawsuit, they will. So that decision is going to have to be made. It is necessary, and the question in my mind is whether it is better for this court to make the decision than for some other court to make the decision. And the short version is, you know more about redistricting in Mississippi than anybody else. And the Legislature said it was trying to follow your guidance, and nobody is better

situated than this court to understand whether the [Legislature] did that, and whether that was a constitutionally permissible thing to do.

[Hearing Tr., Status Hearing, 4/8/22, 5:18-25, 6: 8-19].[12]

The undersigned agrees with Mr. Wallace's statements. By adopting the majority view, we would simply be punting this constitutional issue, that is, the crux of this whole lawsuit, to another, less experienced panel.

The majority approach unfortunately is reminiscent of Mississippi's sordid discriminatory past of allowing overpopulation of one district to the detriment of Black voters elsewhere in the State. The advocates of the instant approach deny any racial animus; however, such relegation of minority voters to a single district within the State takes away the State's Black population's voting power as a whole. This statement is supported by a review of the BVAP of CD 3 under H.B. 384 (33.37%) versus the BVAP proposed by the *amici's* alternative plans (41.90% in Plan 1 and 42.12% in Plan 2).

A "crossover district" is one in which "minority voters make up less than a majority of the voting-age population, but the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett v. Strickland*, 556 U.S. 1 (2009) (Per Justice Kennedy with the Chief Justice and one Justice joining and two Justices concurring in the judgment.). CD 3, in this writer's view, may constitute such a "crossover district." The four counties added to CD 2 under Mississippi's new redistricting plan were previously assigned to CD 3. The majority of the voting age population added to CD 2 was Black. One of the four newly-added counties, Wilkinson, had a BVAP of 66.86%. Another, Adams County, had a BVAP of 55.36%. These figures are significant enough to warrant an analysis of H.B. 384's possible unconstitutional ramifications. CD 2 has an established voting pattern of electing Black-preferred candidates by substantial margins; therefore, Mississippi is less likely to be justified in adding voters to CD 2 on the basis of race. Diluting the BVAP of CD 3; however, is far more likely to have a negative impact on District 3's Black population to elect their preferred candidate. This court has an obligation to veto any weakening of the opportunity of Mississippi's minority voters to elect a representative of their choice.

---

[12] *See also* Hearing Tr., 4/8/22, 8: 14-18; 27:22-25; 28:1; and 43:7-12.

Unaddressed, and seemingly ignored, by the majority opinion's theoretical construct which advances a "let's-wait-and-see" approach for some indefinite time-period is the very real practical effects of their approach. Mississippi has one Black Congressman, Bennie Thompson, who was elected back in 1993, following the vacation of that same office by Mike Espy, Mississippi's first Black Congressman since Reconstruction.[13] Espy was elected in 1986, beating incumbent Webb Franklin, a White Republican, who unwittingly had supported President Ronald Reagan's veto of a farm bill Blacks and Whites of the Mississippi Delta desperately needed.

Blacks voted overwhelmingly for Espy, but angered White farmers "voted with their rumps" and stayed home on election day in large part because of the demise of the farm bill. Although upset with Franklin, many White voters still could not stomach the idea of voting for Espy, a Black candidate. The margin provided by those "stay at home Whites" provided the vote difference which secured Espy's election. After that historic break through, Espy prevailed in three more two-year elections, when his support was truly bipartisan. When Congressman Espy gave up his congressional seat for an appointment to President William Jefferson Clinton's Cabinet (also a first for Mississippi), Bennie Thompson then won the House seat. By then, the BVAP in that District, Mississippi CD 2, was approximately 58%.

Although Blacks have cheered the successive elections of Mike Espy and Bennie Thompson to the United States House of Representatives from the same piece of Mississippi, the somber truth is that since 1881,[14] Mississippi has not elected even one African American state-wide office holder—not a United States Senator (2); Governor; Lieutenant Governor; Attorney General; Secretary of State; Treasurer; Auditor;

---

[13] The Reconstruction era was a period in American history following the American Civil War; it lasted from 1865 to 1877 and marked a time during which the United States grappled with the challenges of reintegrating into the Union the states that had seceded and determining the legal status of African Americans.

[14] Blanche Kelso Bruce was the second African American to serve in the United States Senate from 1875-1881. He was the first elected African American to serve a full term. Prior to Bruce's tenure, Hiram Rhodes Revels was elected by the Mississippi Legislature to the United States Senate to represent Mississippi in 1870 and 1871. Revels was the first African American to serve in either house of the U.S. Congress. Alexander K. Davis, elected in 1874, was Mississippi's first and only Black Lieutenant Governor. Davis was impeached in 1875 as part of Mississippi's plan to return the State government to White Democrats.

Agriculture Commissioner; nor Insurance Commissioner. The Census over the years has recognized Mississippi as having a state-wide Black percentage of about 38% to 39%, which nation-wide bestows bragging rights upon Mississippi for having the second highest population of African Americans (the District of Columbia boasts the highest population of Black Americans with 48%). Yet, Black would-be state-wide office holders have been unable to gain membership into this exclusive club. Any historian knows that for scandalous scores and scores of years, Black Mississippians were locked out of the election process.

Mississippi has made many improvements in race relations, but the majority's mindset here is reminiscent of yesterday's resistance to progress. The majority's opinion has a special message for Blacks in Mississippi: we feel your pain, but you will have to wait for a constitutional cure. Meanwhile, even if H.B. 384 is unconstitutional, because the bulk of you have been herded into the Second District, with no real chance to utilize your numbers in the Third District to elect a candidate of your choice—either by splitting the White vote or partnering with friendly White groups— you must nonetheless tolerate this flawed political design for the unforeseeable future.

For the foregoing reasons, I am in favor of modifying the current injunction to allow presently scheduled elections to go forward, in view of the lateness of the hour, while addressing immediately the prerequisites for reaching a decision on the Section 2 interrogatory.

I reach the above conclusion because H.B. 384 *may be* constitutionally flawed, while our injunction-preserved scheme is *certainly* constitutionally flawed. The citizens of Mississippi should not have to be faced with these unsavory consequences—forced to endure under either an unconstitutional enactment or a possibly unconstitutional enactment—when we can begin the analysis now and, if necessary, the curative process.

**EXHIBIT A**



Illustrative  Plan 1

Water Area

0        40        80

Miles

Mississippi  U.S. House

**EXHIBIT A-1**

## Illustrative Plan 1 – 2020 Census

| District | Population | Deviation | 18+ Pop | % 18+ AP Black | % 18+ NH White |
|----------|-----------|-----------|---------|----------------|----------------|
| 1 | 740319 | -1 | 569508 | 26.69% | 67.40% |
| 2 | 740320 | 0 | 569020 | 54.32% | 41.15% |
| 3 | 740322 | 2 | 571940 | 41.90% | 53.15% |
| 4 | 740318 | -2 | 567131 | 21.57% | 69.38% |

**EXHIBIT B**



**EXHIBIT B-1**

## Illustrative Plan 2 – 2020 Census

| District | Population | Deviation | 18+ Pop | % 18+ AP Black | % 18+ NH White |
|----------|-----------|-----------|---------|----------------|----------------|
| 1 | 740320 | 0 | 569508 | 26.22% | 67.85% |
| 2 | 740316 | -4 | 569020 | 54.58% | 40.67% |
| 3 | 740325 | 5 | 571940 | 42.12% | 53.18% |
| 4 | 740318 | -2 | 567131 | 21.57% | 69.38% |